UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____

MELISSA POTTER, JOHN DOE,
CINDY RODRIGUEZ, THEODORE OLIVEIRA,
JORDAN TOWNS, KRISTEN NORMANDIN,
KRYSTIE WOOD, SHEREE PINE,
MATTHEW STEVENS, REBECCA WOOLF, SHANDA          Docket No.:
JOHNSON, KELLEE SILVA, EUGENE VASQUEZ,

 and

RECLAIM RI,                                     **Jury Trial Demanded**

Plaintiffs,

v.

JEFFREY BUTLER,
CARISSA MARIE ZINGONI a/k/a CARISSA BUTLER
SPRING STREET REALTY, LLC
ELMWOOD REALTY NORTH, LLC,
and
ELMWOOD REALTY, LLC
a/k/a ELMWOOD PROPERTY
MANAGEMENT,

Defendants.
_____/

## **COMPLAINT**

NOW COME the Plaintiffs, Melissa Potter, John Doe, Cindy Rodriguez, Theodore Oliveira,

Jordan Towns, Kristen Normandin, Krystie Wood, Sheree Pine, Matthew Stevens, Rebecca

Woolf, Shanda Johnson, Kellee Silva, Eugene Vasquez (collectively, "tenant-Plaintiffs"), and

Reclaim RI (all, collectively, "Plaintiffs") and for their Complaint, make the following

allegations, and state the following causes of action, and demand trial by jury, all as set forth

below:

# I.    PRELIMINARY STATEMENT

1. Plaintiffs bring this action to redress and to end a fraudulent and illegal scheme to rent serially unfit and uninhabitable homes to unknowing renters. Because this is against the law, the Defendants extort, intimidate and evict any tenant who dares complain. This conduct is in violation of Federal wire and mail fraud statutes (18 U.S.C. §§ 1341 and 1343), Rhode Island's state extortion statute (R.I. G.L. § 11-42-2), the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961 *et seq.*), and other applicable law.

2. Defendant Jeffrey Butler (sometimes, "Mr. Butler"), and his wife Carissa Butler, through their various companies–all collectively acting as an association-in-fact–have bought and sold hundreds of residential rental housing units across various properties around Rhode Island. They do not properly maintain these units, illegally forcing their tenants and their children to live in conditions that include exposure to raw sewage, lack of heat in winter, unabated rodent infestations, contaminated pipes, unabated water leaks, mold, broken windows, and more.

3. Because of these conditions, tenants and their children have gotten sick and injured, missed work and school and performed worse at both, endured emotional distress with physical symptoms, and suffered numerous other predictable and detrimental effects.

4. When their tenants complain about these conditions, the Defendants retaliate instead of remediating. They send eviction notices and evict tenants who complain through courts and by self-help. Many of the tenants subject to this conduct are not in a financial position to retain a lawyer to fight an unlawful eviction, or to pay the costs of moving into new premises. More than one tenant has become homeless this way and others have been cowed into not asserting their rights.

5. Because of these conditions and practices, tenants desired to be represented by a tenants union. Reclaim RI, which organizes tenants unions among other work, began an organizing drive. In order to stifle the organizing drive, Jeffrey Butler emailed all of his tenants to unlawfully threaten to evict them if they became members. The Defendants have driven out known tenant organizers who work with Reclaim RI. And Mr. Butler has personally and through agents physically threatened organizers and tenants who work with them.

6. What Butler, his associates, and their companies are doing is criminal and actionable under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. Butler, his employees who threaten organizers and tenants, his companies, and his eviction counsel have formed an association-in-fact (sometimes, "the Enterprise") for the purpose of illegally making money from rental properties while avoiding the concomitant duty under applicable law to maintain them (sometimes, "the Scheme"). The Enterprise has committed and continues to commit as a matter of practice a number of RICO predicate acts in furtherance of the Scheme. In advertising rental units and entering into leases, the Enterprise makes promises to maintain these premises it never intended to uphold. This is mail and wire fraud. And the Enterprise's actions against those who oppose the Scheme commonly veers into criminal extortion, mail fraud, and wire fraud, including by way of example:

a. surreptitiously making and threatening to publish a sexually embarrassing video of a tenant who asked for repairs;

b. threatening to evict a tenant with a lease before the lease was up by pretending there was no lease, unless the tenant dropped a personal injury lawsuit arising from the bad conditions in his unit;

c. pretending that a tenant whose rent was fully subsidized under Section 8 owed over $11,000 in rent and threatening to have HUD revoke her subsidy after she complained of bad conditions; and,

d. fraudulently bringing retaliatory and otherwise unlawful eviction actions it knows it is not allowed to bring against troublesome tenants.

7. The tenant-Plaintiffs and Reclaim RI sue to vindicate all tenants and their children's rights to live in healthy and habitable homes, to request repairs as necessary, to choose whether or not to be represented by a tenants union without fear of retaliation, and to seek compensation for the unlawful circumstances they have already endured and sufficient punitive damages to deter any further instances of this egregious conduct.

## II.        PARTIES

8. Jeffrey Butler is a natural person who resides in Rhode Island and does business in Rhode Island. His business address is 2121 Elmwood Avenue, Warwick RI 02886.

9. Carissa Marie Zingoni a/k/a Carissa Butler is a natural person who resides in Rhode Island and does business in Rhode Island. She is an attorney-at-law with a license to practice in Rhode Island. Her business address is 1000 Chapel View Blvd., Suite 270, Cranston RI 02920.

10.    Elmwood Realty, LLC is a Domestic Limited Liability Corporation with a principal place of business at 2077 Elmwood Avenue, Warwick, RI 02888. Its registered agent for service of process is Stephen M. Litwin, Esq. of 116 Orange Street, Providence RI 02903. It owns and/or manages real property in Rhode Island.

11.    Elmwood Realty North, LLC is a Domestic Limited Liability Corporation with a principal place of business at 2077 Elmwood Avenue, Warwick, RI 02888. Its registered agent

for service of process is Stephen M. Litwin, Esq. of 116 Orange Street, Providence RI 02903. It owns and/or manages  real property in Rhode Island.

12. Spring Street Realty, LLC is a Domestic Limited Liability Corporation with a principal place of business at 2077 Elmwood Avenue, Warwick, RI 02888. Its registered agent for service of process is Stephen M. Litwin, Esq. of 116 Orange Street, Providence RI 02903. It owns and/or manages real property in Rhode Island.

13. Reclaim RI is a Domestic Nonprofit Corporation with an address at PO Box 40372, Providence RI 02940. It is organized to promote the common good and social welfare of Rhode Islanders through collective action. Reclaim RI is a "tenants' union or similar organization" within the meaning of R.I. G.L. § 34-18-46. It has members who are tenants in the Defendants' properties.

14. Melissa Potter is a natural person. She is a tenant of Elmwood Realty LLC and  lives at 1890 Broad Street in Cranston, RI.

15. "John Doe" is a pseudonym. A motion asking leave for him to proceed under a pseudonym will be filed concurrently with or soon after the filing of this complaint. John Doe is a natural person. He lived in a rental unit as a tenant of Elmwood Realty LLC  at 617 Providence Street.

16. Theodore Oliveira is a natural person. He is a tenant of Elmwood Realty LLC and he lives at 656 Providence Street in West Warwick.

17. Jordan Towns is a natural person. He was a tenant of Elmwood Realty North LLC who lived at 136 Harrison Street in Pawtucket.

18. Cindy Rodriguez is a natural person. She is a tenant of Elmwood Realty LLC who resides at 617 Providence Street in Warwick.

19.     Kristen Normandin is a natural person. She was a tenant of Elmwood Realty LLC who resided at 14 Kenyon Street in West Warwick. She now resides in Warwick, RI.

20.     Krystie Wood is a natural person. She was a tenant of Elmwood realty, LLC. She resides at 71 Roberts Street in West Warwick.

21.     Sheree Pine is a natural person. She is a former tenant of Elmwood Realty LLC who resides in Cranston.

22.     Matthew Stevens is a natural person. He was a tenant of Elmwood Realty LLC. He now resides in Coventry, RI.

23.     Rebecca Woolf is a natural person. She was a tenant of Elmwood Realty LLC. She now resides in Coventry, RI.

24.     Shanda Johnson is a natural person. She was a tenant of Defendant Elmwood Realty at 676 Providence Street in West Warwick. She is now a resident of Woonsocket, RI.

25.     Kellee Silva is a natural person. She was a tenant of Spring Street Realty at 1890 Broad Street. She currently resides in Warwick, RI.

26.     Eugene Vasquez is a natural person. He was a tenant of Spring Street Realty at 1890 Broad Street. He currently resides in Warwick, RI.

### III.     JURISDICTION AND VENUE

27.     The Plaintiffs sue under federal claims including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*  This Court has jurisdiction to hear the Federal claims pursuant to 28 U.S.C. § 1331.

28.     This Court has supplemental jurisdiction to hear claims arising under state law pursuant to 28 U.S.C. § 1367. The state claims are so related to the Federal claims that they form a part of the same case or controversy. All claims arise from the Defendants' practice of not

maintaining their residential rental properties and their unlawful tactics, acts, and omissions to stymie opposition to this practice, including but not limited to their efforts to quell Reclaim Rhode Island's organizing drive.

29.    Venue is proper because all of the subject rental housing units are located within this District.

## IV.    FACTUAL BASIS FOR CLAIMS

### a.  Facts Pertaining to Tenant-Plaintiffs

**Melissa Potter**

30.    Melissa Potter has lived at 1890 Broad Street in Cranston, RI since March 2022 as a tenant of Elmwood Realty.

31.    She has been a caregiver for persons with disabilities for over twenty years.

32.    Ms. Potter, a then co-tenant, and Elmwood Realty LLC executed a lease on February 25, 2022. The lease was prepared by the Defendants exclusively who wrote all terms. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. Moreover, the lease contained a procedure for making maintenance requests and the landlord responding at its paragraph "l". Ms. Potter reasonably expected that the landlord would maintain her unit so that it was fit and habitable under the lease. The lease materially omitted–and Ms. Potter did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for her to live in, and that the provision contemplating maintenance requests was a sham. This material omission constituted a scheme or artifice to defraud Ms. Potter into signing the lease, paying her rent, and moving in. Had Ms. Potter been advised that the landlord had no intention of maintaining fit and habitable premises, she would

not have moved in or paid the Defendants. The lease was uploaded to the internet via interstate wire communication and payments under the scheme to defraud were made by interstate wire.

33.    Ms. Potter has not had reliably functioning heat in her unit since December 2022.

34.    On a Friday night in December 2022, Ms. Potter had her six year old nephew staying with her. Ms. Potter's nephew was sick with COVID-19. At 3 a.m., Ms. Potter woke up shivering. She found out that the heat in her unit was non-functional. She called and emailed with emergency requests for the heat to be restored. No one responded. She had to bundle her sick nephew for warmth and bring him to her father's house. This frightened her because her father is immunocompromised, but her sick nephew needed to be in a warm location.

35.    The Defendants took no action to restore the heat until after Ms. Potter had an asthma attack while shivering, and called emergency services. Even then, the repair of the furnace was done in an unworkmanlike manner and the furnace continues to regularly break each winter.

36.    In December 2022 Ms. Potter received a notice taped to her door threatening not to renew her lease. Upon information and belief, the Defendants gave her this notice because she asked for the heat to be restored.

37.    Ms. Potter caught COVID-19 and has had other respiratory illnesses during the winters since she has lived in the unit. The lack of functioning heat has increased her susceptibility to these illnesses and made it more difficult for her to recover from them.

38.    Ms. Potter worked as a Direct Support Professional assisting disabled individuals in their homes for the Fogarty Center. In the winter of 2023-24 Ms. Potter was frequently sick with respiratory illnesses. These illnesses were worse than they otherwise would have been because of the lack of heat in Ms. Potter's home. Ms. Potter had to call out of work on numerous days that

winter due to being sick. Direct Support Professionals need to be reliable for their clients because these clients rely on them for so many important bodily and other functions. Due to Ms. Potter's frequent absences for work she came to be seen by her client and her client's family as unreliable. They fired her in early 2024.

39.    Two years ago the Defendants began a large-scale construction project outside Ms. Potter's residence. The work continues to this day. Upon information and belief, the work has taken so long because the Defendants do not use proper licensed contractors. They appear to use in-house maintenance men. On one occasion Mr. Butler emailed numerous tenants telling them that the Occupational Health and Safety Administration had shut down the job site due to a licensure issue. While the work goes on, dangerous and unsightly construction debris remain strewn around the front yard.

40.    For over six months, this was the view outside of her front door (Figure 1.)



Figure 1.

41.

42.    Figure 1 was taken by her in February of 2024, and is a fair and accurate representation of the view from her front door at that time.

43.    In February 2023, a pipe burst in her bedroom. Water leaked into the bedroom and made it impossible for her to sleep in her bed for over a week. Unaddressed water damage remains visible in the unit.

44.    The water damage and the Defendants' failure to remediate it has caused mold to infest the unit. This exacerbates Ms. Potter's asthma and has caused her to experience difficulty breathing while she is in the unit.

45.    Ms. Potter has lived with a rodent infestation since the beginning of 2024.

46.    Ms. Potter has complained to her landlord via phone and email for each issue described above.

47.    On April 5, 2024, Melissa Potter, Kellee Silva, and another tenant filed handwritten requests for temporary restraining orders ordering repairs in Kent County District Court. The action was assigned case number Case No. 3CA-2024-02831.

48.    On May 21, 2024 Ms. Potter spoke at the Cranston City Council against Mr. Butler's treatment of his tenants.

49.    Later that week, the Defendants purported to terminate her tenancy via notice purportedly sent May 28, 2024.

50.    In June, Mr. Butler published a video on his social media account saying that he was evicting tenants, including Ms. Potter, for "making [his] life a living hell" – by complaining about the conditions of their units to the Cranston City Council and the Kent County District court.

51.    In early July, the Defendants brought an eviction action against Ms. Potter in Rhode Island's Kent County District Court. The action was titled *Spring Street Realty v. Melissa Potter*, 3CA-2024-05801. This action was retaliatory. Ms. Potter, who is not wealthy, missed days of work and needed income to attend court for this retaliatory eviction.

52.    Ms. Potter was able to obtain free representation from Rhode Island Legal Services (RILS) to defend herself in Kent Country District Court, and prevailed in the action. However, Mr. Butler promptly announced that he planned to bring another suit. Ms. Potter received a subsequent notice to quit that expired October 1, 2024. The subsequent notice to quit was retaliatory.

53.     The Defendants brought a new eviction action against Ms. Potter with docket no. 3CA-2024-08347. This action was retaliatory. It is currently pending in the Rhode Island District Court.

54.     Ms. Potter has been looking for a new apartment to move into. She has been denied seven apartments that she is otherwise qualified for. Upon information and belief, this is because of the records of the two eviction actions against her, which are publicly available online. Upon information and belief, landlords frequently use the Rhode Island court eviction records as a tenant screening device and refuse to rent to a tenant who has had a dispute with a landlord, regardless of the merits of the tenant's cause.

55.     On October 7, 2024, Ms. Potter's living room heater burst  and her unit was flooded with water for several hours, damaging much of her personal property. The Defendants did not fix the heater. It was left broken.

56.     On October 15, 2024 Ms. Potter's bedroom heater burst and flooded the apartment for several hours. The Defendants refused to send anyone to remediate the situation, arguing that they were not responsible for maintenance because they were attempting to terminate Ms. Potter's tenancy. Eventually local police and firefighters came onsite. This finally precipitated the Defendants to turn off the system and stop the flooding. Ms. Potter missed work that day.

57.     Both floods required Ms. Potter to quickly move her belongings around her home to save them from the waters. Ms. Potter has had back surgery. This exertion triggered painful back spasms in Ms. Potter.

58.     Instead of remediating the heating system, the Defendants switched Ms. Potter to an individual electrical system. The new heating system has smaller vents and is less powerful. Ms. Potter's lease requires her to pay for electricity and Elmwood Realty LLC to pay for heat. The

new system effectively shifts the responsibility to pay for heat to Ms. Potter. Her electric bill during the winter jumped from approximately $80/monthly to over $400/monthly during the winter. Ms. Potter cannot afford to pay the higher electric bill and is at risk of having her electricity shut off and of liability to the electric company.

59.    In or about February 2025 the Defendants replaced the windows of at least two tenants who had criticized Reclaim RI's organizing drive. They did not replace Ms. Potter's windows despite those windows being visibly not weatherproof. Ms. Potter heard the workers who were doing the window replacement discuss how Ms. Potter had "beef" with the landlord and would not be receiving any repairs.

60.    In February 2025 Ms. Potter was without heat for a week because the electrical system malfunctioned. Ms. Potter informed the Defendants, who did not promptly remediate. The Defendants instructed Ms. Potter not to use space heaters in her unit. The cold in Ms. Potter's unit triggered painful back spasms.

61.    In March 2025 Ms. Potter learned that the Defendants had purported to raise her rent by $350/monthly. Ms. Potter never agreed to the new rent and was never given advance notice of the rent increase. The Defendants have also instructed Ms. Potter to get rid of her pet cats that she has had since the inception of her tenancy. These actions are retaliatory attempts to drive her from her home.

62.    In or about March 25, 2025, the Defendants caused their eviction counsel to file an additional lawsuit to evict Ms. Potter for nonpayment of rent based on a rental amount that she never agreed to and never owed. The action had docket number 3CA-2025-02901. Upon information and belief, the eviction filing was made via interstate wire because the action was filed online. The action was also sent via U.S. mail to Ms. Potter.

**John Doe**

63.    John Doe (identified here by a pseudonymic name) is a public school teacher. He lived in a rental unit at 617 Providence Street from July of 2022 through June of 2023.

64.    Mr. Doe and Mr. Butler executed a lease dated July 19, 2022. The lease was prepared by the Defendants exclusively who wrote all terms. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. Moreover, the lease contained a procedure for making maintenance requests that contemplated the landlord responding and making repairs at its paragraph "l". Mr. Doe reasonably expected that the landlord would maintain his unit so that it was fit and habitable under the lease, and did not know that the provision contemplating maintenance requests was a sham. The lease materially omitted–and Mr. Doe did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for him to live in. This material omission constituted a scheme or artifice to defraud Mr. Doe into signing the lease, paying his rent, and moving in. Had Mr. Doe been advised that the landlord had no intention of maintaining fit and habitable premises, he would not have moved in or paid the Defendants.

65.    On  August 6, 2022, within a week of Mr. Doe moving in, raw sewage began seeping into his unit. It came up through the drains in his shower and sink. Sewage would enter his unit numerous times over the course of his tenancy.

66.    The first time John Doe noticed the raw sewage in his unit was after work on a Friday evening.

67.    Mr. Doe had no emergency maintenance number and the landlord's office whose number he had been given was closed. He was concerned that he would have to endure the entire weekend with sewage in his apartment. (At this time he did not know that he would have to

endure much more from this tenancy than just a weekend living with raw sewage.) He wrote an email to the Defendants asking for urgent abatement of the issue and noting that he might have to contact local government and possibly use a repair and deduct mechanism to remedy the issue because he had no way of reaching the landlord over the phone.

68.     Defendant Jeffrey Butler responded over email approximately one hour later. Mr. Butler's email admonished Mr. Doe for his email but did not address the underlying issue of raw sewage in Mr. Doe's apartment. Mr. Butler confined himself to expressing umbrage that Mr. Doe would complain about having raw sewage in his apartment and the methods used to complain. Mr. Doe wrote back to ask what Mr. Butler would do about the sewage. He did not get another response from Mr. Butler.

69.     The Defendants did not bring in a technician to abate the issue until August 12, 2022. During this time, Mr. Doe lived with the smell, unpleasantness, and health risks of having raw sewage in his apartment. He also was unable to use his sinks or his bathing facilities.

70.     Mr. Doe spoke with the technician when he did show up. The technician told Mr. Doe that he had only been paid to perform a limited abatement of the issue and not to do any cleaning. The technician said that he had proposed but had not been authorized to perform a fuller and more expensive repair that would resolve the issue more permanently. In fact the technician had only been authorized to perform a temporary fix of the issue causing the raw sewage to emerge. Mr. Doe was forced to clean the sewage himself with an improvised bucket. Mr. Doe did not have the proper equipment to perform raw sewage remediation. He became sick and vomited while cleaning the raw sewage with the improvised bucket.

71.     The sewage came back on August 21, 2022.

72.     The Defendants did not get the technician back to remediate the sewage until August 23, 2022. The sewage came back numerous more times and was not responded to the same day. The technician would joke that he would "see you [the tenants] soon" because the landlord was not paying for a more permanent–and more expensive–remediation (and thus the sewage would predictably return, causing the technician to have to see the tenants again soon when he would predictably be called back by the Defendants to perform a temporary repair).

73.     Mr. Doe would alert the Defendants each time that the sewage would appear in his unit. Mr. Butler frequently expressed umbrage at Mr. Doe complaining about living with raw sewage. (For example, he called Mr. Doe "disrespectful" in a June 4, 2023 email in response to Mr. Doe asking for urgent remediation and quoting Rhode Island law requiring it.)

74.     In late August 2022 the Defendants began a pattern of inspecting Mr. Doe's unit on a regular basis. There was no apparent explanation for the inspections aside from retaliation. They were performed for the purpose of annoying Mr. Doe in retaliation for his complaints about the raw sewage intrusions in his home. No repairs, abatements, or other benefit to Mr. Doe came out of the inspections.

75.     Because Mr. Doe did not trust the Defendants, he made himself present at many of the inspections. This would force Mr. Doe to take the whole day off work, because he worked as a substitute teacher and could not take partial days off. He missed a total of five days of work. Because he worked as a substitute teacher, Mr. Doe was only paid for days actually worked and lost income for the missed days. Mr. Doe lost over $1,314.45 in income from these missed work days.

76.     Eventually Mr. Doe could not afford to take more time off of work for an inspection. During an inspection where Mr. Doe was not present, an employee of the Defendants found a sex

object in a private place within Mr. Doe's apartment. The employee videotaped the sex object within the apartment.

77.    The sex object was of such a nature that it would give the impression that Mr. Doe is gay. Mr. Doe had already experienced discrimination, including at work, for his perceived sexuality.

78.    The employee threatened to post the sexually embarrassing video online if Mr. Doe was not more obedient towards the Defendants. On August 23, 2023 Mr. Doe received an email from Elmwood Realty stating in part: "maybe I should share a video from a walkthrough inspection of your apartment after giving you proper notice. I am sure that people would love to see the way you live and what was stuck on the walls of your shower." "What was stuck on the walls of your shower" referred to the sex object. "[T]he way you live" referred to Mr. Doe apparently being gay as inferred from the sex object.

79.    That winter, workers removed the exterior portion of a wall to Mr. Doe's property, causing it to be uninsulated and the apartment to be too cold. The Defendants did not remedy this situation despite Mr. Doe's complaints.

80.    Over the course of the tenancy Mr. Butler frequently discussed his desire that Mr. Doe move out of his apartment. When Mr. Doe first asked that the raw sewage in his home be addressed, Mr. Butler immediately responded that he wished he had not rented to Mr. Doe.

81.    On June 2nd of 2023, raw sewage once again seeped into Mr. Doe's home.

82.    When John Doe complained to Mr. Butler on the phone, Mr. Butler made cooing noises in order to compare Mr. Doe's desire to live without raw sewage in his home to the cries of an infant.

83.    At this point Mr. Doe found his living situation as tenant of the Defendants untenable. He could no longer take the recurring appearance of raw sewage in his home, the constant inspections, the threats to expose his private sexual life, and the rest of the treatment described above.

84.    Mr. Doe emailed the Defendants to say that the lease was terminated under the circumstances and he was leaving at the end of June 2023. Mr. Doe later spoke with Mr. Butler who agreed with him leaving at the end of June.

85.    Mr. Doe did not have a new rental or other home to live in lined up, but supposed that staying informally with family and friends in the interim would be better than what he was enduring as a tenant of the Defendants.

86.    Mr. Doe left the apartment in as good of a condition as he found it and moved out at the end of June 2023.

87.    Despite the valid cancellation of the lease due to Defendants' recurring noncompliance with their obligation to provide Mr. Doe with sewage-free premises under R.I. General Laws 34-18-28(a)(2), and despite the parties agreement to end the tenancy at the end of June, the Defendants sued Mr. Doe to evict him after he had already left. The Defendants did so even though they knew he had already left.

88.    The decision to bring the eviction action was retaliatory.

89.    As a busy teacher scrambling to find a place to live, Mr. Doe lacked the money to hire counsel to fight the eviction action or to miss further work and attend these unnecessary court hearings. The Defendants' lawyer required him to sign an agreement that *inter alia* "forfeited" his security deposit in order to dismiss the case.

90.    There was no consideration for this agreement to dismiss an action to evict a tenant who had already validly terminated his lease and left under an oral agreement with the landlord.

91.    While living informally with friends and relatives, Mr. Doe sought to rent a new place to live. He looked at numerous units within his price range and was never granted any despite his solid work history and absence of criminal record. The reason that numerous landlords gave him for their refusal to rent to him was the record of the eviction case.

92.    Unable to find a new place that would rent to him with the Defendants' retaliatory eviction case in the court record, Mr. Doe exhausted his welcome with friends and family. He has no permanent address and generally lives out of his car, using the shower at a local gym to make himself presentable at school, and hiding his homelessness from his employer and others in his life.

**Cindy Rodriguez**

93.    Cindy Rodriguez moved into the Defendants' property in February of 2023. She signed a lease with Elmwood Realty on January 31, 2023. Carissa Butler signed on behalf of Elmwood Realty.

94.    The lease was prepared by the Defendants exclusively who wrote all terms. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. Moreover, the lease contained a procedure for making maintenance requests that contemplated the landlord responding and making repairs at its paragraph "l". Ms. Rodriguez reasonably expected that the landlord would maintain her unit so that it was fit and habitable under the lease. The lease materially omitted–and Ms. Rodriguez did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for her to live in. This material omission constituted a scheme or artifice to defraud Ms. Rodriguez into signing the

lease, paying rent, and moving in. Had Ms. Rodriguez been advised that the landlord had no intention of maintaining fit and habitable premises, she would not have moved in or paid the Defendants.

95.    Her tenancy is subsidized by Section 8. Upon information and belief, at the inception of her tenancy, the Defendants promised the Department of Housing and Urban Development ("HUD") in writing that it would maintain her property "in accordance with HQS [Housing Quality Standards]." Ms. Rodriguez is not in possession of the written promise but intends to obtain it in discovery. Upon information and belief, this written promise was transmitted in writing through the mails or through an interstate wire. At the time that this promise was made, the Defendants had no intention of maintaining Ms. Rodriguez's unit in a fit and habitable condition or according to the HQS. HUD would not have agreed to subsidize the tenancy, had it known that the Defendants' promise was a misrepresentation.

96.    Ms. Rodriguez enjoys interior decorating and do-it-yourself interior design projects. She is in the habit of making her home beautiful. She wanted to make her home beautiful so that her grandchildren could enjoy visiting her.

97.    In her first winter in the unit, her heat intermittently failed, leaving her cold and unable to invite her grandchildren to visit. Although she told the Defendants, they failed to effectuate a lasting repair.

98.    Rodents and vermin entered her unit and although she told the Defendants, they have never sent an exterminator. She has identified cracks in her walls and alerted the Defendants to them, but the Defendants have never repaired such cracks. Vermin continue to use these as entry points to her unit.

99.     The Defendants have had a renovation project going on outside Ms. Rodriguez's unit for over a year. It has taken so long because the Defendants, upon information and belief, do not use properly licensed contractors. The Defendants removed siding from Ms. Rodriguez's unit while she was living in it in the course of the project. This made the unit even colder. This is the view of Ms. Rodriguez's front door (Figure 2). Figure 2 was taken by Ms. Rodriguez and is a fair and accurate representation of her front door and the surrounding area at the time it was taken.



Figure 2.

100.    In summer of 2023, mold intruded into Ms. Rodriguez's unit, infecting her

belongings. Her    apartment    began    to    smell    of    mold    throughout.    Although    she    asked    the

Defendants to remediate, they did not. They did tell her to file an insurance claim for her damaged belongings.

101.    The mold caused Ms. Rodriguez to have difficulty breathing, and she was forced to obtain a prescription from her doctor and take medication to improve her breathing.

102.    In October 2023 the Defendants announced that Ms. Rodriguez would have to move out of her unit temporarily due to construction. The Defendants gave her less than a full month's notice of this. Her bed and a few belongings were brought up to an upstairs unit for her to reside in temporarily.

103.    Her new unit has such poor water pressure that she has to pour buckets of hot water combined with dish soap into the toilet in order to flush it. When she does not do this, a sewage smell pervades the unit.

104.    Ms. Rodriguez noticed that the workers who were doing the construction work appeared to be the Defendants' regular employees rather than an outside contractor. The work dragged on for months, while Ms. Rodriguez lived in "temporary" lodgings with few belongings, and then appeared to stop altogether. When Ms. Rodriguez asked why, the Defendants cited permitting difficulties.

105.    The workers opened the interior of Ms. Rodriguez's original apartment, exposing it to the elements, with many of her belongings still inside. Ms. Rodriguez lost items with sentimental value, such as her children's ultrasounds. Two televisions and other personal belongings were damaged beyond repair.

106.    Ms. Rodriguez cannot access her original apartment without assistance because construction debris has been left in front of it. When she has gotten in, she has observed that many of her belongings are covered in mold.

107.    In or about July of 2024, Ms. Rodriguez had to rent a storage unit for her belongings in order to protect them from the conditions the Defendants allowed to persist in her unit. She could not afford to do so on her income and so she had to take out a loan to afford the storage unit.

108.    In taking out the loan, Ms. Rodriguez's credit score went down from 685 to 513. Ms. Rodriguez has been participating in an RIHousing Family Self Sufficiency homebuyer program for five years. The loan and credit score reduction has delayed her progress to homeownership.

109.    From January 13, 2025 to January 24, 2025, Ms. Rodriguez had no water in her home, upon information and belief, because of a failure of plumbing caused by a lack of maintenance. Ms. Rodriguez was forced to defecate in a bucket because her toilet did not work during this period.

110.    Although she does not have extra money, and is ostensibly trying to save for a home, she has on more than one occasion been forced to stay in a hotel and put that cost on a credit card because conditions in her home were too poor to stay. She has been forced to do this when there is no water in the unit and when the unit is so cold that it feels dangerous.

111.    Ms. Rodriguez has complained to the Defendants about each of the issues described above, but the Defendants have not remediated.

112.    Ms. Rodriguez complained to the Defendants about the water shutoff beginning on January 13, 2025.

113.    Ms. Rodriguez received a notice to quit signed by Carissa Butler on January 27, 2025. This notice to quit was retaliatory. Upon information and belief, the notice to quit was in response to Ms. Rodriguez complaining about the lack of water in her apartment.

**Jordan Towns**

114.    Jordan Towns moved into the Defendants' property at 136 Harrison Street in Pawtucket in 2022.

115.    After moving in, Mr. Towns noticed holes in the cabinetry of his unit. Mice began invading his unit shortly thereafter.

116.    Mr. Towns called and spoke in person with various landlord employees to request extermination of the mice. The Defendants never remediated.

117.    The unit also had serious plumbing issues. Water would seep out of the walls. The Defendants never remediated these issues despite being informed of them by Mr. Towns.

118.    In one instance, water came out of Mr. Towns' walls while he had out of town family visiting. He would often have to stay with friends and family out of his unit because of the water and vermin intrusions.

119.    In 2023 a large portion of the ceiling caved in Mr. Towns' bathroom while he was taking a shower. Startled, he tried to get out of the shower and fell. Dirty water went all over the apartment, including into the living room. Defendants did not close the hole.

120.    Below (Figure 3) is a photograph showing Mr. Towns' bathroom after the ceiling cave in. It was taken by Mr. Towns and is a fair and accurate representation of the hole next to the shower.



.

Figure 3.

121.   Maintenance workers and Mr. Butler often remarked to Mr. Towns that he did not have the right to ask for repairs. They based this on Mr. Towns not paying his full rent due to his participation in a subsidy program.

122.   In July of 2023, Mr. Towns called code enforcement officials with the City of Pawtucket seeking remediation of these issues.

123.   Mr. Butler called Mr. Towns after being contacted by Pawtucket City officials. He told Mr. Towns that Mr. Towns would be evicted for calling code enforcement. Mr. Towns told Mr. Butler why he had made the call: to seek remediation of conditions in his unit that the Defendants did not remediate voluntarily. Mr. Butler remarked that "you people" know how to

work the system. Mr. Butler also remarked that Mr. Towns' tenancy was subsidized so he did not have the right to ask for repairs.

**Theodore Oliveira**

124.    Theodore Oliveira is a vehicle condition inspector. He resides at 656 Providence Street with his three children. Mr. Oliveira has sole custody of his children and has been a tenant of Elmwood Realty's since 2020.

125.    Since the start of the tenancy, the heating system in Mr. Oliveira's apartment has failed to function.

126.    Despite informing the Defendants of this issue, they inspected the heating appliance only once and failed to effectuate repairs. This has forced Mr. Oliveira and his children to endure the winters without adequate heating.

127.    Cockroaches entered his unit in November 2022 and it has been infested ever since. He notified the Defendants of this issue via the tenancy app, but the Defendants did not send an exterminator. He called the Defendant and they indicated that the problem was not their responsibility.

128.    Mr Oliveira has invested several hundred dollars in his own extermination methods such as bomb packs and boric acid that have proven unsuccessful. Mr. Oliveira does not have the means to hire a professional extermination company.

129.    The kitchen sink and bathroom sink in Mr. Oliveira's apartment frequently clog when used. When the kitchen sink, bathroom sink, or dishwasher are used, food and debris enter the bathtub through the bathroom drain. This situation negatively impacts his and his children's hygiene. Mr. Oliveira does not use his dishwasher due to this issue. Figure 4 is a true and correct photograph of Mr. Oliveira's bathtub during one of these incidents. The bathtub smells like

sewage. Most evenings, after cleaning up from dinner, Mr. Oliveira has to use a squeegee and bleach to clean the regurgitated debris from his bathtub and disinfect the bathtub so that his children can bathe.



Figure 4.

130.    In October 2024, Mr. Oliveira's refrigerator malfunctioned. Mr. Oliveira promptly alerted the Defendants. The Defendants did not repair or replace the refrigerator. Mr. Oliveira lost hundreds of dollars in food and he and his children were forced to rely on takeout that was more expensive and less healthy. The Defendants only remediated weeks later.

131.    In January 2025 mice began infesting Mr. Oliveira's unit. The infestation continues to the present.

132.    On or about March 12, 2025, Mr. Oliveira's refrigerator stopped working again. Mr. Oliveira and his family lost more food to spoiling. It took approximately two weeks for the Defendants to replace the refrigerator. After they finally did so, a $100 maintenance fee appeared on Mr. Oliveira's account.

133.    Mr. Oliveira has informed the Defendants of all of the above issues by using the tenant portal app.

134.    The unfit conditions in Mr. Oliveira's home have caused him and his children to suffer emotional distress. For his children, this has led to crying spells and other apparent emotional breakdowns. Mr. Oliveira has experienced anxiety, depression, a constricted chest, lost sleep, suicidal ideation, and feelings of hopelessness.

135.    On or about December 26, 2024 Mr. Olieveira emailed Carissa Butler about the poor conditions in his home. The Defendants have not remediated. Carissa Butler did threaten to bring an eviction action as part of her email correspondence with Mr. Oliveira.

136.    In April 2025, Mr. Oliveira received notice that his rent would go up to $1,150 and that the landlord was demanding that he pay an additional $375 towards a larger security deposit. These demands are retaliatory. The demands also breach R.I. G.L. § 34-18-16.1, which requires sixty days notice for rent increases.

**Kristen Normandin**

137.    Kristen Normandin is an accounting associate. She works in the accounting department of a large organization. She moved to Elmwood Realty's building at 14 Kenyon Street in West Warwick in November 2022.

138.    She found the listing for the unit on a website called Craigslist in the last days of October 2022. It listed the number of bedrooms, neighborhood, and photographs that did not

show any bad conditions. At the time that they posted the advertisement, the Defendants knew that a number of unfit conditions prevailed in the unit. The Defendants also knew that they had no intention of maintaining the unit according to law. The advertisement materially omitted these facts. By uploading the advertisement, the Defendants transmitted it through interstate wire communications. Had Ms. Normandin known the omitted facts, she would not have visited the unit or rented it.

139.   Ms. Normandin toured the unit with an Elmwood Realty employee named Jocelyn. Ms. Normandin pointed out a few issues that she saw, such as holes in the walls, and for each issue, the employee represented that it would be fixed by the landlord's maintenance staff. Ms. Normandin rented the unit and signed a lease. At the time when these representations were made, the Defendants knew that they had no intention of maintaining the unit. Had Ms. Normandin known that the representations that the issues would be fixed were not true, she would not have rented the unit.

140.   The lease was prepared by the Defendants exclusively who wrote all terms. The lease was executed by Ms. Normandin on November 1, 2022. Mr. Butler signed the lease digitally, but it is not clear from the face of the document what date he signed it on. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. The lease contained a procedure for making maintenance requests that contemplated the landlord responding and making repairs at its paragraph "l". Ms. Normandin reasonably expected that the landlord would maintain her unit so that it was fit and habitable under the lease, and did not know that the part of the lease contemplating maintenance requests was a sham. The lease materially omitted–and Ms. Normandin did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for her to live in. This material

omission constituted a scheme or artifice to defraud Ms. Normandin into signing the lease, paying her rent, and moving in. Had Ms. Normandin been advised that the landlord had no intention of maintaining fit and habitable premises, she would not have moved in or paid the Defendants.

141.    Maintenance did not come and fix the issues identified during the tour.

142.    Soon after moving in, Ms. Normandin discovered that the unit was infested with pests. The pests included rats, mice, birds, and squirrels. Rodent feces and urine would appear in multiple areas of the unit, including the kitchen and bedroom.

143.    Ms. Normandin asked the Defendants for extermination but they made only minimal efforts to abate the infestation, consisting of placing a single bait trap outside of her front door. The minimal efforts did not effectuate an abatement of the infestation.

144.    Ms. Normandin asked the Defendants to release her from the lease so that she could find a place to live that did not have a rampant pest infestation. The Defendants refused.

145.    On August 11th, 2023 Ms. Nourmandin's unit ran out of oil and there was no hot water. Ms. Normandin emailed the Defendants to say that she would stay in a hotel until they remediated the conditions and take the cost off of the rent. The Defendants responded that she would be evicted if she did so. She was without hot water for two days. In or about December 2023, pipes burst in the building and Ms. Normandin was without heat for about two days. The Defendants only addressed Ms. Normandin's heat when the fire department arrived.

146.    Preparing food in the apartment became difficult with the infestation. At one point she found a dead rodent in a fruit bowl that she had been eating out of. She took a photo, included here at Figure 5. She went to the hospital with severe gastrointestinal distress and was diagnosed with food poisoning. She missed work for approximately a month, losing income.

Soon after, Ms. Normandin was diagnosed with chronic fibromyalgia and chronic fatigue. These conditions were proximately caused by the unremediated unfit conditions in her home. She feels as though her health has not been the same since.



Figure 5.

147.    Normandin left as soon as her lease was up. She had to leave behind furniture and belongings that were soiled with rodent feces.

**Krystie Wood**

148.    Krystie Wood is a medical worker and mother of two. She has been a Certified Nursing Assistant and a Medical Technician. She moved into her apartment in 71 Roberts Street in West Warwick in 2019. Ms. Wood paid a $1200 security deposit to move in. Ms. Wood is a Section 8 voucher holder through West Warwick Housing Authority.

149.     In February 2021 Defendant Elmwood Realty bought the building.

150.    Upon information and belief, upon acquiring the building, Defendants promised HUD in writing that it would maintain Ms. Wood's unit "in accordance with the HQS." The written promise to HUD is not available to Ms. Wood but will be obtained through discovery. Upon information and belief, this written promise was transmitted in writing through the mails or through an interstate wire. At the time that this promise was made, the Defendants had no intention of maintaining Ms. Wood's unit in a fit and habitable condition or according to the HQS. HUD would not have agreed to continue to subsidize the tenancy had it known that the Defendants' promise was a misrepresentation.

151.    The $1200 security deposit was transferred to Elmwood Realty.

152.    After Defendant Elmwood Realty purchased her building, Ms. Wood notified them about a cockroach infestation in her home. Ms. Wood also complained about the heat frequently malfunctioning, and that the electrical sockets in the unit would malfunction and cause sparks. The Defendants did not remediate these issues.

153.    In September 2021 Mr. Butler forced Ms. Wood to sign a new lease. She wanted to wait for her Section 8 worker to approve the lease but Mr. Butler told her that if she did not sign immediately she would be evicted.

154.    At this point, Ms. Wood was not working. Because she did not have an income, her rent was paid entirely by Section 8.

155.    After obtaining her signature on a new lease, the Defendants began demanding that Ms. Wood pay them a security deposit. This is despite her security deposit being transferred from her original landlord to them as assignees of the tenancy when they acquired the property Ms. Wood lived in.

156.    In September 2022 Mr. Butler signed and caused to be sent to Ms. Wood a notice purporting to terminate her tenancy and claiming $11,025 in back rent. This is despite Ms. Wood's rent being fully covered by Section 8. At the time the notice was sent, Ms. Wood owed the Defendants nothing. The rent demand was sent with the intention of defrauding Ms. Wood into paying monies she did not owe and/or to drive her out of her home in retaliation for her complaints about the cockroach infestation and malfunctioning heat.

157.    After Ms. Wood's complaints about the condition of the unit, the Defendants frequently put eviction notices on Ms. Wood's door. She would take down the eviction notice and a new eviction notice would appear the next day. Ms. Wood's children saw the notices and were frightened.

158.    Soon after, the Defendants caused an eviction action to be filed against Ms. Wood alleging non-payment of rent for the $11,025 that she did not really owe, and that the Defendants knew she did not really owe. The action was captioned 3CA-2022-02803. It was filed in the Third Division of the Rhode Island District Court. Causing the eviction action to be filed was a further attempt to defraud Ms. Wood into paying money she did not owe. It was also an effort to defraud the court. The action was filed and prosecuted using interstate wire and/or the mails.

159.    Although she could not afford to retain an attorney, Ms. Wood was fortunate. She obtained *pro bono* counsel from a non-profit legal aid organization called Center for Justice. The Defendants – knowing that they were not really entitled to the $11,025 – promptly dismissed the suit without prejudice, prior to discovery, upon receiving notice of Center for Justice's representation.

160.    In November 2023 a group of men approached Ms. Wood's home. One knocked on her door and demanded entry, claiming to be from the fire department. Ms. Wood did not believe

him and did not allow entry. The man later returned and told Ms. Wood that Mr. Butler had instructed him to "walk right in".

161.    Later, a different man came to Ms. Wood's door and claimed to be a constable. He falsely told her she had been ordered to leave. She did not believe him, but she was severely frightened by this course of conduct.

162.    Mr. Butler and agents that he sent appeared at Ms. Wood's home on many occasions to "inspect" her unit or otherwise harass her. These sham "inspections" often involved them doing little to nothing other than walking up and down the stairs. No remediation came out of the inspections. The inspections were retaliatory and based upon Ms. Wood's complaint about the conditions in her unit.

163.    On a number of occasions when Mr. Butler came to Ms. Wood's home, her children were present. He frequently addressed her children over her objections. In one instance, he asked Ms. Wood's daughter if she knew that her mom was the one causing her to be evicted.

164.    Ms. Wood obtained a position at Fatima Hospital. She was initially excited to work at a hospital.

165.    During her shifts at the hospital, Ms. Wood received a number of telephone calls from her children telling them that Mr. Butler or his men were at their door. This caused her to leave work each time to go and be with her children.

166.    Ms. Wood suffered extreme emotional distress from the misconduct described above during her tenancy. She was anxious and had physical symptoms of anxiety, including a number of panic attacks. On a number of occasions, she was too depressed to go to work. Her absences due to Mr. Butler's and his men's appearances at her home and her depression caused her to be separated from her employment at Fatima. She gained over ninety pounds of excess body weight

due to emotional distress. The depression made it difficult for Ms. Wood to find new work or attend school after being separated from her employment with Fatima.

167.    Ms. Wood's children also suffered symptoms of emotional distress during the tenancy. They became withdrawn, also gained weight and were less sociable and more irritable at school during this period.

168.    Since the Defendants sold the building and are not the family's landlord, the family's emotional distress has begun to subside. Ms. Wood went back to school, got a new credential as a medical technician, and is gainfully employed as a medical technician. Her son is thriving at school.

**Sheree Pine**

169.    Sheree Pine is a disabled tenant. She formerly worked for the Providence Journal. She moved into her unit in 2001 when it was owned by a different landlord. Elmwood Realty became her landlord on or about November 2023. Her unit was subsidized through the Section 8 program.

170.    After Elmwood Realty acquired the property where Ms. Pine lived, Mr. Butler visited the building. Mr. Butler told other tenants in the building that they should be his "spies". Ms. Pine heard this.

171.    On November 1, 2023 Carissa Butler, Sheree Pine, and Cranston Housing Authority executed a "Section 8 Housing Choice Voucher Program Assumption of Contract and Lease Agreement by New Owner" form (the "Assumption Agreement"). The Assumption Agreement made Elmwood Realty a party to Sheree Pine's lease and the Housing Assistance Payments Contract. Both the lease and the Housing Assistance Payments Contract obligated the landlord to maintain the unit and entitled it to receive rent payments from Ms. Pine and the Section 8

program. At the time the Assumption Agreement was signed, Carissa Butler and the other Defendants had no intention of honoring their promise to maintain the unit. Ms. Pine and Cranston Housing Authority would not have signed the Assumption Agreement, and Cranston Housing Authority and the Section 8 program would not have made rent payments, had they known that the Defendants had no intention of honoring their promises to maintain the unit.

172.    Ms. Pine signed a new lease with Elmwood Realty as the listed landlord in August of 2024. As part of this process, Ms. Pine wrote to Elmwood Realty to ask for certain reasonable accommodations. These included an emotional support animal, advance notice of non-emergency maintenance, a parking space near her entranceway, and advance notice of any decision not to renew the lease. Although her prior leases included accommodations for her disability, Elmwood Realty refused to engage in any interactive process to learn about or evaluate Ms. Pine's special needs and did not include the accommodations in their lease with Ms. Pine.

173.    Regular warm showers help provide relief for Ms. Pine from chronic pain caused by her disability. In August, Ms. Pine experienced problems with her shower including intermittent times when no water would run. Ms. Pine's disability makes it difficult for her to move around her unit or to enter and exit the shower. On more than one occasion, she had applied shampoo to herself only to find the water not working, a situation that was more difficult, painful, and frustrating because of her disability.

174.    On August 31, 2024 Ms. Pine wrote the landlord on the tenant maintenance portal asking for the shower to be remediated and alerting the landlord that a functioning shower was especially important to her because of her disability. Within twenty minutes, Ms. Pine received

the        following      message      from      Mr.      Butler      (Figure      6):



Figure 6.

175.    Soon after, Ms. Pine received a notice to quit. The Defendants sent her this notice because she asked for reasonable accommodations during the lease renewal process and because she included "information [Mr. Butler] d[id] not need" (about her disability).

176.    Ms. Pine's father went into hospice around the same time she received her termination of tenancy. She requested an additional 30 or 60 days to move but was denied.

177.    Ms. Pine's Section 8 worker informed her that an eviction could imperil her voucher and so she felt forced to move by the end of the month. She spent daytime hours, when her disability allowed, packing up her apartment, and nights with her dying father, who passed days before her move-out date. She barely slept or ate during this period. She stayed in a hotel for several days before finding a new apartment.

178.    Because of the unlawful termination of her tenancy, and because of the short notice, Ms. Pine had to hire movers on multiple occasions to get everything packed, into a storage facility, and finally into her new apartment. She spent a total of $5307.80 on movers, the hotel, truck rental, and the storage unit.

179.    The eviction escalated Ms. Pine's PTSD. She had to increase her usage of anti-anxiety medication, increasing to daily use whereas before she only used it sporadically. Her pain increased due to lack of hot water but was unable to increase her dosage of Gabapentin because she was already maxed out. Around July 2024, her doctor did prescribe a new pain medication. Ms. Pine lost over fifteen pounds due to stress, from a starting weight of only one hundred ten pounds. Her body weight dropped to as low as ninety-two pounds during this period. She could not keep food down and could barely move because of pain. She had been prescribed rest due to her disability but had to engage in strenuous activity in order to move out of her Elmwood apartment. Her PTSD remains exacerbated in her new apartment due to fear instilled by the eviction. Ms. Pine is currently in therapy to deal with these symptoms.

**Matthew Stevens and Rebecca Woolf**

180.    Matthew Stevens and Rebecca Woolf lived at 175 Concord Avenue in Cranston as tenants of Elmwood Realty since March 1, 2023. They lived in the unit with their two young children until the family was subjected to retaliatory eviction.

181.    Elmwood Realty, Mr. Stevens, and Ms. Woolf executed a lease.  Mr. Stevens and Ms. Woolf signed the lease on March 2, 2023. Mr. Butler signed on behalf of Elmwood Realty. Mr. Butler did not date the lease, but, upon information and belief, he signed it also on March 2, 2023. The lease was uploaded by the Defendants to the Defendants' tenant portal via interstate wire communication. The lease was prepared by the Defendants exclusively who wrote all terms. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. Mr. Stevens and Ms. Woolf (collectively, "the Stevens Family") reasonably expected that the landlord would maintain their unit so that it was fit and habitable under the lease. The lease materially omitted–and the Stevens Family did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for them to live in. This material omission constituted a scheme or artifice to defraud the Stevens Family into signing the lease, paying rent, and moving in. Had the Stevens Family been advised that the landlord had no intention of maintaining fit and habitable premises, they would not have moved in or paid the Defendants. The lease was uploaded to the internet via interstate wire communication and payments under the scheme to defraud were made by interstate wire.

182.    Within two months of moving in, Mr. Stevens and Ms. Woolf realized that the premises had a serious pest problem. The family dealt with rodents and other vermin for the rest of their tenancy. Although they have alerted the Defendants through email and the tenant portal, only minimal efforts have been made to exterminate. These minimal efforts consisted of a

maintenance person named Manny throwing rat poison pellets around the yard and basement, despite the tenants having small children. The efforts did not abate the infestation.

183.    On or about March 1, 2024, Mr. Stevens and Elmwood Realty executed a new lease via Docusign. The lease ran through February of 2025.

184.    In April 2024, Mr. Stevens alerted Elmwood Realty over email and through the tenant portal about corroded and broken plumbing in the basement that would back up and leak. A plumber visited the basement but made no repairs.

185.    On June 4, 2024, Mr. Stevens had a serious personal injury at the property that was proximately caused by the Defendants' failure to maintain the premises. He hired a personal injury lawyer, and the lawyer sent a demand letter. Mr. Stevens does not seek damages for that injury in this lawsuit.

186.    Within days of receiving correspondence from the personal injury lawyer, Mr. Butler began the process of trying to evict the Stevens family.

187.    On June 18, 2024, soon after receiving correspondence from the personal injury lawyer, Mr. Butler sent Mr. Stevens and his partner a letter falsely stating that they were month-to-month tenants despite the valid lease, and enclosing a notice of termination.

188.    Mr. Butler has tried to use the threat of false eviction and the public record it would leave to extort Mr. Stevens into dropping his personal injury lawsuit.

189.    Mr. Butler then sent Mr. Stevens and his partner a number of emails trying to get them to drop the personal injury lawsuit in exchange for not evicting them. For example, on September 5th of this year he wrote a message to Mr. Stevens' partner as follows: "if we go through the eviction process it will be on both of your public records forever and it stays there forever even if you go buy a house. So someday your child will see it or your students parents

will see it as well as your students if they google your name after the eviction is finalized. So what an eviction? It goes to moral character."

190.    In messages to Mr. Stevens and his partner, Mr. Butler has also called Mr. Stevens a fraud and a "nonworker", sarcastically called him a "pillar of the community", and threatened to call the state police, claiming the personal injury suit is fraudulent.

191.    In an attempt to embarrass Mr. Stevens, Mr. Butler has also written to Mr. Stevens' partner about "his [Mr. Stevens'] record", which apparently refers to an old criminal record discovered by Elmwood during its tenant screening process.

192.    Mr. Stevens has an anxiety disorder and has suffered pronounced anxiety and sought medical treatment as a result of this course of conduct. He was informed by his doctor that his blood pressure has risen significantly since this course of conduct began.

193.    The Defendants filed a retaliatory eviction action against Mr. Stevens because he sued them for his personal injury stemming from their failure to remediate. Mr. Stevens could not afford to hire a lawyer. Being evicted and the Defendants' other conduct caused Mr. Stevens severe and persistent emotional distress with physical symptoms.

194.    During the retaliatory eviction action, Mr. Butler emailed Mr. Stevens and his wife. His message contained the following: "I could say something to you like you know eventually Rebecca will get sick of your living your life through scams and not paying bills and dump you. But I didn't say that. Enjoy your moment, the clock is ticking."

195.    Throughout August and September, Mr. Butler sent threats to Mr. Stevens that he would tow his car because he had overstayed his retaliatory termination. On one occasion Mr. Butler sat parked in his vehicle in front of their house and on a second occasion Mr. Butler drove by, going very slowly in front of the house. Mr. Stevens has Complex PTSD and became

hypervigilant during this period, and suffered panic attacks, causing him to have to increase medication and add new medication to manage anxiety related to the intimidation and impending eviction.

196.    Ms. Woolf experienced emotional distress including racing thoughts, tightness in her breathing, distraction, lost sleep, and irritability related to the condition of her home and the Defendants' efforts to retaliate against the family. These symptoms impacted her performance at work.

197.    Mr. Stevens and Ms. Woolf missed one and a half days of work attending court for the eviction action, resulting in warnings at work.

198.    The emotional distress caused by being evicted and the Defendants' other conduct caused Mr. Stevens to fail a course he was taking online at Southern New Hampshire University. The hypervigilance and anxiety attacks made him unable to study. This caused his financial aid to be suspended on November 2, though he was eventually able to appeal and restore his aid.

199.    Ms. Stevens was represented by a free lawyer through Rhode Island Legal Services. The Rhode Island Legal Services lawyer told Mr. Stevens that his best option was to vacate on November 7, 2024, and to waive his security deposit. Mr. Stevens followed this advice and moved out on November 7, 2024.

200.    Since moving out on November 7 to the present, Mr. Stevens, Ms. Woolf, and their two children have been sharing a room and a half as guests in Ms. Woolf's parents' home.

201.    For four months, Mr. Stevens drove an additional two hours a day to get his daughter to and from her old school in Cranston, which interrupted his infant son's nap schedule. In mid-February, Mr. Stevens moved his daughter to a new school in Coventry, which caused her to exhibit distress, sadness and a reluctance to attend school.

202.    Ms. Woolf was fired from her job. Her supervisor cited her missing work, which was a result of the eviction court dates she had to attend, and a diminished performance while there, which was a result of the Defendants' actions and omissions and her resulting emotional distress.

**Shanda Johnson**

203.    Shanda Johnson resided at 676 Providence Street in West Warwick. She became a tenant of Elmwood Realty when it bought the home in 2020.

204.    Ms. Johnson's tenancy is subsidized through the Section 8 Housing Choice Voucher Program. Upon purchasing the unit and executing a lease with Ms. Johnson, Elmwood Realty promised Ms. Johnson and HUD in writing that it would maintain her property "in accordance with HQS [Housing Quality Standards]." This written promise was transmitted in writing through the mails or through an interstate wire. At the time that this promise was made, the Defendants had no intention of maintaining Ms. Johnson's unit in a fit and habitable condition or in according to the HQS. Ms. Johnson would not have rented the apartment, and HUD would not have agreed to subsidize the tenancy, had they known that the Defendants' promise was a misrepresentation.

205.    From the inception of her tenancy, Ms. Johnson has dealt with water entry into her unit from leaky plumbing. However, her previous landlord had a practice of making at least temporary repairs upon request. After Elmwood Realty purchased the home, they did not do so, and Ms. Johnson has lived with unremediated water damage in her unit. This led to black mold in her home.

206.    Ms. Johnson suffers from asthma. The presence of black mold exacerbated her asthma. She had acute trouble breathing twice while in the unit and had to call an ambulance and go to the hospital on each occasion.

207.    Ms. Johnson's apartment was infested with mice and centipedes from June of 2024 to the end of her tenancy.

208.    Ms. Johnson's heat has failed intermittently during the tenancy.

209.    Ms. Johnson informed Elmwood Realty about all issues by telephone and by speaking to their staff when she paid her rent.

210.    In August 2024 Ms. Johnson asked an intermediary to communicate with her Section 8 worker at the West Warwick Housing Authority ("WWHA"). Following receipt of this communication, West Warwick Housing Authority conducted an inspection and announced that it would discontinue rent payments after October's payment if all issues have not been remediated. The Defendants did not remediate.

211.    Ms. Johnson's West Warwick Housing Authority Section 8 worker informed Ms. Johnson that if she stayed in the unit after WWHA discontinued payments, she would be subject to eviction for non-payment of rent, and that this could threaten her voucher.

212.    The conditions were so bad that Ms. Johnson's grandchildren could not visit her. This was a source of great sadness to her.

213.    In September 2024, part of Ms. Johnson's ceiling collapsed because the water damage was not remediated. Figure 7 is a true and accurate image of Ms. Johnson' ceiling after the collapse.



Figure 7.

214.    The water entry that caused Ms. Johnson's ceiling to collapse also flooded Ms. Johnson's home, damaging her possessions including stereo equipment, clothing, a roaster, and a brand new deep fryer. Ms. Johnson is not a wealthy woman and she had saved up to acquire these possessions.

215.    The landlord did not immediately or urgently make repairs after the ceiling collapse. Having an open ceiling worsened the smell of mold throughout the unit and worsened the infestation. Ms. Johnson was forced to move in with her cousin temporarily and sleep on her couch, because the landlord did not provide alternative accommodations and she could not afford them. Ms. Johnson was constructively evicted during this period.

216.    After the flooding the unit smelled of mold. The smell was intolerably strong. The landlord did not remediate.

217.    Ms. Johnson moved out on January 4, 2025. She was forced out by the terrible conditions in the unit. Her move out was the result of constructive eviction.

218.    Being forced to move under these circumstances was incredibly stressful to Ms. Johnson. She had to borrow money to rent a truck so she could move out. She had to rely on favors from her family and friends because she does not own a car or have the money to afford movers. She cried every day during the move and pulled some of her hair out.

219.    The Defendants never returned Ms. Johnson's security deposit. Upon information and belief, there was no lawful reason not to return the security deposit.

**Kellee Silva and Eugene Vasquez**

220.    Kellee Silva and Eugene Vasquez rented a unit at 1890 Broad Street in Cranston from Elmwood Realty. The lease was scheduled to start January 1, 2024.

221.    Mr. Vasquez grew up in the custody of Rhode Island's Department of Children, Youth and Families (DCYF). He enrolled in a DCYF program called Voluntary Extension of Care. Pursuant to that program, DCYF undertakes to assist a participant in their housing search and pay certain sums toward an initial move in cost.

222.    A DCYF social worker brought Mr. Vasquez and Ms. Silva to view the unit at 1890 Broad Street. After touring the unit, Ms. Silva and Mr. Vasquez signed a lease with Defendant Elmwood Realty.

223.    The lease was prepared by the Defendants exclusively who wrote all terms. The lease stated that it would be governed by Rhode Island law, which requires landlords to maintain fit and habitable rental units. DCYF, Ms. Silva and Mr. Vasquez reasonably expected that the

landlord would maintain his unit so that it was fit and habitable under the lease. The lease materially omitted–and DCYF, Ms. Silva and Mr. Vasquez did not know–that the Defendants never intended to maintain the unit so that it was fit and habitable for him to live in. This material omission constituted a scheme or artifice to defraud DCYF and Ms. Silva and Mr. Vasqueuz into signing the lease, paying rent, and moving in. Had Ms. Silva and Mr. Vasquez been advised that the landlord had no intention of maintaining fit and habitable premises, they would not have moved in or paid the Defendants. The Defendants uploaded the lease to the internet via interstate wire communication and payments under the scheme to defraud were made by interstate wire.

224.    The unit was not ready as promised on January 1, 2024, and Mr. Vasquez and Ms. Silva were not allowed to move in until January 5th. Mr. Vasquez was homeless between January 1st and January 5th. Mr. Vasquez, Ms. Silva, and DCYF collectively paid full rent for January 2024 and received no abatement for the time that the unit was unavailable.

225.    Upon moving in, Ms. Silva and Mr. Vasquez discovered that the kitchen window had been installed backwards, such that the locking mechanism was on the outside of the building and the apartment was not secure. The window in the bedroom could not be opened. The front door was not secure and the deadbolt did not function.

226.    The unit was infested with rodents at move-in.

227.    The unit had cracks in the walls and Ms. Silva and Mr. Vasquez could not get the heat to rise past sixty degrees fahrenheit.

228.    Water coming out of the pipes had a white silt.

229.    Ms. Silva promptly informed the Defendants of all issues. Their response was cursory. They sealed the kitchen window shut.

48

230.    Mr. Butler told Ms. Silva and Mr. Vasquez to move out if they were unsatisfied.

231.    Ms. Silva contacted Reclaim RI for help with the poor living conditions and lack of response by the landlord.

232.    The silty water caused Ms. Silva to develop a skin rash. The skin rash disappeared soon after she moved out of the unit.

233.    In March 2024, the Defendants dug a trench outside the front door. This rendered the front door unusable as an egress for six months. No notice was given that the trench would be dug. No safety precautions were installed.

234.    After Reclaim RI went public with its concerns about the Defendants, Mr. Butler had a meeting with Ms. Silva. At the meeting, Mr. Butler agreed to repair the windows, heat, cracks in the walls, and front door and to remediate the mouse infestation. The next day, the front door was replaced. No further repair or remediation followed.

235.    After Ms. Silva, Ms. Potter, and another tenant filed their handwritten request for a court order mandating repairs, the Rhode Island District Court judge ordered Mr. Butler to inspect Ms. Silva and Mr. Vasquez's unit. At this inspection, Mr. Butler caused and was the first aggressor to a physical altercation in which he pushed Ms. Silva and grabbed Mr. Vasquez's wrist. Ms. Silva was a twenty-four year old woman at the time Mr. Butler pushed her. Mr. Vasquez was recovering from having previously broken his wrist at the time and Mr. Butler's grabbing his wrist was painful to Mr. Vasquez. As a result of the physical altercation, Mr. Butler, Ms. Silva, and Mr. Vasquez were arrested. Mr. Vasquez was handcuffed and booked while his wrist was in pain.

236.    Mr. Butler brought charges against Ms. Silva. The criminal court judge told Mr. Butler not to retaliate against Ms. Silva and Mr. Vasquez by attempting to evict them. Mr. Butler offered to drop the charges if Ms. Silva and Mr. Vasquez moved out of the apartment.

237.    Mr. Butler publicly posted a video online showing the interior of Ms. Silva and Mr. Vasquez's apartment and describing his grievances against them. He posted their names, address, and telephone number publicly online. Ms. Silva and Mr. Vasquez received a number of harassing messages as a result. Ms. Silva also received a death threat from an anonymous source. This was especially worrying because she knew that the source of the threat had her home's address and floor plan. This posting was made without Ms. Silva's or Mr. Vasquez's consent. The posting was made in retaliation for Ms. Silva and Mr. Vasquez's opposition to the Scheme, complaints about the conditions prevailing in their home.

238.    As the weather got colder in late 2024, Mr. Vasquez and Ms. Silva were again unable to heat their unit. The apartment would fall as low as forty degrees fahrenheit despite them ostensibly turning up the heat.

239.    In late October 2024, a trench appeared outside the back door, rendering that unusable as an egress. Trash such as coffee cups were strewn around the trench immediately outside the door.

240.    Ms. Silva returned home that night to find the trench and trash strewn about. It was a cold night and the apartment was unheated. Ms. Silva felt trapped in the apartment and violated. Her emotional distress surrounding the unremediated apartment conditions, online harassment and death threats, and criminal case crescendoed. Ms. Silva attempted to take her own life by taking pills and cutting herself. Mr. Vasquez noticed what Ms. Silva was doing and called 911. Ms. Silva was transported to the hospital and saved. To this day, Ms. Silva receives therapy and

takes medications as a result of the emotional distress and resulting suicide attempt caused by the Defendants' misconduct.

241.    In November 2024, the Defendants spray painted the exterior walls of the building. While doing so, they also spray painted Mr. Vasquez's car and Ms. Silva's car, which were parked nearby. When Mr. Vasquez and Ms. Silva asked for compensation to repaint their cars, Mr. Butler made fun of the condition of the cars and refused to pay anything.

**b.    Facts Pertaining to Defendants Generally**

*Social Media Presence*

242.    The Defendants rent to poor people. Mr. Butler knows that many of his tenants have had to save up to pay for the initial costs of moving into their apartments: first months' rent, security deposit, moving costs, and other incidentals. He knows that for many of them, the threat of being evicted is terrifying, because they cannot afford to move, especially an unscheduled move.

243.    Mr. Butler maintains a social media account on the website TikTok. TikTok is a platform where users publicly post videos that anyone with an internet connection can watch.

244.    Mr. Butler's TikTok identity is "@jeffneverhadjobsecurity". His TikTok page with the videos that he makes and posts is available at: https://www.tiktok.com/@jeffneverhadjobsecurity?lang=en.

245.    Mr. Butler posts videos of himself discussing his activities as a landlord. His tenants watch his videos, and he knows that they watch his videos.

246.    Mr. Butler is heavily involved in tenant selection for all Defendants. He discusses how he discriminates against elderly people and families with children for certain units in his tenant selection process. Upon information and belief, one of his goals in selecting tenants is to

find vulnerable tenants who will not be able to resist his scheme to avoid his maintenance obligations as landlord but who will pay their rent.

247.    In his videos, Mr. Butler brags about his ability to arbitrarily evict people from their homes. For example, in one video, he discusses a conflict with a tenant. In his telling, the tenant had a friend who lived elsewhere. This friend tried to help Mr. Butler's tenant by "calling the building inspector" on his tenant's behalf. He narrates how he bought the building where his tenant's friend was a renter in order to evict the tenant's friend in retaliation.

248.    Figure 8 is a still from a video made by Mr. Butler. The video was downloaded by the plaintiffs from the Defendants public social media account online and is available upon request.



Figure 8.

249.    Mr. Butler also brags on social media about calling Child Protective Services on tenants and towing tenants cars when they are behind on rent.

*Unlawful Lease Terms*

250.    The Defendants have a pattern or practice of including unlawful lease terms in their form leases.

251.    The Defendants' form lease contains the following language:

"**Indemnity:** Tenant will indemnify and hold Landlord and Landlord's property – including the leased premises – free and harmless for any liability for injury to or death of any person, including Tenant, or for damage to property arising from Tenant's using or occupying the premises, or from the act or omission of any person or persons, including Tenant, in or about the premises in or about the premises with Tenant's express or implied consent." (Bold in original).

252.    The form lease contains the additional following language:

"**Tenant's Insurance:** The Landlord shall not be liable to anyone for damages not proximately caused by the Landlord or the Landlord's agents. The Landlord will not compensate Tenants or anyone else for damages proximately caused by any other source whatsoever, including Acts of God". (Bold in original.)

253.    The Defendants have and regularly work with counsel experienced in matters of landlord-tenant law.

254.    Defendant Jeffrey Butler stated in an email to all tenants that he has read the Rhode Island Landlord Tenant Handbook. This Handbook contains the following language:

"No rental agreement can make a tenant agree to waive rights or remedies provided by law, or allow the landlord to waive or limit legal responsibilities. Since illegal clauses are unenforceable, they should be deleted from contractual agreements to avoid giving tenants a misleading impression of their responsibilities." Office of Housing and Community Development, The Rhode Island Landlord Tenant Handbook (2007) (Available: https://ohcd.ri.gov/resources-0) (Last Accessed: July 29, 2024.)

255.    Upon information and belief, the inclusion of the above-referenced lease language was meant to deter tenants from seeking legal counsel and to induce them to believe the same to be futile.

256.    The Defendants also include in their form leases a number of excessive and unconscionable fees.

257.    The leases require tenants to pay a $75 late fee if their rent has not been paid on the third day of the month, another $50 "legal administrative fee" if the fee is not paid by the sixteenth day of the month, and a $150 "legal administrative fee" if the rent is not paid on the twenty-first day of the month. The "legal administrative fees" are duplicative of and in addition to the attorney's fees and costs that the lease already makes the tenant responsible for in the event of a non-payment eviction.

258.    The Defendants know that many of their low-income tenants subsist through welfare payments that sometimes arrive after the first of the month. They also know that many of their tenants who do not receive welfare payments are paycheck-to-paycheck and sometimes struggle with unexpected costs and bills. They use these fees to profit off of their tenants' financial weaknesses. Often, unexpected costs, bills, and delays in income come from the Defendants' own actions and omissions, such as when tenants have hospital bills or miss work due to bad conditions such as lack of heat or to attend retaliatory sham "inspections". The Defendants then make additional money from collecting these fees for delays in payment they themselves caused.

259.    The Defendants charged Plaintiffs Krystie Wood and Theodore Oliviera "legal administrative fees".

260.    The Defendants are not licensed attorneys-at-law and/or are not acting in their capacity as attorneys-at-law in collecting the "legal administrative fee". They are not entitled to charge or collect legal fees for work that they themselves perform. The "legal administrative fee[s]" charged under the lease are separate and apart from a recovery of *bona fide* attorney's fees and court costs their real attorneys-at-law might collect, and which they might be

reimbursed for, pursuant to other terms of the lease, statute, and court rules following a successful eviction action.

261.    The late fee is wholly unrelated to any administrative or other action or cost that the Defendants take when a tenant is three days' late on rent. It is simply interest charged for the detention of the landlord's money by the tenant.

262.    As such, the late fees are usurious. The maximum interest rate that may be charged in Rhode Island is 21% *per annum* pursuant to R.I. G.L. § 6-26-2. The exact effective interest rate created by the application of the late fee varies according to the precise length of the tardiness of the rent, the amount of rent due, and the amount failed to be tendered (by its terms, the fee is charged even if only a small portion of the rent is unpaid). However, even in the most favorable possible circumstances to the landlord, the effective interest rate is more than double the maximum allowable interest rate. The highest monthly rent amount of any Plaintiff is $1650. A $75 fee for being three days' late on the rent amounts to more than 4.5% of $1650 principal for a three day loan. The annualized percentage rate of the interest charged through this "fee" is more than 550% per annum, far in excess of the 21% maximum.

*Physical and Other Intimidation*

263.    When Reclaim RI began organizing the tenants of the Defendants, they were in touch with tenants Esteven and Sylvia Rivera. They would visit the Riveras to discuss the possibility of winning better treatment from the Defendants.

264.    The Defendants learned of this. Soon after, other tenants who, upon information and belief, cooperate with the Defendants in exchange for better treatment began loitering in groups in the apartment complex parking lot outside of the Riveras' door. They would watch Reclaim RI organizers visit and speak with the Riveras and other tenants in the complex and indicate they

were reporting back to Mr. Butler, apparently in an effort to deter the Riveras from associating with Reclaim RI.

265.    Mr. Butler left Reclaim RI tenant organizers Shana Crandell and Cherie Cruz voicemails announcing that anyone Reclaim RI talked to would be evicted. The voicemails stated *inter alia*:

a.  "This is Jeff Butler from Elmwood Realty and I just want to let you know if any time you talk to any of my tenants, the tenants are gonna get a 30 day notice to vacate the premises. They have all been notified not to talk to you Reclaim RI pot smoking hippies, OK, I've already told them all….You are creating problems with these poor tenants, who didn't do anything to deserve this and I'm gonna make sure everybody knows it. And I'm putting you on notice that you talk to my tenants, they give me your name and they will be evicted"; and,

b.  "…you are only hurting tenants. You got two evicted last week, you got one evicted today. And all you do is emptying [sic] out my apartments and I clean them up and I re-rent them to somebody else. And now we're adding to the lease now not to talk to you folks."

266.    Soon after, Mr. Butler and approximately five of the Defendants' employees visited the Riveras home to deliver a termination of tenancy notice. There was no purpose for using so many employees to deliver such a notice other than physical intimidation. When the Riveras attempted to close their door, an employee of the Defendants kicked it.

267.    The Riveras called the organizers for help. When the organizers arrived the employees were still there, in the driveway of the Riveras' building.

268.    The Riveras told the organizers that they had the impression they had to move out of the premises immediately.

269.    The Riveras later stopped working with Reclaim RI and are not plaintiffs in this lawsuit.

270.    In other instances Defendants' employees have posed as firefighters and constables to gain entry into a  tenant's residence or to try to convince a tenant that they were required to leave their homes without eviction court process.

## V.    STANDING OF PLAINTIFF RECLAIM RI

271.    Reclaim RI is a nonprofit organization. Part of its mission is to promote collective action on the part of Rhode Island tenants for their collective welfare and to achieve safe, habitable, and affordable rental housing throughout the state.

272.    Reclaim RI organizes Rhode Island tenants and assists tenants in forming tenant unions for the purpose of collectively bargaining with their landlords in order to improve housing conditions and affordability.

273.    Reclaim RI conducted an organizing drive attempting to form a tenants union among the Defendants' tenants. The organizing drive was motivated in large part by the unfit conditions of the units rented by the Defendants.

274.    The Defendants frustrated the organizing drive through unlawful threats of retaliation and actual retaliation, including retaliatory eviction of leading member-tenants.

275.    Reclaim RI used staff time and spent money on the organizing drive. It had to use more staff time and spend more money because of the Defendants' unlawful retaliation.

276.    Reclaim RI has member-tenants that are identified in this complaint and some that are not identified. It has good cause within the meaning of the law not to identify its unidentified members, given the Defendants' pattern or practice of unlawfully retaliating against members.

277.    Reclaim RI's member-tenants would have standing to sue on their own behalf.

278.    All of Reclaim RI's members who are tenants of the Defendants would benefit from the following kinds of injunctive relief:

      a.    An injunction against retaliation for membership in a tenants union or organizing activities;

      b.    An injunction requiring the Defendants to maintain their rental properties;

      c.    An injunction ordering Defendants Jeffrey Butler and Carissa Marie Zingoni a/k/a Carissa Butler to divest from the Enterprise and refrain from acting as residential landlords.

279.    Obtaining this relief is germane to Reclaim RI's purpose.

280.    Individual member participation is unnecessary to the claims asserted by Reclaim RI or to the relief it requests.

## VI.    ADDITIONAL ALLEGATIONS BEARING ON RICO CLAIMS

281.    When tenant organizers with Reclaim Rhode Island began attempting to organize the Defendants' tenants into a tenants' union to collectively seek remediation of the uninhabitable conditions of their homes, the organizers noticed how often tenants spontaneously referred to their landlords (in their own words)  as being akin to a "mafia"-style operation. The organizers learned that since Rhode Island law as written does not allow landlords to operate unfit and unsafe units while collecting rent, the Defendants are only able to do so through a number of illegal tactics. As set forth more fully below, these tactics constitute a pattern of racketeering activity in violation of RICO.

*The RICO Enterprise*

282.    Defendants Jeffrey Butler, Carissa Butler, Elmwood Realty, Elmwood Realty North, Spring Street Realty as well as certain unnamed employees and cooperating tenants associated

together in fact with a common purpose of carrying out an ongoing criminal enterprise ("the Enterprise"), which is engaged in, and whose activities affect, interstate commerce. The purpose of the enterprise was and is to unlawfully enrich themselves through a scheme ("the Scheme") of making money from rental properties while illegally evading the concomitant duties of being landlords by criminal means, including through extortion, violence, mail fraud and wire fraud.

283.    While exact methods and divisions of labor have changed over time, the members of the Enterprise and their roles in the Scheme have been as follows:

a. Defendant Jeffrey Butler owns the corporate Defendants, Elmwood Realty, Elmwood Realty North and Spring Street Realty. He helps to manage the Scheme and benefits financially from it. He maintains a large social media following with over 200,000 subscribers to his posts where he castigates tenants who oppose the Enterprise's scheme. The social media account transmits messages in interstate commerce. He is also responsible for attempting to physically intimidate tenant union organizers and leading and/or directing groups of Enterprise employees to physically intimidate tenants as described below. He is also responsible for individual decisions to rent to certain tenants who he believes will not assert their rights against the scheme and for responding to tenant complaints in an intimidating way to prevent tenants from asserting their rights. Jeffrey Butler is an individual who is capable of owning property.

b. Elmwood Realty, Elmwood Realty North and Spring Street Realty are corporate landlords that own the properties offered for rent by the Enterprise. They do not spend money to appropriately maintain their properties. They jointly operate a tenant portal that serves as a digital sham work order system. In reality, submitting a work order or maintenance request opens the tenant to unlawful discrimination and rarely or never leads to satisfactory repairs. The companies interchangeably share staff, finances, eviction counsel, and other resources. Elmwood

Realty, Elmwood Realty North and Spring Street Realty benefit financially from the Scheme by avoiding expensive maintenance obligations obtaining rent from tenants that they are not entitled to receive under Rhode Island law as landlords who do not properly maintain their properties. Elmwood Realty, Elmwood Realty North, and Spring Street Realty are entities that are capable of owning property.

c. Carissa Marie Zigoni a/k/a Carissa Butler calls herself and acts as "co-landlord" for units held by the corporate Defendants. She frequently receives and fails to act upon tenant complaints about unfit conditions in their homes. She frequently signs retaliatory notice to quit directed to tenants who have complained about the conditions in their unit and/or otherwise opposed the Scheme. Upon information and belief, she has an ownership interest in Elmwood Realty, Elmwood Realty North, and/or Spring Street Realty and/or benefits from the profits of the Scheme. Carissa Marie Zigoni a/k/a Carissa Butler is a person who is capable of owning property.

d. Unnamed Maintenance Employees are employed by Elmwood Realty, Elmwood Realty North and Spring Street Realty and trained and managed by Mr. Butler. They conduct sham inspections of tenants who the Enterprise wishes to retaliate against. They use these inspections to seek out and obtain private information about the tenants from their homes for Mr. Butler to use for blackmail and extortion. They have keys to Tenants' homes and have been instructed by Mr. Butler to "walk right in" – often without notice or even knocking – to Tenants' homes for retaliatory sham inspections. They sometimes impersonate government officials in order to further their harassment of tenants who oppose the Scheme.

e. Unnamed Cooperative Tenants are associated in fact with the Enterprise. They alert the Enterprise when they hear that other tenants are going to do something the Enterprise does not

want them to do, such as assert their rights to safe and habitable premises or associate with a tenants' union. Upon information and belief, they receive certain benefits that tenants who do not cooperate in the Scheme do not receive, such as free or discounted rent, repairs and protection from arbitrary eviction.

f.  An unnamed lawyer identified here as Lawyer 1 is an attorney-at-law who is associated in fact with the Enterprise. His role is to bring and prosecute eviction actions against tenants who oppose the scheme. Many of these actions are barred by RI. G.L. § 34-18-46 (prohibiting the bringing of retaliatory eviction actions as defined in the statute) or contain misstatements or material omissions of fact that benefit the Enterprise and its Scheme.

284.    Although the precise tactics of the Enterprise change, the racketeering activity performed by the Enterprise has an ongoing pattern that it uses repetitively to achieve its purpose of profiting from rental units and gaining an unfair competitive advantage as landlords by illegally avoiding the costs of maintaining safe and fit premises. This conduct has the same or similar purposes, results, victims, and methods of commission, as described below. The victims are the Enterprise's tenants or those who could or would help them, such as the Rhode Island courts and tenants union Reclaim RI. Upon information and belief, the tenant-Plaintiffs are not the only victims of the Scheme. The pattern of racketeering is explained in detail in the next and following paragraphs. At a high level, the pattern of racketeering at the heart of the Scheme can be described as follows, which constitute the Enterprise's regular and ongoing way of doing business:

a.  *Bring in unwitting tenants through fraud:* the Enterprise brings in tenant-customers by offering leases that say that the landlord will be responsible for maintaining the premises, and materially omit that the Enterprise plans on not

maintaining the premises and breaching other aspects of the law governing landlords. The Enterprise selects poor, vulnerable tenants. The most common racketeering activity for this stage of the Scheme is mail and/or wire fraud.

b. *Silence those who complain:* some of the tenants who are subject to the Enterprise's broken promises to maintain their rental units and otherwise follow the law have and will predictably complain. The Enterprise uses racketeering activity to silence these complaints. The most common racketeering activity for this stage of the Scheme is extortion. The Enterprise threatens the complaining tenants' reputation or property by whatever means are available. In the case of tenants like John Doe, this is a threat to reputation by leveraging an intrusion of privacy and sexually embarrassing videotape. For many other tenants it is the threat of (unlawful) eviction.

c. *Drive out the tenants who cannot be silenced (and make sure the other tenants know it)*: Where tenants persistently complain and/or resist the efforts to silence them at the previous stage of the Scheme, the Enterprise moves to push them out the Enterprise's units. The most common racketeering activity at this stage of the scheme is wire and/or mail fraud. The Enterprise causes its counsel to bring often fraudulent eviction actions that it is not entitled to bring because they are retaliatory and/or lack a real basis in fact or law. The purpose of these evictions is to benefit the Scheme by removing those who oppose it and to intimidate other tenants into not opposing it. The Enterprise benefits at this stage of the Scheme from the tenants being too poor to hire a lawyer and/or having to rely on overburdened free lawyers. The Enterprise also knows and benefits from the fact

that suing to evict a tenant will leave the tenant with a publicly accessible court record that will act as a black mark detering other landlords from renting to that tenant. The Enterprise makes sure that other tenants find out what happens to those tenants who oppose the Scheme. This is why, for example, Mr. Butler brags about retaliatory evictions on his social media.

d. *Use proceeds from the Scheme to purchase additional residential rental realty:* Upon information and belief, the Enterprise obtains a competitive advantage through its unlawful activity by foregoing maintenance costs that other landlord's have to pay. Upon information and belief, it re-invests the proceeds of its illegal activities in expansion by purchasing additional rental properties.

e. *Return to step "a" and repeat the process:* The Enterprise engages in further fraud by re-letting the units to new unwitting tenants. Mr. Butler himself admitted that this cycle continues to repeat in his voicemail to Reclaim Tenant organizer Shana Crandell by saying: "you got one evicted today. And all you do is emptying [sic] out my apartments and I clean them up and I re-rent them to somebody else." Absent relief from this Court the Enterprise is expected to continue this pattern of racketeering activity endemic to the Scheme indefinitely.

*The Enterprise's Engagement in and Affect upon Interstate Commerce*

285. The Enterprise relies in part upon financing from a number of out of state financial institutions, including but not limited to Digital Federal Credit Union, to acquire the real estate that it leases to tenants, including Plaintiff-tenants. Upon information and belief, the Enterprise received lent funds from and makes debt service payments to these institutions via interstate wire and/or the mails.

64

286.     The Enterprise receives funds from the United States Department of Housing and Urban Development for housing Section 8 participants. HUD is located in Washington, DC. The funds that it receives are, upon information and belief, sent through interstate wire or the mails.

287.     The tenant portal operated by the Defendants is, upon information and belief, an electronic system run on an interstate wire by a company outside of Rhode Island with servers outside of Rhode Island. Upon information and belief, all communications between the Defendants and their tenants send signals out of Rhode Island to the out-of-state servers, even if all parties to the communication are located in Rhode Island.

288.     The Enterprise is engaged in and affects the Providence Metropolitan Statistical Area rental housing market. The Providence Metropolitan Statistical Area is a region with high population density and close economic ties throughout the region as determined by the United States Census Bureau. The Providence Metropolitan Statistical Area includes Bristol County, Massachusetts. Landlords in Massachusetts – including landlords who pay to have legally compliant, fit and habitable units – have to compete with the Enterprise for tenant-customers who live, work and have family ties in the Providence Metropolitan Statistical Area.

289.     TikTok is a social media platform whose primary servers are located in Oregon and Virginia. It is owned by a Chinese company called ByteDance. Mr. Butler uses TikTok on behalf of the Enterprise and in furtherance of the Scheme, to intimidate tenants into not asserting their rights or to punish them when they do. When Mr. Butler uses TikTok he sends transmissions through interstate wire to Oregon and/or Virginia so that they can be uploaded and viewed by anyone located anywhere in the world.

290.     Upon information and belief, the corporate Defendants employ individuals who live out of state, such as in Massachusetts.

291.    The existence of the Enterprise and its activities in renting to tenants cause tenants to move into and out of state using the instrumentalities of interstate commerce. For example, after being displaced from and moving out of the Defendants' unit, Jordan Towns moved to Georgia and used the instrumentalities of interstate commerce in order to do so.

*Pattern of Racketeering Activity: Wire Fraud and Mail Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

292.    The Enterprise engaged in a wide-ranging scheme or artifice to defraud the Tenant Plaintiffs, other tenants, and the Department of Housing and Urban Development ("HUD") and other subsidy organizations. The ultimate objective of the scheme or artifice was to induce the foregoing defrauded parties to lease or agree to fund the leasing of unlawfully substandard rental units from the Defendants, and to obtain rent without fulfilling their maintenance and other obligations as landlords.

293.    In furtherance of the scheme, the Defendants transmitted or caused to be transmitted by means of wire communication in interstate commerce and through the mails and by private interstate carrier the following things and communications:

a.  advertisements for residential rental units claimed to be lawful and habitable dwellings;

b.  telephone conversations with putative tenants claiming and implying that prospective tenants would be leasing lawful and habitable dwellings;

c.  leases and other contracts with HUD and other organizations providing rental subsidies promising to maintain the premises in a fit and habitable way in compliance with the law;

d.  leases with each tenant promising to maintain the premises in a fit and habitable way in compliance with the law;

e.  emails and other communications to tenants claiming to operate according to the law and inducing tenants to send maintenance requests that would never be honored.

294.    These communications contained false statements of fact because the Defendants never intended to provide fit or habitable premises or to properly maintain the rental units they were offering to the tenants. In fact they intended to use various unlawful tactics, such as unlawful retaliation, extortion, and threats of violence in order to continue to receive rent unlawfully while not performing their obligations.

295.    The tenants relied upon the foregoing false statements of fact in their decisions to rent their rental units, to pay rent, and to stay in the premises.

296.    HUD and other subsidy organizations relied upon the foregoing false statements of fact to their detriment in their decision to subsidize and fund tenancies that were unlawful and did not further their mission to promote affordable and safe housing.

297.    The Enterprise's violations of 18 U.S.C. §1341 and 1343 proximately harmed the tenant-Plaintiffs *inter alia* because it caused them to move into and live in unsafe and unfit apartments and to pay rent for unsafe and unfit apartments.

*Pattern of Racketeering Activity: Extortionary Threats to Retaliate in Violation of State Extortion Statute at R.I. G.L. § 11-42-2*

298.    Mr. Butler frequently talks about his evictions of tenants or planned evictions of tenants who object to the Enterprise's scheme on his public social media platform. The messages on this platform are transmitted through interstate communication in interstate commerce. These messages were intended to be seen and were seen as threats by tenants who have become afraid to assert their rights in a similar manner to other tenants who are being evicted.

299.    He also sent an email to his tenants threatening to evict anyone who spoke with or worked with the Reclaim Rhode Island's tenants' union organizing drive. The email was transmitted through the instrumentalities of interstate commerce.

300.    Mr. Butler emailed Matthew Stevens and Ms. Woolf numerous threats to evict them, and to embarrass them with court records of the eviction, unless Mr. Stevens gave up his personal injury lawsuit.

301.    These threats to wrongfully evict are illegal under RI. G.L. § 34-18-46.

302.    Mr. Butler made the threats maliciously, with the purpose of deterring his tenants from availing themselves of their lawful rights, including their rights to fit and habitable homes, to complain to governmental authorities, including the courts, about a landlord who does not provide such homes, and to join a tenants' union.

303.    These threats to illegally evict threatened injury to the property and financial condition  of the tenants within the meaning of the Rhode Island Extortion Statute. In making the threats, Mr. Butler sought to obtain a pecuniary advantage for the Defendants in the form of not having to pay to maintain the tenant Plaintiffs' units, and to obtain the dismissal of a lawsuit against the Defendants.

304.    The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed the Plaintiff-tenants because it deterred and/or prevented them from using mechanisms that they were lawfully entitled to use to obtain repairs and maintenance that they were entitled to under Rhode Island law. The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed Reclaim RI because they stymied Reclaim RI's organizing drive and prevented it from obtaining numerous tenant-members.

*Pattern of Racketeering Activity: Threatened Use of Embarrassing Sexual Video against John Doe in Violation of State Extortion Statute, R.I. G.L. § 11-42-2*

305.    After John Doe requested that the Defendants remediate the raw sewage intrusion into his unit, the Defendants set out to silence him by unlawful means and obtain compliance with their unlawful plan to charge him rent without associated maintenance obligations.

306.    One of the ways they did this was through a pattern of inspections of his unit that were designed to harass him.

307.    At one such inspection the Defendants obtained footage of private sexual materials in Mr. Doe's apartment.

308.    This footage was made solely in order to harass and control Mr Doe and to effectuate the Enterprise's illegal scheme.

309.    The Enterprise sent Mr. Doe an email message threatening to reveal its footage of Mr Doe's private sexual materials if he did not comply with the scheme and cease complaining about the unsafe and unfit condition of his residential unit.

310.    This threat was made maliciously, and it threatened the reputation of Mr. Doe if he did not comply with the scheme.

311.    The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed Mr. Doe by causing him emotional distress and eventually to move out of his home and become homeless.

*Pattern of Racketeering Activity: Extortionary and Violent Suppression of Tenant Organizing Activities  in Violation of State Extortion Statute at R.I. G.L. c. § 11-42-2.*

312.     The Enterprise has resisted Reclaim Rhode Island's peaceful efforts to speak with the Enterprise's tenants and organize them to collectively oppose the scheme through intimidation and violence.

313.    Defendant Jeffrey Butler has followed Reclaim RI organizers in his car and shouted at them and tenants they were speaking with outside the tenants' homes. He demands that the organizers stop, get away from "my doors" and leave. When Mr. Butler refers to "my doors", he means doors to units that he has rented to tenants who have the right to have any guests they want.

69

314.    During these confrontations, he has shouted at tenants, ordering them to go back inside their homes and not talk to organizers. All of these commands occur within the context of numerous other threats of unlawful eviction.

315.    In one instance, on November 17, 2023, Mr. Butler yelled at one tenant that the tenant owed him money and must go back into the tenants home. Later, he shouted at organizer and Rhode Island state legislator Cherie Cruz to leave the premises, although she had permission to be there from tenants who wanted to speak with her about organizing a tenants' union. When she felt frightened and got into her car to leave, he chased her car with his car. He hit his car into her car as she made to pull over, afraid of being chased. After the collision, he got out of his car yelling.

316.    In another instance, organizer Cherie Cruz was at a tenant union member's apartment to observe an inspection being conducted by the Enterprise. Mr. Butler arrived and, apparently enraged at Ms. Cruz's presence, yelled at the tenant and precipitated a violent confrontation that led to multiple arrests, including the arrest of Mr. Butler on or about April 9, 2024.

317.    This course of conduct constituted malicious threats to commit violence against tenants and organizers and to unlawfully evict tenants in order to coerce them into going away and stopping their organizing activities, with the goal of extorting an unlawful pecuniary advantage – namely, the continuation of the Scheme without the impediment of a tenants union, all in violation of the state extortion statute, R.I. G.L. c. § 11-42-2.

318.    The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed the Plaintiff-tenants because it deterred and/or prevented them from becoming members of a tenants union and obtaining the benefits of collective bargaining that they were entitled to under Rhode Island law. The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed Reclaim RI

because they stymied Reclaim RI's organizing drive and prevented it from obtaining numerous tenant-members.

*Pattern of Racketeering Activity: Bringing Fraudulent Eviction Actions in Violation of 18 U.S.C. § 1341 and 1343*

319.    The Defendants have brought and caused to be brought eviction actions in the Rhode Island District Court that are fraudulent within the meaning of and violate 18 U.S.C. §1341 and 1343.

320.    For example, after John Doe moved out of his home voluntarily through an agreement with Mr. Butler, and relinquished possession to the Defendants, the Defendants caused Lawyer 1 to file an eviction action against Mr. Doe. The complaint in the eviction action contained the following language: "Defendant [i.e., Mr. Doe] remains in possession of the rental premises." The Defendants knew that the statement was not true. The statement was material. The statement constituted an artifice or scheme to defraud the District Court and Mr. Doe.

321.    The artifice or scheme was intended to cause Mr. Doe to "forfeit" his security deposit, and was successful in this. It was also intended to punish Mr. Doe for requesting repairs and opposing the Scheme.

322.    In another example, the Defendants brought and caused to be brought an eviction action against Melissa Potter that they knew to be illegal. At all relevant times the Defendants knew that they were evicting Ms. Potter for "making my [Mr. Butler's] life a living hell" by complaining to government agencies about conditions affecting the health and safety of her rental premises, and for joining a tenants' union. By its nature, the eviction action complaint implied that the eviction action was lawfully brought. It contained a material omission in neglecting to include the information that the action was an illegal retaliatory eviction action. The material omission constituted an artifice or scheme to defraud the District Court. It caused

Ms. Potter harm in the form of annoyance, embarrassment, and needing to defend an illegal action that the Defendants knew from the beginning they were not entitled to bring.

323.    The Defendants then brought and caused to brought an additional eviction action, with docket number 3CA-2025-02901, against Melissa Potter that they also knew to be illegal. At all relevant times the Defendants knew that they were again evicting Ms. Potter for "making my [Defendant Jefferey Butler's] life a living hell" by complaining to government agencies about conditions affecting the health and safety of her rental premises, and for joining a tenants' union. By its nature, the eviction action complaint implied that the eviction action was lawfully brought. It contained a material omission in neglecting to include the information that the action was an illegal retaliatory eviction action. The material omission constituted an artifice or scheme to defraud the District Court. Moreover, the Defendants knew that the second eviction action sought an amount of rent that Ms. Potter had never agreed to pay and that they were not entitled to receive. The complaint in that action pleaded that Ms. Potter owed $1,500, an amount that she never agreed to and did not owe. Pleading that the rent owed was $1,500 was a material misstatement of fact constituting a scheme or artifice to defraud the District Court and Ms. Potter.

324.    The artifices and schemes to defraud in these eviction actions were transmitted through interstate wire and/or the mails, including but not limited to through the Rhode Island courts' Odyssey digital filing system.

325.    The Enterprise's violations of 18 U.S.C. §1341 and 1343 proximately harmed John Doe and Melissa Potter because it caused them to be wrongfully sued for eviction.

*Pattern of Racketeering Activity: Forcible Eviction Activity in Violation of State Extortion Statute at R.I. G.L. Section 11-42-2*

326.    The Enterprise has coerced and attempted to coerce tenants to move out of their rental units without the benefit of judicial eviction process. It does so by sending a large number of employees to deliver termination of tenancy  notices and eviction court summons in a threatening manner. These employees undertake threatening behavior such as blocking tenants from closing their front door by kicking the front door. Upon receiving eviction documents in this threatening manner, tenants believe they are currently being evicted and that it is not safe to stay. In this way they are coerced to leave their residential units without a lawful eviction order from a Rhode Island judge.

327.    This is integral to the overall scheme, because it removes tenants who might otherwise complain about the violation of their lawful rights to fit and habitable rental premises to government bodies or others.

328.    This is also integral to the overall scheme because it prevents tenants from asserting the unfit, uninhabitable, or otherwise non-compliant nature of their rental units as a defense to eviction in a lawful eviction action. Because Rhode Island law makes bad conditions of rental units a defense to residential eviction, the tenants might not be able to be evicted otherwise

329.    This pattern of conduct is intended to prevent tenants from attending court, asserting claims in court, and to force them to give up their lawful property rights to their leased rental home without due process.

330.    The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed Reclaim RI because they stymied Reclaim RI's organizing drive and caused it to lose tenant-members such as the Rivera Family.

   *Pattern of Racketeering Activity: Demanding that Tenants Self-Evict under Threat of Criminal Prosecution in Violation of State Extortion Statute at R.I. G.L. §11-42-2*

331.    Mr. Butler caused and was the first physical aggressor in a physical altercation between himself and Kellee Silva during a court-ordered inspection that was supposed to redress unfit conditions in her unit. He knew that he was the first physical aggressor who started the physical altercation with Ms. Silva.

332.    Mr. Butler caused criminal charges to be filed against Ms. Silva in state court for the physical altercation.

333.    Mr. Butler threatened to press charges against Ms. Silva unless she and Mr. Vasquez moved out of their home, and offered to have the charges dismissed if they did move out.

334.    In making this threat, Mr. Butler maliciously attempted to obtain an unlawful pecuniary advantage – Mr. Silva and Mr. Vasquez surrendering possession of their home and their rights under the lease – through extortion.

335.    The Enterprise's violations of R.I. G.L. § 11-42-2 proximately harmed Ms. Silva because it caused her to be prosecuted and to suffer emotional distress.

## VI.        CAUSES OF ACTION

### Count I
**Conducting and Participating in an Enterprise's Affairs through a Pattern of Racketeering Activity in Violation of RICO,  18 U.S.C. § 1962(c) (Predicate Acts including Wire Fraud, Mail Fraud, and Extortion; Unlawful Debt Collection)**
**All Plaintiffs against Defendant Jeffrey Butler**

336.    Plaintiffs incorporate all other paragraphs of the complaint by reference.

337.    Mr. Butler conducted and participated in the Enterprise in furtherance of the Scheme through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). He is associated-in-fact with the Enterprise. Mr. Butler engaged in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c):

a.  Wire Fraud and Mail Fraud in Violation of 18 U.S.C. § 1341 and 1343;

b.  Violation of State Extortion Statute at R.I. G.L. c. § 11-42-2.

338.    Mr. Butler also conducted and participated in the Enterprise in furtherance of the Scheme by collecting an unlawful debt.

339.    Mr. Butler is a "person" within the meaning of the RICO statute.

*Wire Fraud and Mail Fraud in Violation of 18 U.S.C. § 1341 and 1343*

340.    The Defendants  engaged in a scheme to obtain money or property by means of false or fraudulent pretenses by obtaining rent from the Plaintiff tenants and subsidy payments from HUD and other housing subsidy agencies under the false pretense that they intended to fulfill their obligations as landlords and maintain the rental units in fit and habitable condition.

341.    The Defendants knowingly and willfully participated in the scheme with the intent to defraud. They knew that their statements and material omissions would cause the Plaintiff tenants to reasonably believe that they were renting housing units that would be maintained in fit and habitable conditions by the landlord. Meanwhile, the Defendants knew they would not fulfill their obligations as landlords when they advertised, leased, and otherwise induced the Plaintiff tenants to move in and pay rent. At the time the Plaintiff tenants moved in and paid rent, the Defendants knew that they instead intended to avoid their obligations through a pattern and practice of willful non-compliance, retaliation, intimidation, and other tactics described above.

342.    The Defendants engaged in a scheme or artifice to obtain money from tenants and relief from the Rhode Island District Court by means of false or fraudulent pretenses by causing to be filed eviction actions that they knew to be without basis, because *inter alia* the tenant-defendant had already delivered up possession or the action was barred by R.I. G.L. § 34-18-46. This fraud was perpetrated willingly and knowingly.

343.    The Defendants used the mails and interstate wire in furtherance of their frauds in the following ways:

a.  by advertising rental units on the internet using interstate wire;

b.  by executing leases and other tenancy documents digitally on the internet through interstate wire;

c.  by inducing rental and subsidy payments through the mails and interstate wire;

d.  by filing fraudulent eviction actions through interstate wire communication, namely Rhode Island's digital court filing system and using the mails to prosecute said actions; and,

e.  by utilizing a tenant portal to take sham work orders in furtherance of the scheme or artifice to defraud through interstate wire communication.

*Violation of State Extortion Statute at R.I. G.L. c. § 11-42-2.*

344.    The Defendants maliciously threatened injury to the person, reputation, property, or financial condition of the Defendants in the following ways:

a.  by threatening to harm Mr. Doe's reputation by making and threatening to reveal an embarrassing video taken in his unit;

b.  by threatening the Plaintiff tenants' property interest in their rental homes and reputations and financial condition by threatening to illegally evict or attempt to evict them;

c.  by threatening injury to the person and property of tenant union organizers of Plaintiff Reclaim Rhode Island by chasing and colliding automobiles with them; and by

d.  threatening injury to the person, property, reputations and financial condition of tenants by seeking to physically intimidate them into leaving their residential units without court process.

345.    The Defendants intended to extort money and unlawful pecuniary advantage and to extort others to do acts against their will, namely:

a. extorting rental payments without the concomitant obligations including maintenance obligations;

b. extorting tenants to refrain from contacting the government to complain about unfit and uninhabitable conditions in their homes, against the tenants' will;

c. extorting tenants to refrain from joining a tenants union, against the tenants' will;

d. extorting Reclaim Rhode Island tenant organizers to refrain from organizing the Defendants' tenants against the organizers' and Reclaim Rhode Island's will.

*Collection of Unlawful Debt*

346.    The Enterprise has collected an unlawful debt. It did so by collecting usurious late fees. The usurious late fees are disguised unsecured loans that have an annualized interest rate exceeding twice the maximum allowable interest rate in Rhode Island of 21%.

347.    The Defendants charged Plaintiff-tenants including but not limited to Krystie Wood and Theodore Oliveira the usurious late fees.

*Damages and Entitlement to Relief*

348.    The Plaintiff tenants have been injured in their business or property as a direct and proximate result of the Defendant's violations of 18 USC 1962(c), including but not limited to as follows: they have been forced to endure unsafe and unsanitary conditions in their homes; paid rent for premises with diminished value; endured emotional distress and suffering; been damaged in their participation in work and school; suffered physical injuries; and suffered other harms.

349.    Plaintiff Reclaim Rhode Island has been injured in its business or property as a direct and proximate result of the Defendant's violations of 18 USC 1962(c). It has had its lawful

organizing drive stymied, its organizers physically threatened, and has lost potential dues, grants, and other fruits of a successful organizing campaign.

350.    All Plaintiffs are entitled to actual consequential damages, trebled, and a reasonable attorney's fee.

**Count II**
**Conspiracy to Violate RICO,  18 U.S.C. § Section 1962(d)**
**All Plaintiffs against all Defendants**

351.    Plaintiffs incorporate all other paragraphs of the complaint by reference.

352.    The Defendants are "persons" within the meaning of the RICO statute. They are members of the Enterprise.

353.    In pursuing the Scheme, the members of the Enterprise have unlawfully, knowingly, and willfully combined, considered, confederated, and agreed together with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

354.    The Defendants used the mails and interstate wire in furtherance of their conspiracy, agreement, combination, and/or confederation.

355.    The Defendants violation of 18 U.S.C. § 1962(d) harmed the Plaintiffs in their business and property.

356.    All Plaintiffs are entitled to actual and consequential damages, trebled, and a reasonable attorney's fee.

**Count III**
**Investment of Racketeering Income in Violation of RICO,  18 U.S.C. § 1962(a)**
**All tenant-Plaintiffs against Mr. Butler**

357.    Plaintiffs incorporate all other paragraphs of the complaint by reference.

358.    Defendant Butler has received income derived directly and indirectly from a pattern of racketeering activity making up the Scheme.

359.    Defendant Butler has used and invested this income through the Enterprise in furtherance of the Scheme, in part by buying rental properties resided in by the Plaintiffs. This use of this income has caused the Plaintiffs to become the Enterprise's tenants, and to be subject to the wrongful acts and omissions described in this complaint.

360.    This use of income has proximately harmed the tenant-Plaintiffs in their business or property.

361.    The usage and investment of this income was in interstate commerce.

362.    All Plaintiffs are entitled to actual and consequential damages, trebled, and a reasonable attorney's fee.

### Count IV
**Sexual Harassment in Violation of Fair Housing Act, 42 U.S.C. § 3604**
**John Doe against all Defendants**

363.    The Plaintiffs incorporate all other paragraphs in the complaint by reference.

364.    The Defendants searched private areas of Mr. Doe's apartment, found a private adult object suggesting that Mr. Doe is gay, videotaped that object for the purpose of harassing Mr. Doe ensuring his obedience towards the landlord, and threatened to publicize the video (and therefore Mr. Doe's sexual orientation and activities) if he did not comply.

365.    The Defendants kept the footage and maintained the leverage it gave them through Mr. Doe's decision to leave early and to agree (under duress) to forfeit his security deposit.

366.    This conduct was unwelcome.

367.    This subject was based on Mr. Doe's sex and sexual orientation.

368.    The conduct was sufficiently severe and pervasive that it altered the condition of the tenancy. It was intended to, and in fact did, cause Mr. Doe not to avail himself of his lawful rights to compel the landlord to provide habitable premises, forcing him to live in unfit

conditions, forced him to live in an atmosphere of fear of the landlord, and eventually drove him

from his rental home and to "forfeit" his security deposit.

369.    Mr. Doe is entitled to compensatory damages, punitive damages, costs, and a

reasonable attorney's fee.

**Count V**
**Disability Discrimination in Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)**
**Sheree Pine against Jeffrey Butler and Elmwood Realty, LLC**

370.    Plaintiff Sheree Pine repeats and realleges all other paragraphs in the complaint by

reference.

371.    Sheree Pine is an individual with a disability within the meaning of the Fair Housing

Act, 42 U.S.C. § 3602(h). She suffers from physical and mental impairments, including mobility

limitations and post-traumatic stress disorder (PTSD), which substantially limit one or more

major life activities, including walking, climbing stairs, and maintaining emotional stability.

372.    The apartment Pine occupied, located at a property owned and managed by

Defendants Jeffrey Butler and Elmwood Realty, LLC, is a dwelling within the meaning of 42

U.S.C. § 3602(b).

373.    Under the Fair Housing Act, 42 U.S.C. § 3604(f)(2) and (f)(3)(B), Defendants are

required to make reasonable accommodations in rules, policies, practices, or services when such

accommodations are necessary to afford a person with a disability an equal opportunity to use

and enjoy a dwelling.

374.    Pine notified Defendants of her disability and requested reasonable accommodations,

including permission to keep an emotional support animal to mitigate her PTSD and access to

accessible parking to accommodate her mobility limitations. She also informed Defendants that

the lack of hot water in her apartment exacerbated her physical and mental impairments,

necessitating repairs to ensure habitability.

375.    These accommodations were necessary to afford Pine an equal opportunity to use and enjoy her dwelling, as her disabilities directly impacted her ability to live comfortably and safely in the apartment.

376.    Defendants failed to engage in an interactive process to address Pine's requests and refused to grant the requested accommodations. Instead, Defendants issued a notice to quit and announced their intent to evict Pine shortly after she made her accommodation requests, in retaliation for asserting her rights.

377.    Defendants' refusal to provide reasonable accommodations and their retaliatory actions violated 42 U.S.C. § 3604(f)(2) by discriminating against Pine on the basis of her disability and denying her equal opportunity to use and enjoy her dwelling.

378.    As a direct and proximate result of Defendants' discriminatory actions, Pine suffered harm, including exacerbation of her PTSD, physical pain from the lack of hot water, emotional distress, financial losses from moving costs, and the burden of finding alternative housing.

379.    Defendants' actions were intentional, willful, and in reckless disregard of Pine's rights under the Fair Housing Act, entitling her to compensatory and punitive damages, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

**<u>Count VI</u>**
**Failure to Maintain Fit and Habitable Premises in Violation of R.I. G.L. § 34-18-22**
**All Tenant Plaintiffs against all Defendants**

380.    The Plaintiffs incorporate all other paragraphs in the complaint by reference.

381.    The Defendants have and had a duty to maintain each tenant's home in a fit and habitable manner and in compliance with all applicable building and housing codes affecting health and safety.

382.    The Plaintiff-tenants' homes have not been fit and habitable in violation of this duty because of conditions including but not limited to the following:

      a.   lack of heat in violation of R.I. G.L § 45-24.3-9(1);

      b.   vermin infestation in violation of R.I. G.L § 45-24.3-10(9);

      c.   presence of raw sewage in violation of R.I. G.L § 45-24.3-10(18);

      d.   unworkmanlike repairs in violation of R.I. G.L. § 34-18-22(a)(2);

      e.   blocked entrances and egresses in violation of R.I. G.L. § 34-18-22(a)(2) and (3);

      f.   unsafe exteriors and yards  in violation of R.I. G.L. § 34-18-22(a)(3);

      g.   broken windows; in violation of R.I. G.L. § 45-24.3-10 (7, 8 and 20).

      h.   broken appliances in violation of R.I. G.L. § 45-24.3-10(19); and,

      i.   unclean and unsafe plumbing  R.I. G.L. § 34-18-22(a)(2) and (6).

383.    The Defendants have been on notice of these issues and have failed to remedy them in a timely manner and to prevent them through workmanlike repairs.

384.    The Defendants' failure to meet their obligations under § 34-18-22 are willful. The volume of complaints, the number of unaddressed issues, the Defendants' contumacious responses to notifications of problems, and the Defendants' own statements each and all support the wilful nature of this failure.

385.    The Defendants are liable to the Plaintiff tenants for the Plaintiff tenants' actual and consequential damages, including but not limited to lost wages, diminution in value of the rental premises, damages for sickness and injury, emotional distress damages, and disgorgement of profits gained from omitting to properly maintain the premises. The Plaintiffs are also entitled to a reasonable attorney's fee and to an injunction against the Defendants' continuing failure to maintain fit, habitable, and compliant premises.

**Count VII**
**Unlawful Collection of Rent in Violation of R.I. Gen. Laws § 34-18-18**
**All Plaintiffs against all Defendants**

386.     The Plaintiffs incorporate all other paragraphs in the complaint by reference.

387.     The Defendants had and have a pattern or practice of renting residential units without maintaining them according to R.I. G.L. § 34-18-22. The Defendants rented residential units to each Plaintiff tenant without intending to maintain them.

388.     R.I. G.L. § 34-18-18 forbids the collection of rent by landlords who do not take on maintenance obligations.

389.     The Plaintiffs are entitled to disgorgement, restitution, and/or return of all rents paid and an injunction against the Defendants receiving rents in violation of R.I. G.L. § 34-18-18.

**Count VIII**
**Retaliation in Violation of R.I. G.L. § 34-18-46**
**All Tenant Plaintiffs except Kristie Wood against all Defendants**

390.     The Plaintiffs incorporate all other paragraphs from the complaint by reference.

391.     The Defendants' conduct in running their buildings, including their failure to maintain fit and habitable premises, have provoked the Plaintiff tenants to take a number of actions that are protected by law.

392.     The tenant-Plaintiff have complained to the landlord and to government agencies about the condition of their premises and violations of § 34-18-22.

393.     Tenant-Plaintiffs have joined a tenants' union organized by Reclaim RI.

394.     Tenant-Plaintiffs have availed themselves of other lawful rights and remedies, including their first amendment rights to free speech and assembly and to petition the government, to consider joining the tenants' union, and other rights.

395.    As a result of these complaints, tenant union activities, and availments of lawful rights, the Defendant has diminished services to tenants, raised their rent, terminated their leases, and threatened to bring and brought actions to evict.

396.    Pursuant to R.I. G.L. §§ 34-18-48 and 34-18-34, the tenant-Plaintiffs are entitled to damages in the amount of three months' rent for each retaliatory diminution in service, rent increase, threat to evict, and action for eviction. The Plaintiff tenants are also entitled to their actual and consequential damages including but not limited to lost income, emotional distress, moving costs, and reputational harm including the difficulty in renting alternative premises when a tenant has an eviction court record due to retaliation.

397.    The Plaintiff tenants are also entitled to a temporary restraining order, preliminary injunction, and permanent  injunction against the Defendants' retaliating for their bringing  this action or for any other prohibited reason and to a reasonable attorney's fee.

### Count IX
### Unlawful Inclusion of Prohibited Lease Terms
### All Plaintiffs against all Defendants

398.    Plaintiff tenants incorporate all other paragraphs from the complaint by reference.

399.    The "Indemnity Clause" and the "Tenants Insurance Clause" both provide that the tenant agrees to the exculpation or limitation of any liability of the landlord arising under law or to indemnify the landlord for that liability or the costs connected with the liability. These clauses violate R.I. G.L. § 34-18-17.

400.    Upon information and belief, both clauses are included in all leases that the Defendants prepare for their tenants to execute and are included in all leases between the Defendants and their tenants.

401.    The Defendants deliberately used clauses known to be prohibited in their leases.

402.    The Plaintiff tenants are entitled to actual damages, three months' rent, and their attorney's fees.

403.    The Plaintiff tenants are also entitled to a declaration that the Indemnity Clause and the Tenants Insurance Clause or similar clauses in any and all of Defendants' leases are void and unenforceable.

### Count X
**Unconscionable Lease Terms**
**All Plaintiffs against all Defendants**

404.    Plaintiff tenants incorporate all other paragraphs from the complaint by reference.

405.    The Defendants present their leases as a contract of adhesion.

406.    The Defendants are the stronger contracting party, and their tenants are the weaker contracting party.

407.    The late fee and legal fee manifested a gross disparity of consideration between the contracting parties.

408.    The late fee and "legal administrative fee" are unconscionable.

409.    The Plaintiff tenants are entitled to a declaration that the late fee and "legal administrative fee" are unconscionable pursuant to R.I. G.L. § 34-18-13 and unenforceable and to disgorgement of all paid fees.

### Count XI
**Unlawful Ouster in Violation of R.I. G.L. § 34-18-34/Common Law Constructive Eviction**
**John Doe, Sheree Pine, Shanda Johnson, Kellee Silva and Eugene Vasquez against all Defendants**

410.    Plaintiffs John Doe, Sheree Pine, Shanda Johnson, Kelle Silva, and Eugene Vasquez repeat and reallege all previous allegations.

411.    The Defendants failed to provide a fit and habitable place to live to the above-named tenants.

412.    The Defendants were on notice of the unfit conditions and failed to remediate.

413.    This failure to remediate made remaining in the above-named Plaintiffs' units untenable and forced the above-named Plaintiffs to vacate their homes.

414.    These actions constitute a common law constructive eviction and an unlawful ouster pursuant to R.I. G.L. § 34-18-34.

415.    The Defendants are liable to the above-named Plaintiffs for their actual and consequential damages, trebled, or three months' rent, and a reasonable attorney's fee.

**Count XII**
**Violation of R.I. Privacy Statute, R.I. G.L. § 9-1-28.**
**John Doe, Kellee Silva, and Eugene Vasquez against all Defendants**

416.    Plaintiff incorporates all other paragraphs of the complaint by reference.

417.    The Defendants repeatedly entered Mr. Doe's home in order to retaliate for his asking them to remediate unlawful conditions in his home. The repetitious entries were under the guise of inspections. These inspections were unnecessary and had no lawful purpose.

418.    During one such entry the Defendants searched private places in Mr. Doe's unit.

419.    The Defendants discovered and video taped private sexual material in Mr. Doe's home.

420.    The Defendants emailed Mr. Doe, threatening to reveal the footage if he did not cooperate with the Scheme. Upon information and belief the footage was published within the meaning of the law. The footage's publication is offensive to a person of ordinary sensibilities.

421.    These actions constituted an intrusion into Mr. Doe's privacy and solitude.

422.    The Defendants' intrusions were into a place in Mr. Doe's apartment that was entitled to be private and expected to be private.The invasion was offensive and objectionable to a reasonable person.

423.    Mr. Butler posted Ms. Silva's and Mr. Vasquez's images, address, and phone number to his TikTok account, making said information publicly available. As a foreseeable result of this post, Ms. Silva and Mr. Vasquez received a number of derogatory communications, including a death threat, and suffered emotional distress.

424.    In doing so, Mr. Butler published private facts about Ms. Silva and Mr. Vasquez. The publication was offensive and objectionable to a reasonable person.

425.    The invasions and disclosures were intended to retaliate for Mr. Doe, Ms. Silva, Mr. Vasquez opposing the Scheme and/or complaining about the conditions in their homes. There was no legitimate purpose for the invasions and disclosures.

426.    The Defendants have violated R.I. G.L. § 9-1-28 and are liable to Mr. Doe, Ms. Silva, and Mr. Vasquez for damages and a reasonable attorney's fee.

**Count XIII**
**Civil Conspiracy**
**All Plaintiffs against all Defendants**

427.    Plaintiffs incorporate all other paragraphs of the complaint by reference.

428.    The members of the Enterprise intentionally and willfully agreed to conspire illegally and perform illegal acts and to act as an illegal enterprise for the furtherance of the Scheme. Each unlawful act conducted in furtherance of the Scheme against any tenant benefitted the Scheme as to all tenants by terrorizing the tenants and making them believe that  asserting their rights was futile.

429.    The Defendants are jointly liable for all conduct committed in furtherance of the civil conspiracy.

**Count XIV**
**Interference with Prospective Contractual Relations**
**Reclaim RI against all Defendants**

430.    Plaintiff Reclaim RI incorporates all other paragraphs of the complaint by reference.

431.    Reclaim Rhode Island began an organizing drive to recruit the Defendants tenants into becoming members of its tenants' union and accepting Reclaim Rhode Island as their bargaining representative. Many tenants wished to be represented by Reclaim Rhode Island in their dealings with the Defendants, and many signed union cards to that effect. Many others did not sign union cards to that  effect because of the Defendants' improper interference.

432.    Reclaim Rhode Island had an expectancy of entering into beneficial contractual relations with the tenants who it was attempting to organize and who wanted to be represented by Reclaim Rhode Island.

433.    The Defendants became aware of Reclaim Rhode Island's organizing drive and expectancy of entering into agreements to represent tenants as their tenants' union.

434.    The Defendants intentionally and improperly interfered with the organizing drive including, but not limited to, in the following ways:

a.  unlawfully threatening to evict tenants who spoke to Reclaim Rhode Island or joined the tenants union;

b.  actual retaliatory eviction notices and eviction actions of tenant union members;

c.  unlawful retaliation including eviction of tenants who opposed the scheme, such as by complaining to governmental authorities about the unfit living conditions of their homes;

d. attempting to divide the tenants and break their ability to unify in a tenants union by engaging in unlawful housing discrimination against members of protected classes;

e. extortion and blackmail, such as by threatening to reveal videos obtained of Mr. Doe's private sexual materials;

f. physical interference with organizers.

435.    As a result of the Defendants wrongful conduct, Plaintiff Reclaim Rhode Island suffered damages, including increased organizing expenses and staff costs reduced membership, and loss of revenue including dues, grants, publicity and other organizational growth and opportunities that would have come from an organizing drive that was not interfered with.

**Count XV**
**Intentional Infliction of Emotional Distress**
**All Tenant-Plaintiffs against all Defendants**

436.    Plaintiffs incorporate all other paragraphs of the complaint by reference.

437.    The Defendants have intentionally and recklessly caused the tenant-Plaintiffs emotional distress.

438.    The Defendants' conduct has been extreme and outrageous. In addition to the inherent outrageousness of the conditions that the Plaintiff tenants and their children have been forced to live in, the Defendants have engaged in conduct calculated to cause emotional distress such as publishing private information publicly, cooing and baby noises to make fun of the tenants' complaints, taunting videos, and sexual harassment.

439.    The Defendants' conduct caused the tenant-Plaintiffs' emotional distress.

440.    The tenant-Plaintiffs have suffered severe emotional distress, including emotional distress manifesting with physical symptoms.

441.    The tenant-Plaintiffs are entitled to actual, compensatory, and punitive damages.

## VIII.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Honorable Court do the following:

442.     Enter judgment in favor of all Plaintiffs on each claim for relief.

443.     Declare that the Defendants have violated the Plaintiffs' rights to habitable dwelling units in violation of R.I. General Laws § 34-18-22.

444.     Declare that the Defendants' violations of R.I. General Laws § 34-18-22 were willful.

445.     Declare that the Defendants have unlawfully retaliated against the Plaintiffs in violation of R.I. General Laws § 34-18-46.

446.     Declare that the  "Indemnity Clause" and the "Tenants Insurance Clause" or similar clauses in Defendants' leases are void and unenforceable.

447.     Award each tenant Plaintiff statutory damages of not less than three months' rent for each violation of R.I. General Laws § 34-18-46.

448.     Award each tenant Plaintiff statutory damages of three months' rent for each lease executed including unlawful lease terms.

449.     Award all Plaintiffs compensatory damages in an amount to be determined at trial, trebled.

450.     Award all Plaintiffs punitive damages in an amount sufficient to deter future unlawful conduct on the part of the Defendants.

451.     Order Defendants Jeffrey Butler and Carissa Marie Zingoni a/k/a Carissa Butler to divest themselves of any interest, direct or indirect, in the Enterprise, and to refrain from ever investing in, managing, or participating in any residential landlord business in the future pursuant to 18 U.S.C. § 1964(a).

452.    Enter a permanent injunction requiring Defendants to maintain all of their properties in fit and habitable condition and in accordance with all relevant standards and codes.

453.    Enter a permanent injunction forbidding Defendants from retaliating against Plaintiffs.

454.    Enter a permanent injunction forbidding Defendants from filing an eviction action against any Plaintiff-tenant absent leave of court.

455.    Award Plaintiffs their costs and reasonable attorney's fees.

456.    Provide any other relief that is just and equitable under the circumstances.

**Plaintiffs hereby demand trial by jury on all claims so triable.**

Respectfully submitted,
Plaintiffs,
By their Attorney

Dated: July 9, 2025                     /s/Francis Curren/s/____
                                        Francis Curren, Esq.
                                        CURREN LAW, PLLC
                                        RI Attorney Reg. # 11032
                                        PO Box 5891
                                        Providence, RI 02903
                                        (401) 406-5550
                                        frankcurren@currenlaw.com