UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MELISSA POTTER; JOHN DOE; CINDY RODRIGUEZ; THEODORE OLIVEIRA; JORDAN TOWNS; KRISTEN NORMANDIN; KRYSTIE WOOD; SHEREE PINE; MATTHEW STEVENS; REBECCA WOOLF; SHANDA JOHNSON; KELLEE SILVA; EUGENE VASQUEZ; JOHN OLSON; and RECLAIM RI,<br>    *Plaintiffs,*<br><br>v.<br><br>JEFFREY BUTLER; CARISSA MARIE ZINGONI a/k/a CARISSA BUTLER; SPRING STREET REALTY, LLC; ELMWOOD REALTY NORTH, LLC; and ELMWOOD REALTY, LLC a/k/a ELMWOOD PROPERTY MANAGEMENT,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No.: 1:25-cv-00323-JJM-AEM |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) AND 12(B)(1)**

**I.      Introduction**

"[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991) (Selya, J.). This is because "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Id.* "The very pendency of a RICO suit can be stigmatizing and its consummation can be costly[.]" *Id.* (citing 18 U.S.C. § 1964(c)). Therefore, "[i]n fairness to innocent parties, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).

After months of delay and investigative work by the Plaintiffs to unearth additional facts to support their claims, the Plaintiffs have renewed their attempt to transform a collection of garden variety, landlord-tenant disputes into a civil RICO case.

However, the First Amended Complaint—now spanning one hundred and eighteen (118) pages long—contains the same outlandish allegations and legal theories as the original Complaint, and in all respects, remains a paper tiger.[1]

The Defendants, Jeffrey Butler, Carissa Marie Zingoni a/k/a Carissa Butler, Spring Street Realty, LLC, Elmwood Realty North, LLC, and Elmwood Realty LLC a/k/a Elmwood Property Management (the "Defendants") hereby move for dismissal of the Plaintiffs', Melissa Potter, John Doe, Cindy Rodriguez, Theodore Oliveira, Jordan Towns, Kristen Normandin, Krystie Wood, Sheree Pine, Matthew Stevens, Rebecca Woolf, Shanda Johnson, Kellee Silva, Eugene Vasquez, John Olson, and Reclaim RI (the "Plaintiffs")'s First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

For the reasons stated herein, the First Amended Complaint filed by the Plaintiffs on May 18, 2026 fails to state a single, plausible claim under the RICO Act or the Fair Housing Act. After the allegations are stripped of their federal garments, the First Amended Complaint is reduced to a matter of Rhode Island landlord-tenant law. Accordingly, after dismissing the federal claims in the First Amended Complaint, the Court should decline to exercise supplemental jurisdiction over any of the residual State law claims.

---

[1] "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Defendants submit that the First Amended Complaint violates Rule 8(a)(2) and subjects it to dismissal on procedural grounds, in addition to the substantive reasons stated below. Not only is responding to the 118-page First Amended Complaint a burden to the Defendants, evidenced by this seventy (70) page Motion; more importantly, it is a burden for the Court and strains precious judicial resources.

II.    **Facts and Travel**

As averred by the First Amended Complaint, the Plaintiffs are allegedly fourteen (14) tenants (mostly former tenants) of the Defendants and a Domestic Nonprofit Corporation called "Reclaim RI." ECF No. 26 (First Amended Complaint) ¶¶ 13–27.

The Plaintiffs have sued the Defendants Jeffrey Butler ("Butler") and his wife, Carissa Marie Zingoni a/k/a Carissa Butler ("Zingoni") individually. *Id.* ¶¶ 8–9. They have also sued several real estate entities (the "Entities"). *Id.* ¶¶ 10–12.

The Plaintiffs allege that federal question jurisdiction under 28 U.S.C. § 1331 arises from their claims brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") and the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA"). *Id.* ¶ 28. Additionally, the Plaintiffs claim the Court has supplemental jurisdiction over their State law claims under 28 U.S.C. § 1367. *Id.* ¶ 29.

The First Amended Complaint then proceeds to allege a slew of landlord-tenant grievances from the individual tenants, along with additional allegations concerning mortgage documents, Housing Assistance Payment ("HAP") contracts, social media activity, and tenant organizing. *See, e.g.*, *id.* ¶¶ 49–57, 337–345, 359–65. This sprawling pleading again stitches together what are essentially multiple separate landlord-tenant disputes that would normally be brought, if at all, under the Rhode Island Landlord-Tenant Act in Rhode Island District Court. *Id. See also*, *infra* Section IV.D (arguing that the Court should decline to exercise supplemental jurisdiction over these claims after dismissing the claims under RICO and the FHA).

In fact, as explained below, a swath of the allegations in the First Amended Complaint are nothing but re-packaged versions of prior Rhode Island District Court disputes involving individual tenants against certain Defendants—some of which have already been adjudicated by

3

the Rhode Island District Court. *Compare, e.g.*, ECF No. 26 (First Amended Complaint) ¶¶ 53–97 (allegations relating to Melissa Potter's tenancy and alleged deficiencies), *with* **Exhibit A** (Docket, Complaint, and Order of Dismissal in 3CA-2024-02831, *Melissa R. Potter v. Elmwood Realty* ("*Potter I*")) (containing allegations arising from the same tenancy and purported issues as those set forth in the present First Amended Complaint by Potter, and showing prior case dismissed by the Rhode Island District Court (Trezvant, J.) after a bench trial on May 14, 2024).

### A. Individual Tenant Allegations

The Defendants will attempt to summarize the allegations made by the individual Plaintiffs in the instant action as concisely as possible below for the Court's convenience:

### 1. Melissa Potter

Melissa Potter ("Potter"), who appears to be the lead Plaintiff, brings claims under RICO, the Landlord-Tenant Act, and Rhode Island common law. *See* ECF No. 26 (First Amended Complaint), Counts I–XVI. Potter alleges that she has lived at 1890 Broad Street in Cranston since March of 2022, a property which was formerly owned by Elmwood Realty. *Id.* ¶ 53. She claims various issues with her unit such as unreliable heat, mold, a trench in front of her door, and rodents. *Id.* ¶¶ 68, 75–80.

Potter claims that the Defendants "retaliated" against her for requesting repairs by threatening not to renew her lease, and then later initiating multiple eviction proceedings in Rhode Island District Court. *Id.* ¶¶ 71, 84, 87–88, 97. Potter also alleges that mold in her unit exacerbates her asthma and that the mold was caused by water damage from a broken pipe in February of 2023. *Id.* ¶¶ 73, 79. Among other grievances with her tenancy, Potter claims a lack of heat in her apartment "increased her susceptibility" to COVID-19, caused her to miss work, and ultimately be fired from her job due to ongoing respiratory illnesses. *Id.* ¶¶ 67–74.

Significantly, Potter has already (a) asserted (or could have asserted) the same claims based on her allegations in the present First Amended Complaint in the Rhode Island District Court, and they were dismissed after a bench trial in *Potter I*, **Ex. A** (*Potter I*) (Order of Dismissal) (entered May 14, 2024), and/or (b) asserted claims in this Complaint arising from a common nucleus of the operative facts presented to the Rhode Island District Court through Counterclaims and Affirmative Defenses she asserted in *Potter II*, *III*, and *IV*, which also have all been dismissed. **Exhibit B** (Docket, Complaint, Potter's Answer and Counterclaim, and Judgment from 3CA-2024-05801, *Spring Street Realty, LLC v. Melissa Potter* ("*Potter II*") (dismissed by Court without prejudice on August 2, 2024); **Exhibit C** (Docket, Complaint, Potter's Answer and Counterclaim, and Dismissal Stipulation from 3CA-2024-08347, *Spring Street Realty, LLC v. Melissa Potter* ("*Potter III*")) (dismissed without prejudice by parties on October 14, 2025); **Exhibit D** (Dismissal Stipulation in 3CA-2025-02901, *Spring Street Realty, LLC v. Melissa Potter* ("*Potter IV*") (same result as *Potter III*, dismissed without prejudice by parties on October 14, 2025).

Nonetheless, in an effort to transform these previously adjudicated, dismissed, and/or moot claims and disputes into a RICO cause of action, Potter alleges the following in Paragraphs 60 through 62 of the First Amended Complaint:

(i)      that when she executed her lease with Elmwood Realty, LLC on February 25, 2022, it "stated that it would be governed by Rhode Island law" requiring "landlords to maintain fit and habitable rental units";

(ii)     that "Potter reasonably expected that the landlord would maintain her unit so that it was fit and habitable under the lease";

(iii)    that "the Defendants never intended to maintain the unit so that it was fit and habitable for her to live in";

(iv)    that this was a "material omission" in her lease, that maintenance provisions in her lease were a "sham," and that this "material omission constituted a scheme or artifice to defraud Ms. Potter into signing the lease, paying her rent, and moving in";

(v)    that Potter "would not have moved in or paid the Defendants" if she had "been advised that the landlord had no intention of maintaining fit and habitable premises"; and

(vi)    that "[t]he lease was uploaded to the internet via interstate wire communication and payments under the scheme to defraud were made by interstate wires."

ECF No. 26 (First Amended Complaint) ¶¶ 60–62.

Potter also claims she complained to her landlord via phone and email for each issue and that the Defendants caused their eviction counsel to file an action for nonpayment of rent in 3CA-2025-02901 via interstate wire, which was also sent via U.S. mail to Potter (and has now been dismissed). *Id.* ¶¶ 81, 97. *See also* **Ex. D** (Dismissal Stipulation in *Potter IV*).

These allegations by Potter are largely representative of the types of allegations that the Plaintiffs are attempting to stretch into a RICO claim—*i.e.*, that the Defendants allegedly entered leases with tenants and held no intention of performing contractual or legal maintenance obligations thereunder. ECF No. 26 (First Amended Complaint) ¶ 380 (describing allegedly fraudulent RICO scheme and the "racketeering activity" of the "Enterprise" as "an ongoing pattern that it uses repetitively to achieve its purpose of profiting from rental units and gaining an unfair competitive advantage as landlords by illegally avoiding the costs of maintaining safe and fit premises").

Of note, Potter also alleges a new RICO theory relative to a mortgage recorded on the property at 1890 Broad Street in Cranston (the "Broad Street Mortgage"). *Id.* ¶¶ 54–59. Though Potter alleges her lease was with Elmwood Realty, Potter alleges that Defendant Spring Street Realty, LLC mortgaged the property to Bank RI on December 21, 2021 to secure a promissory note in favor of Bank RI in the amount of $5.8 million. *Id.* ¶¶ 55–56. Potter claims that she was on "constructive notice" of the Broad Street Mortgage because it was recorded in the Land Evidence Records. *Id.* ¶ 56.

Potter contends that the Broad Street Mortgage shows that Butler "promised" on behalf of Spring Street Realty through the Broad Street Mortgage that Spring Street Realty would "not permit or commit waste, impairment or deterioration of the Property [1890 Broad Street] . . .and shall keep the Property and every part thereof, including the Improvements and Personal Property, in good order, repair, and tenantable condition" and "shall comply, in all material respects, with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property or any part thereof." *Id.* ¶ 57. Potter claims that this boilerplate statement in the Broad Street Mortgage shows that "Butler intended that Bank RI would believe that Spring Street Realty, LLC would keep 1890 Broad Street in good order, repair, and tenantable condition, and in compliance with R.I. law that requires rental properties to be fit and habitable[,]" and that Bank RI would not have loaned Butler money had this promise not been made. *Id.* ¶ 58.

Potter further alleges that "[u]pon information and belief, at the time he signed the 1890 Broad Street Mortgage Mr. Butler knew that Spring Street Realty, LLC would not honor the promises in the 1890 Broad Street Mortgage par. 5" and that "Mr. Butler made the promises in par. 5 of the 1890 Broad Street Mortgage as part of scheme or artifice to defraud Bank of RI into lending money to Spring Street Realty, LLC notwithstanding his knowledge that these promises

would never be fulfilled." *Id.* ¶ 59. Potter points to alleged "large-scale maintenance problems" at 1890 Broad Street as support for Butler's alleged intent not to repair the properties, that Butler performed ongoing renovations on the property while it was tenanted, and that Butler inspected the properties and knew of their allegedly poor condition. *Id.* ¶ 60. However, Potter does not connect these alleged misrepresentations to any injury sustained by her. *See generally id.* ¶¶ 55–60.

Later in their First Amended Complaint, the Plaintiffs claim this type of activity constitutes federal "mail fraud," "wire fraud," and/or "bank fraud" subject to RICO. *See id.* ¶¶ 292–97, ¶¶ 403–415 (claiming the Defendants committed federal mail and wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively, through activities such as executing leases with tenants that they claim promised to maintain fit and habitable premises and "inducing tenants to send maintenance requests that would never be honored," and that Defendants committed "bank fraud" under 18 U.S.C. § 1344 due to the Broad Street Mortgage and Potter's "constructive notice" of the mortgage).

### 2. John Doe

Next, John Doe ("Doe"), a pseudonym, alleges that he lived in a rental unit at 617 Providence Street in Warwick from July 2022 to June 2023, where he experienced raw sewage intrusions in his apartment and inadequate maintenance. *Id.* ¶¶ 98–110. Notably, Doe claims that during an inspection of his rental unit, for which he states he was not present, an employee of the Defendants found a sex object in a private place within Doe's apartment and videotaped it. *Id.* ¶¶ 113–14.

Doe then alleges the following in Paragraph 123:

> The employee who took it threatened to post the sexually embarrassing video online if Mr. Doe did not remove a negative

review that Mr. Doe had left online, and impliedly if Mr. Doe did not accept the loss of his security deposit. **On August 23, 2023** Mr. Doe received an email from Elmwood Realty stating in part: "maybe I should share a video from a walkthrough inspection of your apartment after giving you proper notice. I am sure that people would love to see the way you live and what was stuck on the walls of your shower." "What was stuck on the walls of your shower" referred to the sex object. "[T]he way you live" referred to Mr. Doe apparently being gay as inferred from the sex object.

*Id.* ¶ 123 (emphasis added).

However, Doe alleges he "received" this email from the unnamed employee **after** he had already terminated his own lease through an email to the Defendants and moved out of his apartment "**at the end of June 2023**." *See id.* ¶¶ 120–22 (emphasis added).

Ultimately, Doe alleges "retaliatory" eviction proceedings were initiated against him by the Defendants after he voluntarily moved out of his apartment. *Id.* ¶¶ 124–25. Doe also claims that "[t]he Defendants' lawyer required him to sign an agreement that *inter alia* 'forfeited' his security deposit in order to dismiss the [eviction] case." *Id.* ¶ 126. While he states he works as a schoolteacher, Doe alleges he is now homeless, that he "generally lives out of his car," and that "[t]he reason that numerous landlords gave him for their refusal to rent to him was the record of the eviction case." *Id.* ¶¶ 127–29.

Like Potter, Doe claims that when he signed his lease with Elmwood Realty on July 19, 2022, the Defendants never intended to maintain the unit so that it was fit and habitable for him to live in, that this was a material omission in his lease, which was part of a scheme and artifice to defraud him, and that he would not have signed the lease if he had been advised that the landlord had no intention of maintaining fit and habitable premises. *Id.* ¶¶ 99–101.

9

### 3. Cindy Rodriguez

Cindy Rodriguez ("Rodriguez") alleges that the Section 8 unit she moved into at 617 Providence Street in Warwick in February of 2023 was not maintained according to Housing Quality Standards issued by the Department of Housing and Urban Development ("HUD") and her lease with Elmwood Realty. *Id.* ¶¶ 130–32. She claims that "the Defendants promised the Warwick Housing Authority ("WHA") in writing that Elmwood Realty would maintain her property "in accordance with the HQS [Housing Quality Standards][,]" and that this "promise" to Warwick Housing Authority was a misrepresentation to HUD by Defendants that was made through interstate wires or the mails. *Id.* ¶ 132.

Rodriguez complains about issues with intermittent heat, "vermin," an ongoing "renovation project," mold, and poor water pressure. *Id.* ¶¶ 134–38. She then claims that after the Defendants provided Rodriguez with notice that she would be required to move out of her unit temporarily due to construction, Rodriguez did not move out but brought her belongings upstairs and remained there during construction. *Id.* ¶¶ 140–44. Rodriguez avers that the construction for the renovation project, which she was provided notice of, "dragged on for months" and damaged her belongings, so she "had to rent a storage unit . . . to protect them[,]" but she "could not afford" the storage unit, so she had to take out a loan to do so, and that taking out this loan reduced her credit score from 685 to 513. *Id.* ¶¶ 142–46.

Joining the others, Rodriguez alleges, without pointing to any specific facts supporting this belief, that "the Defendants had no intention of maintaining Ms. Rodriguez's unit in a fit and habitable condition or according to the HQS[,]" and that this "material omission [in her lease] constituted a scheme or artifice to defraud Ms. Rodriguez into signing the lease, paying rent, and moving in." *Id.* ¶¶ 131–33. She also claims that she "received a notice to quit signed by Carissa

10

Butler on January 27, 2025[,]" that "[t]his notice to quit was retaliatory[,]" and, without identifying any reason for this belief, that "[u]pon information and belief, the notice to quit was in response to Ms. Rodriguez complaining about the lack of water in her apartment." *Id.* ¶ 151.

### 4. Jordan Towns

Jordan Towns ("Towns") alleges that his unit at 136 Harrison Street in Pawtucket had holes in cabinetry, mice "invading" his unit, plumbing issues, and that his bathroom ceiling caved in, which the Defendants failed to remediate. *Id.* ¶¶ 158–63. He claims he called code enforcement officials at the City of Pawtucket in July of 2023. *Id.* ¶ 165. Then, Towns alleges that on an unspecified date, Butler called him and told Towns he would be "evicted for calling code enforcement[,]" and that after Towns mentioned "remediation[,]" Butler remarked, "'you people' know how to work the system." *Id.* ¶ 166.

Significantly, Towns brought a prior lawsuit with three (3) other tenants—including Plaintiff Krystie Wood—against Butler and Elmwood Realty in Rhode Island District Court, where Towns made these same exact allegations and asserted a claim for retaliation under the Landlord-Tenant Act on January 2, 2024 in 6CA-2024-00134. *See* **Exhibit E** (Docket, Verified Complaint, and Stipulation in 6CA-2024-00134 ("*Towns I*")). In *Towns I*, Towns voluntarily dismissed his own claims **with prejudice** on May 9, 2024 in a signed Stipulation. *Id.* (Stipulation) ("Plaintiff Jordan Towns agrees to dismissal of his claims against Defendants which are currently pending in 6CA-2024-00134. This notice of dismissal is submitted pursuant to Dist. Ct. R. 41(a)(1)(B), with prejudice.").

### 5. Theodore Oliveira

Theodore Oliveira ("Oliveira") admits that he "does not have a copy of his lease but . . . intends to obtain the lease in discovery." *Id.* ¶ 168.

11

Oliveira alleges that he resides at 656 Providence Street in Warwick and "endure[d] winters without adequate heating[,]" and that he had cockroaches and mice in his unit (which he claims he tried to exterminate himself with "bomb packs and boric acid"). *Id.* ¶¶ 170–73. He also claims he has experienced plumbing issues that "negatively impacts his and his children's hygiene," *Id.* ¶ 174, as well as a malfunctioning refrigerator that cost him "hundreds of dollars in food and he and his children were forced to rely on takeout that was more expensive and less healthy." *Id.* ¶¶ 180–84

Oliveira alleges that he complained of these issues using the "tenant portal app[,]" that the Defendants have not remediated, and that (i) "unfit conditions in Mr. Oliveira's home have caused him and his children to suffer emotional distress"; (ii) that Zingoni threatened to evict him "as part of her email correspondence with Mr. Oliveira" (representing another undated "threat"); and (iii) that in April of 2025, after he noticed his rent had increased, "the landlord was demanding that he pay an additional $375 towards a larger security deposit." *Id.* ¶¶ 183–86. He claims these demands violation the Rhode Island Landlord Tenant Act.

Oliveira also alleges a RICO claim based upon a mortgage recorded on the 656 Providence Street Property to secure a loan from Centreville Bank for $249,600.00 (the "656 Providence Street Mortgage"), averring a similar legal theory as Potter based upon allegations that Butler promised Centreville Bank that Elmwood Realty would maintain the property through a term in the mortgage. *Id.* ¶¶ 175–178. Like Potter, Oliveira does not connect this alleged "omission" to himself.

### 6. Kristen Normandin

Kristen Normandin ("Normandin") alleges that she found her unit at 14 Kenyon Street in West Warwick on Craigslist in October of 2022 and moved in to the unit in November of 2022. *Id.*

¶¶ 187–88. Normandin claims the listing did not "show any bad conditions." *Id.* ¶ 188. She claims "[a]t the time that they posted the advertisement, the Defendants knew that a number of unfit conditions prevailed in the unit[,]" that "they had no intention of maintaining the unit according to law[,]" and that this "advertisement materially omitted these facts" and "the Defendants transmitted it through interstate wire communications." *Id.* Normandin does not state how she knows this, who posted the ad on Craigslist, or when it was posted. *Id.*

Normandin then alleges that she toured the unit with "an  Elmwood Realty employee named Jocelyn[,]" that she noticed "a few issues . . . such as holes in the walls," and Jocelyn "represented that it would be fixed by the landlord's maintenance staff[,]" and then she signed the lease (making the same "material omission" argument as the others) and moved in. *Id.* ¶¶ 189–92.

Additionally, Normandin alleges that "[m]aintenance did not come and fix the issues identified during the tour[,]" and that the unit was infested with pests, which she alleges the Defendants "made minimal efforts to abate . . . ." *Id.* ¶¶ 193–98. She claims "the Defendants refused" to release her from the lease. *Id.* ¶ 198. Normandin also alleges that she was "without hot water for two days" in August of 2023, that over the course of other unspecified dates, "she found a dead rodent in a fruit bowl that she had been eating out of[,]" and that on some other unspecified date, "[s]he went to the hospital with severe gastrointestinal distress and was diagnosed with food poisoning." *Id.* ¶¶ 199–200. Normandin states, "[s]he missed work for a month" and was "diagnosed with chronic fibromyalgia and chronic fatigue," claiming the Defendants "proximately caused" these "conditions." *Id.* ¶ 200. She says she left when her lease was up. *Id.* ¶ 201.

### 7. Krystie Wood

Krystie Wood ("Wood") alleges that the unit she moved in to in 2019, which was located at 73 Roberts Street in West Warwick and subsidized by Section 8 through West Warwick Housing

13

Authority, had a "cockroach infestation" and malfunctioning heat and electrical sockets, which the Defendants allegedly failed to remediate. *Id.* ¶¶ 202, 207. Wood avers that an entity named "CAS Holdings, LLC," which she does not allege was affiliated with Butler, was the original landlord and made representations to the West Warick Housing Authority about maintenance. *Id.* ¶ 203. Wood also claims that after Elmwood Realty bought the building in 2021, Elmwood Realty assumed the HAP contract with West Warwick Housing Authority containing the maintenance provisions, and therefore is responsible for the alleged "material omissions" in Wood's lease. *Id.* ¶ 204–05.

Wood further alleges that "Butler forced Ms. Wood to sign a new lease" in September of 2021 and "the Defendants began demanding that Ms. Wood pay them a security deposit." *Id.* ¶¶ 208–210. She alleges that in September of 2022, despite Wood being covered by Section 8 for rent, a "rent demand was sent with the intention of defrauding Ms. Wood into paying monies she did not owe and/or to drive her out of her home in retaliation for her complaints about the cockroach infestation and malfunctioning heat." *Id.* ¶ 211.

Wood also states that after she complained about her unit in 2022, the Defendants placed eviction notices on her door that "frightened" her children. *Id.* ¶ 212. She claims that the Defendants filed an eviction action against her in Rhode Island District Court as "a further attempt to defraud Ms. Wood into paying money she did not owe" for back rent and "to defraud the court" by "using interstate wire and/or the mails." *Id.* ¶ 213.

Finally, Wood alleges that a "group of men" approached her home in November of 2023, that "[o]ne knocked on her door and demanded entry, claiming to be from the fire department[,]" and when she did not let him in, he later returned and said that "Butler had instructed him to 'walk right in.'" *Id.* ¶¶ 215–17. She says there was another occasion that a different man who "claimed

to be a constable" came to her unit, and that on several occasions "Butler and agents he sent" conducted "sham inspections." *Id*. Wood alleges these incidents caused her and her children "extreme emotional distress," that she gained over ninety (90) pounds, and that she lost her job at Fatima Hospital due to "Mr. Butler's and his men's appearances at her home and her depression . . . ." *Id.* ¶¶ 219–21.

Along with Towns, Wood filed suit against Butler and Elmwood Realty on January 2, 2024, making these exact allegations. *See* **Exhibit F** (Docket, Verified Complaint, Agreement and Consent Order, and Judgment in 6CA-2024-00134 ("*Wood I*")). Initially, Wood agreed to an Agreement and Consent Order (along with Towns) with Butler and Elmwood Realty that addresses her claims. *Id.* (Agreement and Consent Order) (filed February 2, 2024) (providing the Agreement and Consent Order was entered "to resolve all issues not expressly reserved in this Agreement and Consent Order as to claims presented in the Verified Complaint and Motion for Restraining Order filed by and on behalf of tenants Towns and Wood").

However, since that time, the Rhode Island District Court conducted a bench trial— resulting in a judgment in favor of Butler and Elmwood Realty and dismissal of Wood's claims **with prejudice**. *Id.* (Judgment) (DeCarvalho, J.) (entered Oct. 8, 2025) (emphasis added). Wood is now pursuing her State law appellate remedies in the Rhode Island Superior Court, with Wood filing a Notice of Appeal on October 14, 2025. *Id.* (Notice of Appeal) (filed Oct. 14, 2025) (and Docket referring to Superior Court Case No. PD-2025-05550).

### 8.   Sheree Pine

Sheree Pine ("Pine") alleges that she is disabled and that she moved into her unit in 2001 when it was owned by "a different landlord[.]" ECF No. 26 (First Amended Complaint) ¶ 224. She states that Elmwood Realty became her landlord around November of 2023, and that her unit was

15

subsidized by Section 8. *Id.* Pine alleges Elmwood Realty (through Zingoni), Pine, and the Cranston Housing Authority entered into an "Assumption Agreement" on November 1, 2023 relating to maintenance and rent under Section 8, and that she was defrauded because Zingoni and the Defendants "had no intention of honoring their promise to maintain the unit." *Id.* ¶ 227. She also claims the HAP contract for Section 8 payments "required the landlord to agree not to discriminate against 'any person' (including the tenant) on the basis of disability[,]" *Id.* ¶ 228, and that Elmwood Realty failed to include "reasonable accommodations" in a lease that she claims to have signed in August of 2024. *Id.* ¶ 234. She does not mention whether any of the Defendants signed this lease. *Id.*

Pine continues to allege that her unit was not maintained according to HUD's "Assumption Agreement," also citing a lack of hot water that she says she needed for her disability. *Id.* ¶¶ 234–239. Primarily, she claims that: (1) on an unspecified date, "Ms. Pine wrote an email to an Elmwood Realty employee named Amanda stating that she was 'legally disabled' and has a disability parking tag[,]" *Id.* ¶ 232; and (2) "[o]n August 31, 2024 Ms. Pine wrote the landlord on the tenant maintenance portal asking for the shower to be remediated and alerting the landlord that a functioning shower was especially important to her because of her disability." *Id.* ¶ 236.

She then includes a screenshot, allegedly from the tenant portal, with a message "from Elmwood Realty regarding the Plumbing/Shower/Tub/Other Maintenance Request," thanking Pine for her message, but stating she included "a lot of information [the sender] do[es] not need." *Id.* ¶¶ 237–238. The message displayed in the FAC also notes Pine had "refused to sign [her] lease" and that she should "start looking for a new place" because her tenancy would be terminated. *Id.* Pine states that she then received a notice to quit, concluding, without pointing to any specific facts, this was "because she asked for reasonable accommodations during the lease renewal

16

process and because she included 'information [Mr. Butler] d[id] not need' (about her disability)." *Id.* ¶¶ 239.

Finally, Pine asserts that while her father was in hospice, her tenancy was terminated, and she makes conclusory statements that her eviction caused her to incur moving costs, "escalated [her] PTSD," and caused her other physical symptoms that led her to increase her anti-anxiety medication and lose weight. *Id.* ¶¶ 240–243.

### 9.  Matthew Stevens and Rebecca Woolf

Matthew Stevens ("Stevens") and Rebecca Woolf ("Woolf") allege that they lived at their unit at 175 Concord Avenue in Cranston, which was owned by Elmwood Realty, "since March 1, 2023." *Id.* ¶ 244. They make the same argument about "material omissions" in their lease and being defrauded as the other tenants. *Id.* ¶¶ 246–47. Stevens and Woolf claims their unit had a "serious pest problem[,]" which went unabated, although they signed a new lease the next year (and then say they had plumbing issues in 2024). *Id.* ¶ 249.

Stevens alleges there was an incident on the property where he was injured, and that he filed a personal injury lawsuit against the Defendants, claiming his injury resulted from a failure to maintain the premises. *Id.* ¶ 252. While Stevens claims he is not seeking damages for those injuries in this case, Stevens broadly alleges in his Superior Court complaint filed against Elmwood Realty on August 9, 2024 that his injuries resulted from Elmwood Realty's (and unnamed others) failure to maintain the premises and remediate and perform remedial work. *See* **Exhibit G** (Docket and Complaint in PC-2024-04447 ("*Stevens I*")) (showing case pending and undergoing discovery).

In addition, Stevens alleges in the present First Amended Complaint that after his attorney sent Butler a demand letter in *Stevens I*, Butler allegedly sent him a notice of termination and "tried

to use the threat of false eviction and the public record it would leave to extort Mr. Stevens into dropping his personal injury lawsuit[,]" sent him a series of written threats, and filed a "retaliatory eviction action" against him. *See* ECF No. 26 (First Amended Complaint) ¶¶ 253–261. He cites an email from September 5, 2024, which advises Mr. Steven and Ms. Woolf that "if we go through the eviction process, it will be on both of your public records . . . ." *Id.* ¶ 256. Stevens and Woolf claim they have suffered emotional and financial distress because of the alleged eviction proceeding, although Stevens admits he eventually decided to vacate the premises at his lawyer's advice and "waive[d] his security deposit" on November 7, 2024. *Id.* ¶¶ 262–269.

### 10. Shanda Johnson

Shanda Johnson ("Johnson") alleges that her Section 8 unit at 676 Providence Street in West Warwick, which Elmwood Realty bought in 2020, had water damage, mold, and intermittent heat, which the Defendants failed to remediate. *Id.* ¶¶ 270, 274–88. She claims that the Defendants' failure to address these issues led to her "constructive eviction" on January 4, 2025, that this was "incredibly stressful," that "[s]he cried every day during the move[,]" and that she "pulled some of her hair out." *Id.* ¶¶ 286–87. Johnson also alleges her security deposit was not returned to her. *Id.* ¶ 288.

Like several others, Johnson alleges that when Elmwood Realty (this time through non-party Andrew Butler) signed a HAP contract and lease with West Warwick Housing Authority, agreeing to the HAP contract and lease, "Elmwood Realty promised that it would maintain 'the contract unit' and 'premises' in 'accordance with the Housing Quality Standards' and 'applicable local zoning and building codes[,]" but that they failed to do so, and that this was always their intent. *Id.* ¶¶ 272–73.

**11. Kellee Silva and Eugene Vasquez**

Kellee Silva ("Silva") and Eugene Vasquez ("Vasquez") allege that their unit at 1890 Broad Street in Cranston was not ready on the lease start date of January 1, 2024, and that they had issues such as unsecured windows, rodents, silty water, and a trench outside of their front door. *Id.* ¶¶ 289, 295–305. Silva filed suit on these issues in Rhode Island District Court. *See* **Exhibit H** (Docket, Complaint, and Order of Dismissal in 3CA-2024-02834 (Trezvant, J.) ("*Silva I*")) (showing dismissal after trial). Silva's case against Elmwood Realty litigated these issues and was ultimately dismissed after a bench trial on May 14, 2024.

Silva and Vasquez proceed to make allegations in the present case about a physical altercation with Butler, resulting in all of them being arrested. ECF No. 26 (First Amended Complaint) ¶¶ 306–307.[2] Silva also alleges that Butler posted an online video about her without her consent, and she claims she "received a death threat from an anonymous source." *Id.* ¶ 308.

Silva and Vasquez then claim that in late 2024, they lost heat, and in October of 2024 "a trench appeared outside the back door, rendering that unusable as an egress." *Id.* ¶¶ 309–310. They state there was "[t]rash such as coffee cups" in the trench. *Id.* Silva then alleges she "attempted to take her own life by taking pills and cutting herself[,]" stating that the "resulting suicide attempt [was] caused by the Defendants' misconduct." *Id.* ¶ 311. Finally, Silva and Vasquez also claim Butler spray painted their cars, although they do not aver that they called the police about the incident. *Id.* ¶ 312.

---

[2] There is pending litigation between Butler and Silva in the Rhode Island Superior Court, in which Butler has asserted claims of defamation and other tort liability related to this physical altercation and an online post by Silva falsely stating that Butler is a "borderline sex offender." *See* Complaint filed in PC-2025-04497 (filed Aug. 25, 2025). The Superior Court is the appropriate forum for this purely State law dispute between Butler and Silva.

### 12. John Olson

John Olson ("Olson"), who is a new Plaintiff in the First Amended Complaint, alleges that he used to work for Butler as an HVAC technician and also lived at the 1890 Broad Street Property. *Id.* ¶¶ 313–14. He claims that he "had a written lease but does not have a copy[,]" and that his "rent came out of his paycheck[.]" *Id.* ¶ 315. Olson alleges Butler supervised him. *Id.* ¶ 316. He also states that Butler allowed Olson to keep his bass boat and canoe at the property. *Id.* ¶ 317.

Olson claims to have seen the properties in unfit condition, and that Butler did not ask Olson to fix these conditions, but instead, "routinely assigned Mr. Olson to convert building-wide heating and utility systems in his various properties to smaller individual systems so that the Enterprise could bill tenants for utilities individually." *Id.* Olson does not allege that he was a general laborer, only that he was an HVAC technician, with the allegations in Paragraph 319 appearing to fall within the scope of such a role. *See generally id.* ¶¶ 313, 316–323. He avers that he often worked on "empty properties that Mr. Butler was attempting to sell." *Id.* ¶ 320.

Olson generally claims that he witnessed "employees who were denominated as maintenance staff . . . delivering eviction notices and throwing away belongings of tenants who were being evicted." *Id.* ¶ 321.

As for Olson's claims, Olson states that he "[i]n or about September 2025, Mr. Olson went on medical leave in order to obtain in-patient treatment for substance use disorder related to alcohol." *Id.* ¶ 324. He then states that he achieved sobriety, but that after Butler "heard a rumor that Mr. Olson was not planning on coming back to work[,]" Butler "pretended that he had loaned Mr. Olson money to cover the rent[,]" placed abandonment notices on the door of his unit and shut off utilities, and "stole the two boats owned that Mr. Olson had been storing at 1890 Broad Street." *Id.* ¶¶ 326–329. Notably, Olson does not state that he called the police for this alleged theft. *Id.*

20

Nonetheless, Olson claims that Butler ordered Olson to pay back a $2,000 personal loan, and also that Butler sent Olson a text message stating, "if you want to pay me the $1975 personal loan then you can pick up your boat and I will call it even and you can pick up the boat or you will have an eviction in your record." *Id.* ¶ 332.[3]

Olson states that he never saw his boat again and relapsed into alcoholism before eventually becoming sober again. *Id.* ¶ 333–34. He brings RICO and FHA claims against Butler.

### B.  General Allegations Against the Defendants

The Plaintiffs then make a series of general allegations against the Defendants in attempt equate the Defendant to "a 'mafia'-style operation." *Id.* ¶¶ 335–77. The Plaintiffs broadly allege that "[t]he Defendants rent to poor people[,]" that "Mr. Butler knows that many of his tenants have had to save up to pay for the initial costs of moving into their apartments[,]" and that "[h]e knows that for many of them, the threat of being evicted is terrifying[.]" *Id.* ¶ 337.

The Plaintiffs proceed with allegations about Butler's TikTok account, and they allege, "[u]pon information and belief, one of [Butler's] goals in selecting tenants is to find vulnerable tenants who will not be able to resist his scheme to avoid his maintenance obligations as landlord but who will pay their rent." *Id.* ¶¶ 338–42.

They also state that "Mr. Butler's videos are often framed as advice to other landlords[,]" suggesting these allegations are the Plaintiffs' interpretation of Butler's public TikTok's, not anything that Butler has said himself. *Id.* ¶ 340–42. The Plaintiffs cite to a single post where Butler allegedly states that he evicted a friend of a tenant. *Id.* ¶¶ 343–45.

---

[3] This alleged communication is clearly inadmissible under Federal Rule of Evidence 408 and should be given no credit by the Court.

Additionally, the Plaintiffs accuse the Defendants of including "unlawful lease terms" like indemnity clauses and tenant-insurance clauses in leases. *Id.* ¶¶ 346–49. They claim Butler stated in an email to tenants (undated and unquoted) that he has read the Rhode Island Tenant Handbook, and that the Handbook prohibits these clauses. *Id.* ¶¶ 350–51. The Plaintiffs also claim the Defendants include "unconscionable fees" in their lease, including a $75 late fee. *Id.* ¶¶ 352–53.

Further, the Plaintiffs allege more about what the Defendants "know" regarding their tenants' low-income status and when their payments arrive, and then broadly claim that the Defendants use the Plaintiffs' financial status to profit off them. *Id.* ¶¶ 354–56. The Plaintiffs also complain about "legal administration fees" and "late fees" they say are "usurious" under Rhode Island law. *Id.* ¶¶ 357–59. The Plaintiffs (specifically, Wood and Oliveira) also claim this "usury" qualifies as the "collection of unlawful debt" under RICO, with no supporting figures or allegations about what they paid. *Id.*

Finally, the Plaintiffs claim that the Defendants use "physical intimidation" tactics, such as allegedly sending multiple employees to deliver eviction notices or "coercing" tenants into leaving without legal eviction processes. *Id.* ¶¶ 359–66.

However, these allegations appear to be asserted on behalf of a couple by the name of "Rivera," who are not Plaintiffs in this action (although who were Plaintiffs in 6CA-2024-00134 with Towns and Wood and voluntarily dismissed their claims shortly after filing in 2024). *See* **Exhibit I** (Voluntary Dismissal by Riveras). Reclaim RI claims that the Riveras called them for help when they were being evicted, but that "[t]he Riveras later stopped working with Reclaim RI and are not plaintiffs in this lawsuit." ECF No. 26 (First Amended Complaint) ¶¶ 360, 363–65.

## C. Reclaim RI

As described by the Plaintiffs, Reclaim RI is a nonprofit organization that organizes tenants and seeks to "promote collective action on the part of Rhode Island tenants for their collective welfare and to achieve safe, habitable, and affordable rental housing throughout the State." *Id.* ¶¶ 367–369. Concerned with standing, the Plaintiffs allege Reclaim RI has "member-tenants," but they do not identify any "member-tenants" who are tenants of the Defendants, claiming they do not have to disclose this "given the Defendants' pattern or practice of unlawfully retaliating against members." *Id.* ¶ 372. Nonetheless, Reclaim RI maintains it is entitled to injunctive relief in its organizational capacity. *Id.* ¶¶ 374–376. As explained *infra*, Section IV.A, Reclaim RI lacks organizational standing to bring any of the claims in this First Amended Complaint.

## D. RICO Allegations

While attempting to cast the remark towards unidentified tenants, the Plaintiffs boldly state that the Defendants are "**<u>akin to a 'mafia'-style operation</u>**." *Id.* ¶ 377 (emphasis added).

In their second attempt at pleading RICO claims, the Plaintiffs' First Amended Complaint piggybacks on the Plaintiffs' prior, insufficient RICO theories by adding allegations concerning mortgage covenants, Housing Assistance Payments ("HAP") contracts, assumption agreements, social media activity, tenant organizing, and a new plaintiff, John Olson. ECF No. 26 (First Amended Complaint) ¶¶ 335–387. Yet the First Amended Complaint merely repackages the same landlord-tenant grievances into an even more far-fetched narrative—with unsupported allegations of federal "bank fraud"—and the FAC still fails to allege a plausible federal racketeering claim. *Id.* In substance, the Plaintiffs again contend that the Defendants allegedly entered leases, HAP contracts, assumption agreements, and mortgage documents (often with third parties who are not the Plaintiffs), while supposedly holding a secret, present intention not to comply with future

23

maintenance obligations, and without any evidence of the Defendants' scienter or a plausible "RICO" scheme. *Id.*

### 1. The Enterprise and Scheme

The Plaintiffs claim the RICO "Enterprise" consists of Defendants Jeffrey Butler, Carissa Butler, Elmwood Realty, Elmwood Realty North, Spring Street Realty, certain unnamed employees, certain unnamed "cooperative tenants," and an unnamed lawyer supposedly "associated together in fact with a common purpose of carrying out an ongoing criminal enterprise." ECF No. 26 (First Amended Complaint) ¶¶ 378–380.

As for the alleged "Scheme," the Plaintiffs contend that "[t]he purpose of the enterprise was and is to unlawfully enrich themselves through a scheme ("the Scheme") of making money from rental properties while illegally evading the concomitant duties of being landlords by criminal means, including through extortion, violence, mail fraud and wire fraud." *Id.* ¶ 378. Allegedly, the Defendants selected "poor, vulnerable tenants" as the targets of this allegedly profitable Scheme. *Id.* ¶ 380.

In total, the Plaintiffs claim that the Defendants violated RICO through leases, advertisements, HAP contracts, assumption agreements, and mortgage documents supposedly contained promises or omissions from which the Court should infer a present intent not to maintain rental properties in the future and constitute "mail fraud," "wire fraud," or "bank fraud." ECF No. 26 (First Amended Complaint) ¶¶ 403–435. Second, they attempt to characterize various alleged eviction threats, litigation activity, online statements, and interpersonal disputes as "extortion." *Id.* ¶¶ 436–471. Third, they recycle the theory that late fees and so-called "legal administrative fees" somehow constitute the "collection of unlawful debt" under RICO. *Id.* ¶¶ 472–481. None of these theories states a plausible predicate act under controlling First Circuit precedent.

The Plaintiffs' First Amended Complaint also adds a new factual thread involving John Olson, a former employee-tenant who alleges Butler later treated his apartment as abandoned and retained his boats after Olson entered inpatient treatment. ECF No. 26 (First Amended Complaint) ¶¶ 313–334. Those allegations, even if accepted as true for purposes of Rule 12, describe at most a separate State-law dispute about possession of personal property, alleged self-help, or leasehold status, for which Mr. Olson's remedy was either calling the Cranston Police Department or filing his suit in a State court. They do not transform the broader FAC into a plausible civil RICO case.

### 2. The Pattern of Racketeering Activity

As for their futile attempt at the "racketeering activity" element of RICO, the Plaintiffs set forth allegations that "the Enterprise has an ongoing pattern that it uses repetitively to achieve its purpose of profiting from rental units and gaining an unfair competitive advantage as landlords by illegally avoiding the costs of maintaining safe and fit premises." *Id.* ¶ 380. They assert, "[u]pon information and belief, the tenant-Plaintiffs are not the only victims of the Scheme." *Id.*

The Plaintiffs also assert that "[a]t a high level, the pattern of racketeering activity at the heart of the Scheme includes the following:

(1) "[b]ring in unwitting tenants through fraud" and the "material omissions" in their leases, constituting "mail and/or wire fraud," selecting "poor, vulnerable tenants";

(2) "[s]ilence those who complain" through "extortion," including Doe's "sexually embarrassing videotape" and "the threat of (unlawful) eviction";

(3) [d]rive out the tenants who cannot be silenced (and make sure the other tenants know it)" by bringing "fraudulent eviction actions" that constitute "wire and/or mail fraud";

25

(4) "[u]se proceeds from the Scheme to purchase additional residential rental realty" through the "competitive advantage" of "foregoing maintenance costs that other landlords have to pay"; and

(5) return to the first step "and repeat the process[,]" citing an undated alleged voicemail to Reclaim RI Shana Crandall from Butler stating, "you got one evicted today. And all you do is emptying [sic] out my apartments and I clean them up and I re-rent them to somebody else."

*Id.*

### 3. Interstate Commerce

The Plaintiffs claim this alleged activity affects interstate commerce because the Enterprise relies upon out-of-state financial institutions, receives funding from HUD, operates a tenant portal, competes with landlords in Massachusetts and employs Massachusetts employees, uses TikTok, and has caused tenants to move to other states. *Id.* ¶¶ 381–84.

### 4. Predicate Acts

### i. Federal Mail, Wire, and Bank Fraud

In an attempt to allege predicate acts to form their RICO claim, the Plaintiffs claim "the Enterprise" violates federal wire and mail fraud statutes (18 U.S.C. § 1341 and 18 U.S.C. § 1343, collectively sometimes referred to as the "Federal Mail and Wire Fraud Statutes"), and also constitutes federal "bank fraud" (18 U.S.C. § 1344), pointing to advertisements, leases, mortgages, and communications transmitted over wires and the mail about the Defendants' alleges promises to "maintain the premises in a fit and habitable way in compliance with the law." *Id.* ¶¶ 398–435. The Plaintiffs claim that the Defendants never intended to follow through on these boilerplate provisions in mortgages and leases (often with third parties). *Id.*

26

### ii.    Extortion

The Plaintiffs cite Butler's alleged threats of "illegal" eviction as constituting extortion under R.I. Gen. Laws § 11-42-2 (the "Rhode Island Extortion Statute"). *Id.* ¶¶ 436–45. They claim Butler "made the threats maliciously" and with the intent of obtaining property (*i.e.*, a "leasehold interest") from the Defendants. *Id.* ¶¶ 446–71. As for their factual support, the Plaintiffs cite to alleged retaliation, allegedly deterring tenant organizing, Silva and Vasquez's alleged self-eviction, Doe's alleged sexually embarrassing video, and the alleged "boat-jacking" of Olson's bass boat and canoe. *Id.*

### iii.    Unlawful Debts

The Plaintiffs cite the late fees and Olson's allegedly fake "personal loan" as the collection of an unlawful debt. *Id.* ¶¶ 472–81.

### iv.    Injuries

The Plaintiffs claim that the Enterprise's alleged violations of RICO proximately harmed the tenant-Plaintiffs because "they have been forced to endure unsafe and unsanitary conditions in their homes; paid rent for premises with diminished value and without the warranties that they had bargained for; been damaged in their participation in work and school; lost jobs and work opportunities; had personal property damaged; suffered physical injuries; incurred medical costs; incurred moving costs; and suffered other harms." *Id.* ¶ 482.

## III.    Standard of Review

"Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a paring of viable claims from those doomed by law." *Dacier v. Anchor Medical Associates*, 322 F. Supp. 3d 295, 297 (D.R.I. 2019) (McConnell, C.J.) (quoting *Iacampo v. Hasbro, Inc.*, 929 F.Supp. 562, 567 (D.R.I. 1996)).

In order to survive a motion to dismiss based upon Rule 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint presents a claim with "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level[,]" *Twombly*, 550 U.S. at 555, and "a complaint warrant[s] dismissal [when] it fail[s] *in toto* to render plaintiffs' entitlement to relief plausible." *Id.* at 569 n.14.

Granted, it is well established that in evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts alleged in the complaint as true. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013). **Yet, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice**." *Iqbal*, 556 U.S. at 678 (emphasis added). The First Circuit "do[es] not credit legal labels or conclusory statements, but rather focus[es] on the complaint's **non-conclusory, non-speculative factual allegations** and **ask whether they plausibly narrate a claim for relief**." *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 103 (1st Cir. 2025) (quoting *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022)) (emphasis added).

Importantly, because the Plaintiffs allege that the Defendants violated the RICO Act, the Complaint faces "the heightened standard required for RICO claims[.]" *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 450 (1st Cir. 2000). Such as here, where the Plaintiffs' "claims are based on the defendants' allegedly fraudulent conduct, [the Court's] review includes a deeper scrutiny of the [P]laintiffs' allegations." *In re Financial Oversight and Management Board for Puerto Rico*, 54 F.4th 42, 52 (1st Cir. 2022) (citation omitted); *see also Humana*, 126 F.4th at 103

28

(explaining that when "a RICO complaint pleads mail and wire fraud as predicate acts, it adopts the heightened pleading requirement of Federal Rule of Civil Procedure 9(b)"). Fundamentally, "**it would be unjust if a RICO plaintiff could defeat a motion to dismiss simply by asserting an inequity attributable to a defendant's conduct and tacking on the self-serving conclusion that the conduct amounted to racketeering**." *Miranda*, 948 F.2d at 44 (emphasis added).

"[H]eightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims effectively charge fraud." *Katz v. Belveron Real Estate Partners, LLC*, 28 F.4th 300, 308 (1st Cir. 2022) (quoting *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020)).

Finally, where a complaint is based on federal question jurisdiction, and all of the federal claims are dismissed, the Court should decline to retain supplemental jurisdiction over any pendent state law claims, and the "state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Vega Kodak Caribbean, Ltd.*, 3 F.3d 476, 478 n.2 (1st Cir. 1993) (explaining that because the suit "triggered the district court's federal question jurisdiction[,] . . . when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject matter jurisdiction").

IV.    **Legal Argument**

A.  **The Plaintiffs have failed to state a claim under the RICO Act.[4]**

The Racketeer Influenced and Corrupt Organizations Act (the "RICO Act" or "RICO") makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A private cause of action under RICO is available to "[a]ny person injured in his business or property by reason of a violation of section 1962." *Id.* Further, RICO also makes it unlawful for any person to "conspire" to violate the Act, or to invest income in the Enterprise obtained from racketeering activity. 18 U.S.C. § 1964(d); 18 U.S.C. § 1964(a).

As recognized by the First Circuit, "[t]o raise a civil RICO claim, 'a plaintiff must allege 'a violation of section 1962' and an injury '**by reason of**' that violation.'" *Efron v. UBS Financial Services of Puerto Rico*, 96 F.4th 430, 437 (1st Cir. 2024) (quoting *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022)) (emphasis added). When the alleged RICO violation is under § 1962(c), "the four key elements of a RICO claim (which also constitute the underlying substantive offense for a

---

[4] "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985). However, "civil RICO has undeniably evolved "into something quite different from the original conception of its enactors." *Medical Marijuana, Inc. v. Horn*, 145 S.Ct. 931, 946 (2025) (quoting *id.* at 500). "More suits are brought against ordinary businesses than against 'archetypal, intimidating mobster[s][.]'" *Id.* (quoting *Sedima*, 473 U.S. at 499). "As a result, courts have expressed concern over 'the 'over-federalization' of traditional state-law claims[.]'" *Id.* (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008)). Likewise, this Court should be concerned about whether the Plaintiffs have "over-federalized" their Complaint, which in essence consists of "traditional state-law claims" that are covered by the Rhode Island Landlord-Tenant Act.

RICO conspiracy claim) are: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Before diving into the weeds of the 118-page First Amended Complaint and considering whether it passes substantive muster (irrespective of its extraordinary length), the Court should note that federal courts have grown increasingly weary of RICO claims in the landlord-tenant context. *See, e.g.*, *Lu v. Canton Corp.*, Case No. 15-cv-10088-ADB, 2015 WL 13697141, at *8 (D. Mass. May 13, 2015) ("**At best, the Complaint suggests that Plaintiff has a long list of grievances against his landlords and the employees of the unnamed "service provider," some of which may be legitimate tenant complaints. But, absent exceptional circumstances, landlord-tenant disputes are not fodder for civil RICO claims**.") (emphasis added).

Capturing the sentiment of federal courts, the Southern District of New York has spoken plainly on its disapproval of civil RICO claims in the real estate context:

> **He has shoehorned a dispute over the meaning of condominium by-laws into federal claims based on RICO** and FDCPA, statutes aimed at "long-term criminal activity" and "abusive debt collection practices," respectively. *H.J. Inc. v. Nw. Bell Tel. Co.,* 429 U.S. 229, 239, 97 S.Ct. 441, 50 L.Ed.2d 427 (1989) (RICO); 15 U.S.C. § 1692(e) (FDCPA). This litigation strategy—presumably geared to exploit the damage multiples for which the federal statutes provide—is baldly improper, but Pu is not the first to employ it. One court in this district has surmised "that every member of the federal bench has before him or her at least one–and possibly more–**garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages** by resort to what another respected jurist, Judge Allan Schwartz . . . has referred to as '**the litigation equivalent of a thermonuclear device**'-a civil RICO suit." *Goldfine v. Sichenzia,* 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) (quoting *Schmidt v. Fleet Bank,* 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)). In the same vein, two other courts in this district have issued notably **sharp dismissals of RICO claims premised on real estate disputes** similar to Pu's dispute with the condo Association. *See Calka v. Kucker Kraus & Bruh, LLP,* No. 99 Civ. 4999, 2000 WL 557266, at *1 (S.D.N.Y. May 8, 2000) (Mukasey, J.) (calling suit "**frivolous and obstructive**"

31

where plaintiff brought RICO claims for what was "essentially a landlord/tenant dispute"); *West 79th Street Corp. v. Congregation Kahl Minchas Chinuch,* No. 03 Civ. 8606, 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) (Sweet, J.) ("**It has been suggested that the civil provisions of [RICO] are the most misused statutes in the federal corpus of law**. . . . **To this end, courts must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing**.") (citation omitted). Pu's complaint does not adequately plead a RICO claim.

*Pu v. Charles H. Greenthal Management Corp.*, No. 08 Civ. 10084(RJH) (RLE), 2010 WL 774335, at *2–3 (S.D.N.Y. Mar. 9, 2010) (Howell, J.) (emphasis added).

Persuasive here, this Court has cited the Southern District of New York when showing the same impatience for allegations in a complaint that are already accounted for by other bodies of federal or state law, which a plaintiff had attempted to stretch into a civil RICO claim.

In *Grassick v. Holder*, Civil No. 09-CV-587-PB, 2012 WL 1066691, at *3–10 (D.R.I. Mar. 28, 2012) (Barbadoro, J.), the plaintiff attempted to transform a dispute with her employer into a RICO case. As summarized by this Court, "Grassick assert[ed] that a plethora of adverse workplace actions by defendants constitute witness tampering and/or witness retaliation." *Grassick*, 2012 WL 106691, at *5. "Where defendants' actions are alleged to involve false statements and/or the use of mail or email, Grassick asserts that defendants committed mail fraud and wire fraud[,]" and "[w]here the actions involved a supervisor who threatened discipline or demanded that Grassick perform work she thought outside of her job description, Grassick alleges extortion." *Id.* at *5.

The District of Rhode Island ultimately rejected and dismissed Grassick's claims, citing the Southern District of New York and quipping, "[l]ike many other plaintiffs before her, **Grassick attempts to stretch the RICO statute to reach 'well beyond the bounds of the law's reasonable construction**. . . . RICO simply was not designed by Congress to encompass many of the creative,

32

and even 'extraordinary, if not outrageous uses' for which plaintiffs have labored the statute." *Id.* at \*6 (citing *Gross v. Waywell*, 628 F. Supp. 2d 475, 480–81 (S.D.N.Y. 2009)). The *Grassick* court further determined that "**Grassick's injuries were caused by her termination, and the removal of Grassick from her position was a personnel decision that does not fit under the rubric of witness tampering, extortion, or fraud**." *Id.* at \*9–10 (emphasis added).

Finally, "[a]s a policy matter, plaintiffs' . . . mail, wire and bank fraud allegations should be dismissed because their theory of defendants' alleged scheme to defraud "defies logic."" *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates*, 777 F. Supp. 228, 239 (S.D.N.Y. 1991) (quoting *Atlantic Gypsum Co., Inc. v. Lloyds Intern. Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990)).

The Plaintiffs' theory that the Defendants schemed to prey on "poor, vulnerable tenants," or that the Defendants intentionally drove their own properties into the ground (and where one such property allegedly carried a $5.8 million mortgage) defies all logical and economic reason. *Atlantic Gypsum*, 753 F. Supp. at 514 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595 (1986)) ("**Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent**.'") (emphasis added).

As such, the Court should be weary of the Plaintiffs' RICO claims from a birds eye view, because the Defendants' wide-array of alleged injuries clearly was not caused by the Defendants allegedly running an "Enterprise" "akin to a 'mafia'-style operation" to defraud any of the Plaintiffs (or any third parties such as banks), and the Defendants were clearly engaged in run-of-the mill business and real estate activities. *Pu*, 2010 WL 774335, at \*2–3. If the Plaintiffs have been provided legal remedies against the Defendants for any shortcomings in maintenance, they reside solely in State law for alleged breaches of contract or violations of the Rhode Island Landlord Tenant Act.

1. **The First Amended Complaint fails "identify a basis for inferring scienter" and "plausibly establish" that any of the Defendants held a "specific intent to defraud" any of the Plaintiffs at the time they committed an alleged RICO violation through "non-conclusory, non-speculative factual allegations."**

As explained, "RICO prohibits certain conduct involving a 'pattern of racketeering activity.'" *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006)). Pleading a "pattern of racketeering activity" requires identifying at least two predicate crimes that are related and that amount to, or threaten, continued criminal activity. *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 945 (2025) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Here, the First Amended Complaint fails at the threshold because it does not plausibly allege even one (1) actionable predicate act.

### i.    Federal Mail or Wire Fraud

"RICO claims premised on mail or wire fraud must be particularly scrutinized" because of the ubiquity of the mails and wires and the relative ease with which a plaintiff may attempt to mold ordinary disputes into a RICO theory. *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 103 (1st Cir. 2025) (quoting *Lerner v. Colman*, 26 F.4th 71, 74 (1st Cir. 2022)); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000). Thus, where a plaintiff pleads mail or wire fraud as RICO predicate acts, Rule 9(b) applies with full force. *Humana*, 126 F.4th at 103 (looking to "a RICO plaintiff's '**non-conclusory, non-speculative factual allegations**'") (emphasis added).

To the extent the District Court were not previously clear on the burden of pleading a RICO mail or wire fraud claim, the First Circuit answered the question in 2024. *Efron v. UBS Fin. Servs. of P.R.*, 96 F.4th 430, 437–38 (1st Cir. 2024). Under *Efron*, where the First Circuit affirmed the dismissal of RICO mail and wire fraud claims based upon an alleged scheme by UBS to cover-up the disclosure of Efron's account information (including through subsequent litigation initiated by UBS), the Plaintiffs are required to "**plausibly establish**" that the Defendants "engaged in a

scheme to defraud with the **specific intent to defraud**" the Plaintiffs. *Id.* at 438 (quoting *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 790 (1st Cir. 1990)).

Beyond the fundamental "time, place, and content" requirement of Rule 9(b), *Efron* adds that "**Rule 9(b) 'requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter**." *Id.* (quoting *N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009)) (emphasis added). Accordingly, in *Efron*, the First Circuit held that Efron "fail[ed] to plausibly demonstrate how [its] conduct—which may constitute negligence, breach of contract, or breach of fiduciary duty—can be construed as mail or wire fraud." *Id.* (citing *United States v. Greenleaf*, 692 F.2d 182, 188 (1st Cir. 1982); *see also id.* (quoting *McEvoy*, 904 F.2d at 791) ("Nor does a breach of contract in itself constitute a scheme to defraud.").

The First Amended Complaint commits the same mistakes as Efron. The FAC relies on sweeping assertions that the Defendants "never intended" to maintain units, comply with HAP obligations, or honor mortgage covenants, without "non-conclusory, non-speculative factual allegations" showing a present, specific intent to defraud the Plaintiffs at the time the relevant documents were allegedly executed. *Id. See also Humana*, 126 F.4th at 103.

Rather than specifically and plausibly alleging that any particular Defendant possessed the requisite "scienter" for "fraud" at the "time" and "place" when the "material omissions" in leases or other communications were made, many of the allegations of fraud in the First Amended Complaint are addressed to "the Defendants" generally. *See, e.g.*, ECF No. 26 (First Amended Complaint) ¶ 60 (Potter alleging generally that "the lease was prepared by the Defendants exclusively who wrote all terms"). This does not even come close to complying with Rule 9(b)— especially in a RICO case. *Efron*, 96 F.4th at 438 (holding Rule 9(b) in a RICO case requires

35

allegations as to not only "**whom they were made** but also identifying the basis for inferring scienter") (emphasis added).

Additionally, a swath of the "RICO" allegations are charged to "the Enterprise" itself, rather than to any individual Defendant. ECF No. 26 (First Amended Complaint) ¶¶ 378–387; *see, e.g., id.* ¶ 380(a) (alleging that "the Enterprise brings in tenant-customers by offering leases that say that the landlord will be responsible for maintaining the premises, and materially omit that the Enterprise plans on not maintaining the premises and breaching other aspects of the law governing landlords"). These allegations fail to state a claim under RICO, because "[a]n 'enterprise' does not "*conduct or participate . . . in the conduct of* " that same enterprise's affairs[,]" and "the unlawful enterprise itself cannot also be the person the plaintiff charges with conducting it." *Arzuaga-Collazo v. Oriental Federal Sav. Bank*, 913 F.2d 5, 6 (1st Cir. 1990) (citation omitted).

Further, the Plaintiffs repeatedly fail to identify the "time" that the alleged representation was made, include a "place" that the alleged representation was made, identify "who" actually made the alleged representation, or in some cases, allege if any Defendant made a representation to them whatsoever. *See, e.g.*, ECF No. 26 (First Amended Complaint) ¶ 205 ("The written promise to West Warwick Housing Authority is not available to Ms. Wood but will be obtained through discovery."); *Id.* ¶ 168 ("Mr. Oliveira does not have a copy of his lease but upon information and belief it the same lease described elsewhere, with the same invocation of Rhode Island law and the same maintenance provision. Mr. Oliveira intends to obtain the lease in discovery."); *Id.* ¶ 168 (Olson, the new Plaintiff, vaguely claims that "Mr. Olson had a written lease but does not have a copy."); *Id.* ¶¶ 292–93 (Silva and Vasquez stating that "[t]he lease was prepared by the Defendants exclusively who wrote all terms," but not alleging that any Defendant signed the lease other than "upon information and belief, Mr. Butler also signed the lease that day[,]" or when the lease was

36

purportedly entered or when it was "uploaded . . . to the internet"); *Id.* ¶¶ 272 (Johnson alleging generally that, upon acquiring the building, Defendants promised the housing authority in writing that they would maintain her unit in accordance with HQS, then the alleged signer of the document as "Andrew Butler" who is mentioned nowhere else in the FAC); *Id.* ¶ 191 (Normandin alleging that "Mr. Butler signed the lease digitally, but it is not clear from the face of the document what date he signed it on."); *Id.* ¶ 246 (Stevens and Woolf alleging that "Mr. Butler did not date the lease, but, upon information and belief, he signed it also on March 2, 2023.").

None of these vague allegations made by the Plaintiffs satisfy Rule 9(b) or can form the basis for federal mail or wire fraud under RICO, and while the Plaintiffs have had every opportunity to provide specificity to their allegations, they have failed to do so. *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) (quoting *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 640 F. Supp. 1168, 1176 (S.D. Fla. 1986)) ("A complaint alleging RICO, like a complaint alleging fraud, should be filed only after a wrong is reasonably believed to have occurred. **It should be a vehicle to right a wrong, not to find one**.") (emphasis added). And as explained below, statements to HUD, local housing authorities, and other third parties such as banks do not fulfill the direct and proximate causation requirement of alleging a plausible RICO claim. *See infra* Section IV.A.2.

Moreover, many of the Plaintiffs' allegations merely point to boilerplate lease provisions, not to any specific representation by a particular Defendant that could plausibly establish fraudulent scienter. ECF No. 26 (First Amended Complaint) ¶ 60 (Potter alleging the lease was "governed by Rhode Island law" and contained a maintenance-request procedure). But the existence of maintenance provisions in leases—even coupled with general knowledge of Rhode Island landlord-tenant law and later alleged nonperformance—does not "plausibly establish" that

37

the Defendants did not intend to follow those provisions at the time the leases were executed and transmitted. *Efron*, 96 F.4th at 438–40. Rather, the more plausible inference is the opposite: that the Defendants intended to abide by the obligations they placed in the lease. *See Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*, 199 A.3d 1034, 1040 (R.I. 2019) (quoting *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 746 (R.I. 2009)) ("[T]he language employed by the parties to a contract is the best expression of their contractual intent.").

The same is true of Plaintiffs' reliance on allegations that Butler read the Rhode Island Landlord-Tenant Handbook or generally knew landlords must maintain habitable premises. ECF No. 26 (First Amended Complaint) ¶ 350. Knowledge of the law, without more, does not identify a basis for inferring a specific intent to defraud tenants at the time of contracting. If anything, it cuts the other way. A landlord who knows the statutory framework could have drafted leases to shift repair duties where the statute permits written agreement to that effect. *See* R.I. Gen. Laws § 34-18-22(c) (providing for such. Plaintiffs' theory therefore remains circular at best, and backwards at worst.

Nor do Plaintiffs' allegations concerning alleged ongoing disrepair at other properties solve the scienter problem. They do not plausibly establish that when Defendants later entered a new lease, HAP document, assumption agreement, or mortgage covenant, they held a specific, present intention never to perform maintenance or repairs of the properties (even assuming, *arguendo*, such defects existed). That is precisely the sort of "fraud-by-hindsight" inference the First Circuit has rejected. *Rodríguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 97–98 (1st Cir. 2007) (securities fraud case premised upon analogous theory to *Efron* where "Rodríguez contend[ed] that Margo misled him into accepting options as part of his compensation package while secretly intending either never to allow the exercise of the options at all, or at least never to allow their exercise

following a voluntary resignation[,]" and First Circuit dismissing claim because "to hold otherwise would be to permit the pleading of a form of 'fraud by hindsight,' essentially inferring earlier knowledge based only on the situation that later came to pass"); *Efron*, 96 F.4th at 438–40 (analogous reasoning to *Rodriguez*, reaffirming that a civil RICO plaintiff alleging predicate acts of mail or wire fraud (like that of a securities fraud plaintiff) must "**plausibly establish**" that the defendant acted with a "**specific intent to defraud**," and that Rule 9(b) demands factual allegations identifying the basis for inferring scienter, and explaining that "[b]esides conclusory allegations as to UBS's fraudulent intent in disclosing the documents to Candelario, Efron's proposed second-amended complaint does not credibly suggest that UBS acted with specific intent to deceive.").

At bottom, the First Amended Complaint still rests on the same deficient theory that animated the original Complaint: that because tenants later experienced alleged maintenance problems, the Court should infer that when leases were signed, and when related documents were transmitted through the mails or wires, the Defendants secretly intended from the outset not to perform future maintenance obligations. ECF No. 26 (First Amended Complaint) ¶¶ 416–435. The theory asserted by Plaintiffs is entirely implausible. *Efron*, 96 F.4th at 438–40; *see also Atlantic Gypsum*, 753 F. Supp. at 514 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 595 ("**Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent**.'") (emphasis added).

The FAC does not satisfy the *Efron* standard because it offers only later-occurring maintenance disputes, later litigation activity, and general, conclusory assertions of bad intent as the supposed basis to infer that leases, HAP documents, assumption agreements, and mortgage covenants were fraudulent from inception. *See, e.g.*, ECF No. 26 (First Amended Complaint)

¶ 59(a) (alleging generally that "the Enterprise had a continuous, preexisting pattern and practice of renting residential units like 1890 Broad Street to tenants without keeping them in fit and habitable condition the Enterprise had a continuous, preexisting pattern and practice of renting residential units like 1890 Broad Street to tenants without keeping them in fit[,]" while failing to aver any specific facts bearing on fraudulent scienter).

Nor do Plaintiffs' new circumstantial allegations that some properties were allegedly already in disrepair, or that some tenants experienced maintenance issues shortly after move-in, bridge this gap. *See, e.g.*, *id.* ¶ 63 (claiming that "[a]t the time that Mr. Butler and Ms. Potter signed the lease, Mr. Butler knew, but Ms. Potter did not, that the building at 1890 Broad Street did not have a reliably functioning heating system or plumbing, that he intended to place a trench that would unlawfully block her egress and ingress via her front door, and that he did not intend to remediate these issues during her tenancy"). At most, these allegations, if assumed true, would suggest that the Defendants were negligent, dilatory, or already in breach of existing obligations elsewhere when their leases were executed—not that they intended to defraud any of the Plaintiffs for purposes of RICO. *McEvoy*, 904 F.2d at 791 ("Nor does a breach of contract in itself constitute a scheme to defraud.").

Even if the sequence such as that alleged in Paragraph 63 were true, the analytical leap from alleged ongoing disrepair in one setting to fraudulent intent in a later transaction is an impermissible inferential jump under *Efron*, *Humana*, and Circuit precedent. A pattern of alleged poor maintenance may plausibly support state-law theories; it does not, without particularized facts tied to the moment of contracting, plausibly establish mail or wire fraud under RICO. Read in a light most favorable to the Plaintiffs, the alleged "material omissions" in leases, on their face, do not even rise to the level of a "failure to disclose" because of the absence of a duty to any specific

40

Plaintiff. Under RICO, "[a] defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes." *Sanchez v. Triple-S Management Corp.*, 492 F.3d 1, 10 (1st Cir. 2007); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 75 (1st Cir. 1998) ("A mail or wire fraud conviction usually cannot result from a failure to disclose unless the defendant was aware of its duty to disclose.").

There are no allegations made against the Defendants by the Plaintiffs that the Defendants made any specific representations to the Plaintiffs about maintenance that would permit a "reasonable inference" that the Defendants are liable for intentional fraud under the Federal Mail and Wire Fraud Statutes. *Iqbal*, 556 U.S. at 678. At best, the First Amended "**Complaint reads as if it is charging a breach of contract or a violation of a consumer protection law, not racketeering**." *Efron*, 96 F.4th at 438 (quoting *Arzuaga-Collazo v. Oriental Fed. Sav. Bank*, 913 F.2d 5, 6 (1st Cir. 1990) (Breyer, C.J.)).

In this sense, the present case is on all fours with the First Circuit's decision in *Arzuaga-Collazo*. In that case, which was an appeal from a grant of a Rule 12(b)(6) motion, residents of a housing project had filed an 89-page RICO complaint against a Puerto Rican bank, claiming the defendant-bank violated RICO "basically by selling them defective housing." *Arzuaga-Collazo*, 913 F.2d at 6.

Retired United States Supreme Court Justice Stephen Breyer (Chief Judge of the First Circuit at the time) "boil[ed] down" the 89-page complaint to allegations that (i) when the residents bought their houses, "**many of the houses were built badly**, and many were damaged during a landslide[,]" (ii) that the defendant-bank loaned the developer money for the project but "**failed to conduct adequate inspections**," and the **project "was never fully completed**," (iii) that **the defendant-bank started to manage the project and profit off it**, and (iv) that later, the

41

defendant-bank "forced the developers into bankruptcy, failing to tell the bankruptcy court of the plaintiffs' interests or to tell the plaintiffs what it was doing, and **then proposed a rehabilitation plan that made no provision for the plaintiffs**." *Id.* (emphasis added).

The *Arzuaga-Collazo* court then summarily concluded, "**[t]his complaint reads as if it is charging a breach of contract or a violation of a consumer protection law, not racketeering**." *Id.* (emphasis added). The instant 118-page First Amended Complaint—despite being almost thirty (30) pages longer than the complaint at issue in *Arzuaga-Collazo*—reads exactly the same way, and this Court should determine that the Plaintiffs have failed to "plausibly" allege a RICO claim founded in predicate acts of federal mail or wire fraud. *Iqbal*, 556 U.S. at 678.

Again, if there is any merit at all to the tenant-Plaintiffs' allegations concerning failures to repair, delays in repair, or noncompliance with Rhode Island landlord-tenant obligations, those allegations sound in contract, statute, or tort—not racketeering. *Arzuaga-Collazo*, 913 F.2d at 6.

### b. Bank Fraud

The First Amended Complaint now adds allegations concerning mortgage documents for 1890 Broad Street and 656 Providence Street. ECF No. 26 (First Amended Complaint) ¶¶ 54–59, 175–179, 403–415. According to the FAC, Butler executed mortgage instruments in favor of Bank RI and Centreville Bank containing covenants to keep the mortgaged properties in good order, repair, and tenantable condition and to comply with law, and Plaintiffs say those covenants were fraudulent because Butler allegedly never intended to honor them. *Id.* ¶¶ 54–59, 175–179, 403–415. But these new allegations do not rescue the FAC. If anything, they underscore why the FAC fails to plausibly plead scienter.

"To commit bank fraud, a person must "execute[ ], or attempt[ ] to execute, a scheme or artifice' either '(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds,

credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.'" *H&Q Properties, Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (citing 18 U.S.C. § 1344). "[T]he purpose of the bank fraud statute 'is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions.'" *Id.* (quoting *United States v. Staples*, 435 F.3d 860, 867 (8th Cir. 2006) (quoting *United States v. Davis*, 989 F.2d 244, 247 (7th Cir. 1993)). *See also Loughrin v. United States*, 573 U.S. 351, 365 (2014) ("[T]he text of § 1344(2) [ ] limits its scope to deceptions that have some real connection to a federally insured bank, and thus implicate the pertinent federal interest.").

First, to plausibly alleged bank fraud for purposes of RICO, the Plaintiffs "must demonstrate that the defendants engaged in a deliberate plan or course of action designed 'to deceive the bank *and* [to] deprive it of something of value." *Wright v. Richardson*, 740 F. Supp. 3d 601, 617 (E.D. Mich. 2024) (quoting *Shaw v. United States*, 580 U.S. 63 (2016)). Nothing in the First Amended Complaint establishes that the Defendants intended to defraud Bank RI or Centreville Bank, and the Plaintiffs merely point to boilerplate provisions in mortgages inserted by the banks themselves. ECF No. 26 (First Amended Complaint) ¶¶ 58, 177.

A promise in a mortgage instrument to keep collateral in good repair and in compliance with law is not, by itself, evidence of a fraudulent scheme. Rather, it is the opposite: it is an express assumption of contractual responsibility and compliance. ECF No. 26 (First Amended Complaint) ¶¶ 57, 177, 406, 411. If anything, the existence of those covenants cuts against the Plaintiffs' theory that Butler intended not to maintain the properties or not to assume those obligations. The most plausible inference from such covenants is that the lender required them and that the borrower

43

accepted them as part of an ordinary financing transaction. *See Efron*, 96 F.4th at 438–39; *Rodríguez-Ortiz*, 490 F.3d at 97–98.

Second, "[t]he fraudulent scheme must involve misrepresentations or concealment of material facts that could influence the decisionmaking process of a financial institution." *Wright*, 74- F. Supp. at 617 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)). Before loaning $5.8 million to the Defendants, a more plausible inference is that Bank RI would have inspected the property and have been well aware of its condition, and more importantly, the Defendants' financial condition. The allegation that an alleged "secret intent" held by the Defendants not to maintain the property would have any influence on Bank RI's decision to loan the Defendants millions of dollars based upon their credit and substantive financial commitments is implausible.

Third, the Plaintiffs "must also demonstrate that the defendants acted with the intent to deceive or to cheat a financial institution." *Id.* (citing *Loughrin v. United States*, 573 U.S. 351 (2014)). The First Amended Complaint does not do this, and there is no evidence that any bank was "cheated" by the Defendants. The Plaintiffs' theory concerning the mortgage documents is merely another variant of the same impermissible hindsight theory rejected in *Rodriguez* and *Efron*. For instance, the FAC says Butler later failed to maintain the properties to Plaintiffs' satisfaction and therefore must have secretly intended to violate the mortgage covenants when he signed them. ECF No. 26 (First Amended Complaint) ¶¶ 58–59, 178–179, 408–415. But later alleged neglect, delayed repair, breach of contract, or statutory noncompliance does not plausibly establish that a defendant held a present intent to deceive at the time a financing instrument was executed. *Efron*, 96 F.4th at 438–40; *Rodríguez-Ortiz*, 490 F.3d at 97–98.

And fourth, the Plaintiffs "must demonstrate that the targeted financial institution was federally insured." *Id.* Again, this is alleged nowhere in the First Amended Complaint, and the

FAC's fabricated allegations of "bank fraud," or that this "bank fraud" somehow caused harm to the Plaintiffs is far-fetched.

Finally, the Plaintiffs are not a bank, and their claim hinging upon "bank fraud" under 18 U.S.C. § 1344 based upon boilerplate representations inserted by a bank in a mortgage to which they are not a party is completely implausible.

Accordingly, because the "[f]ailure to plead predicate acts adequately is enough to sink [the Plaintiffs'] RICO claim[,]" the Court must dismiss Plaintiffs' RICO counts listed in the Complaint. *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1990).

### ii.    Extortion

Turning to "extortion," the First Amended Complaint again fails to plead any plausible extortion-based predicate act under RICO. For a state-law offense to qualify as "an act or threat involving . . . extortion" under RICO, the conduct must be capable of being generically classified as extortion under federal law. *United States v. Munoz-Martinez*, 79 F.4th 44, 52 (1st Cir. 2023) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003)). Generic extortion requires "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Id.* (quoting *Scheidler*, 537 U.S. at 409). The FAC does not plausibly allege that type of acquisition.

The bulk of the FAC's extortion allegations still reduce to claims that the Defendants threatened eviction, filed eviction actions, referenced the public nature of eviction proceedings, or otherwise engaged in litigation-related pressure. ECF No. 26 (First Amended Complaint) ¶¶ 436–471. *See Scheidler*, 537 U.S. at 405 (holding that "depriv[ing] respondents of their alleged property right" is not "generic extortion").

But threats to sue, eviction notices, and even allegedly meritless litigation activity do not constitute extortion under RICO. *See Dias v. Bogins*, 134 F.3d 361 (Table), 1998 WL 340241, at *1 (1st Cir. 1998) (Unpublished) (explaining that "although a threat to sue, if groundless and made in bad faith, may be tortious under state law, it is not extortion under federal law"); *Kim v. Kimm*, 884 F.3d 98, 104 (2nd Cir. 2018) (citing *Gabovitch v. Shear*, 70 F.3d 1252 (Table), at *2 (1st Cir. 1995) (Unpublished)) (explaining that "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act"); *Mendlow v. Seven Locks Facility*, 86 F. Supp. 2d 55, 59 (D. Conn. 2000) ("An eviction pursuant to a TRO does not meet the statutory definition of a predicate act, even if veiled as extortion of property. 18 U.S.C. § 1961."); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract . . . does not constitute extortion.").

Likewise, allegations that Defendants sought to deter tenant complaints, discourage organizing, pressure tenants to vacate, or secure dismissal of claims still do not plausibly allege the acquisition of property required by *Scheidler*. ECF No. 26 (First Amended Complaint) ¶¶ 436–471.

Notably, the "obtaining something of value" requirement for RICO extortion (analogous to the "money or any unlawful pecuniary advantage" under the Rhode Island Extortion Statute, but likely stricter) has been construed narrowly by the United States Supreme Court to maintain the distinction between "extortion" and "coercion." *Scheidler*, 537 U.S. at 400–11 (general discussion of "extortion" under RICO); *Id.* 404–05 (explaining that where the defendant only "deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets," this at most constituted "coercion," not "extortion," and that holding otherwise, would "eliminate the recognized distinction between extortion and the separate crime

46

of coercion—a distinction that is implicated in these cases"); *Id.* at 404 ("Most importantly, we have construed the extortion provision of the Hobbs Act at issue in these cases **to require not only the deprivation but also the acquisition of property**.") (emphasis added).

In other words, the Defendants did not "obtain" or "acquire" any of the Plaintiffs' "money" or "property" through these alleged threats, or anything that the Defendants "could exercise, transfer, or sell" under the Supreme Court's clear precedent. *Scheidler*, 537 U.S. at 405. Instead, Plaintiffs' theory is that Defendants sought to avoid spending money they already had on maintenance or litigation exposure, not that they acquired transferable property from the tenants by extortion. *See, e.g.*, ECF No. 26 (First Amended Complaint) ¶ 380(d) (claiming "the Enterprise . . . gain[ed] an unfair competitive advantage as landlords by illegally avoiding the costs of maintaining safe and fit premises").

Nor does the FAC plausibly allege "extortion" by repackaging supposed deterrence, coercion, embarrassment, or pressure as the obtaining of property. ECF No. 26 (First Amended Complaint) ¶¶ 436–471. Allegations that the Defendants sought to silence tenant complaints, discourage organizing, press tenants to vacate, or obtain dismissal of claims still do not plausibly allege the acquisition of property required by *Scheidler*. *See Scheidler*, 537 U.S. at 404–05, 409. At most, such allegations sound in purported "coercion," not "extortion." *Id.*; *Munoz-Martinez*, 79 F.4th at 52.

In fact, a provision in the Rhode Island Fair Housing Practices Act explicitly addresses "coercion," rather than "extortion," reflecting the distinction and where the Plaintiffs' remedy would be found, if at all existing. R.I. Gen. Laws § 34-37-5.1 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of

47

his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this chapter.").

To the contrary, the First Circuit and United States Supreme Court hold that the purported victim's "consent" is required for "extortion" under RICO. *Scheidler*, 537 U.S. at 409 ("with his consent"); *Munoz-Martinez*, 79 F.4th at 52 (citing *Camelio v. American Fed'n*, 137 F.3d 666, 670–71 & n.5 (1st Cir. 1998)) (where the First Circuit affirmed dismissal of a private RICO action predicated on extortion because the defendant's "unilateral acts" did not constitute extortion due to the absence of the victim's consent). Reclaim RI does not plausibly allege that it consented to any of Butler's or the Defendants' allegedly obstructionist conduct. ECF No. 26 (First Amended Complaint) ¶¶ 436–471. That would be absurd.

The Plaintiffs previously relied upon *U.S. v. Gotti*, 459 F.3d 296 (2nd Cir. 2006) for their extortion theory in their attempt to rebut *Sheidler* and *Munoz*. The distinguishable facts underlying this opinion from the Second Circuit involved criminal RICO indictments against members and associates of the Gambino Family, a mob exercising control over labor unions, businesses, and individuals in Brooklyn and Staten Island. *Gotti*, 459 F.3d at 301.

The Second Circuit merely explained in *Gotti*, looking to *Scheidler*, that "intangible property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal[,]" and then declined to dismiss extortion counts based upon specific allegations that the defendants threatened union members, told delegates who to vote for, and installed loyalists in leadership positions of the union. *Id.* at 325–26. These criminal acts were committed under clear threats of violence. *See id.* at 306 (alleging **statement obtained through wiretapped conversation** where one of the defendants instructed a fellow mob member to "'[s]top

48

by' Sacchetti's house, '**ring his bell**,' and '[s]ay, you know what? You'd better stop it. . . . **You'd better stop**. . . . **Otherwise, you know what's gonna happen here**?'").

It is not alleged that anything like the orchestrated crime scheme in *Gotti*—where the government had obtained wiretapped conversations reminiscent of scenes from the Sopranos—occurred in the present case. Contrary to what the Plaintiffs fantasize and conclude in their Complaint, the Defendants are not the "mafia." ECF No. 26 (First Amended Complaint) ¶ 418.

More persuasively, and returning to the civil realm, the Ninth Circuit affirmed the dismissal of a RICO claim based upon predicate acts of extortion alleged by a group of elderly, mobile home tenants against their landlord. *Rothman v. Vedder Park Management*, 912 F.2d 315 (9th Cir. 1990).

In *Rothman*, one of the specific allegations in the complaint was that "the park manager visited residents and said, '**If you don't sign the lease, you don't know what you are in for because without a lease they can charge you anything they want**. **Who will protect you after the year is over**?'" *Id.* at 317–18. Despite this allegation and several others in the complaint alleging that Defendant Vedder or the park manager threatened this group of plaintiff-retirees to sign an illegal lease, the Ninth Circuit affirmed the trial court's dismissal of the complaint for failure to plausibly allege a RICO claim based upon predicate acts of extortion or mail fraud. *Id.*

Borrowing "the words of Justice Holmes," the *Rothman* court reasoned that "'[a]s a general rule, even if subject to some exceptions, **what you may do in a certain event you may threaten to do, that is, give warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences**.'" *Id.* (quoting *McKay v. Retail Auto. Salesmen's Local Union No. 1067*, 16 Cal. 2d 311, 321, 106 P.2d 373, 379 (1940)).

The same rule in *Rothman* bars the Plaintiffs' RICO claims here based upon allegations that the Defendants "threatened" them with respect to their leases, made "demands" in connection with their tenancy, or initiated eviction proceedings against them. *Id.*

Ultimately, the only allegation in the Complaint that hints at anything like a "use of force, fear, or threats" concerns vague allegations about unnamed strangers, one allegedly knocking on Plaintiff Wood's door, demanding entry, and walking into the apartment, and then allegedly a different man returning later claiming to be a constable and telling Wood she was ordered to leave. ECF No. 26 (First Amended Complaint) ¶¶ 215–18.[5] There are no allegations suggesting that any of this was "wrongful," or that the Defendants "obtain[ed] something of value from" Wood. *Munoz-Martinez*, 79 F.4th at 52. Nor does the First Amended Complaint suggest Wood (or any other Plaintiff) "consented" to any demands that were made, such as during the alleged door-knocking incident, or even that Wood "voluntarily abandoned" her apartment in response to these alleged threats. *See United States v. Burhoe*, 871 F.3d 1, 28–29 (1st Cir. 2017) (describing "consent" for "generic extortion" purposes as requiring "voluntar[y] abandon[ment]" of property).

The foregoing defects are fatal to the Plaintiffs' RICO allegations based upon extortion, which are all cut from the same cloth. *See also 287 Franklin Ave. v. Meisels*, No. 11–CV–0976 (KAM)(JO), 2015 WL 5457959, at *8 (E.D.N.Y. July 20, 2015) ("First, the plaintiffs purport to establish the extortion on which they rely by declaring that **Goldberger occasionally came to their doors during nighttime hours, knocking loudly, and demanding rent**. . . . **That fails to establish, as required, that the defendants procured the plaintiffs' consent to make rent**

---

[5] Silva also now alleges RICO extortion based upon the physical altercation already being litigated in the Superior Court, which claims are subject to State law claims and Superior Court jurisdiction.

**payments** by "the wrongful use of actual or threatened force, violence or fear (including fear of economic loss).").

Further, the "extortion" allegations set forth by the Plaintiffs generate insurmountable causation hurdles. *Sanchez v. Triple–S Management, Corp.*, 492 F.3d 1, 14 (1st Cir. 2007) (holding that the "plaintiffs cannot press a RICO claim based on attempts at extortion that did not succeed in harming them"). *See infra* Section IV.A.2 (on causation).

Here, the District of Massachusetts' holding in *Lu v. Canton Corp.*, Civil Action No. 15-cv-10088-ADB, 2015 WL 13697141, at *7 (D. Mass. May 13, 2025) dismissing RICO extortion provides further persuasive value given the factual parallels:

> Here, Plaintiff alleges that the defendants have **committed various wrongful acts against him**, such as **stealing his personal property**, **turning off his hot water**, **entering his home without permission**, **damaging his apartment**, **failing to make certain repairs**, and **defaming him**. But **Plaintiff does not allege that defendants forced him to voluntarily turn over his property to them**, **by the wrongful use of threatened or actual force, violence, fear, or under color of official right**. Further, **Plaintiff's allegation that the Fairfields mailed him a 30-Day Notice to Quit his apartment** [ECF No. 1 ¶ 12], **does not plausibly make out an act of extortion**. *See Mendlow v. Seven Locks Facility*, 86 F.Supp.2d 55, 59 (D. Conn. 2000) ("An eviction pursuant to a [temporary restraining order] does not meet the statutory definition of a predicate act, even if veiled as extortion of property.").

*Lu*, 2015 WL 13697141, at *8.

For instance, as it relates to Plaintiff Doe, he alleges he "terminated his own lease" and simply moved out of his apartment. ECF No. 26 (First Amended Complaint) ¶ 120. Doe's fact-pattern averring unauthorized inspections and defamatory threats related to his sexual orientation, but which did not "force[ ] him to voluntarily turn over his property to [the Defendants], by the wrongful use of threatened or actual force, violence, fear," places Doe squarely within the facts of *Lu*. *Lu*, 2015 WL 13697141, at *8.

In sum, the Plaintiffs have failed to plausibly allege predicate acts of "extortion" under the RICO Act. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

### iii.      Collection of an Unlawful Debt

The FAC's unlawful-debt theory also remains deficient. RICO's "unlawful debt" provision is aimed at illegal gambling debts and usurious loans made in the business of lending money or a thing of value. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 n.8 (1st Cir. 2015); 18 U.S.C. § 1961(6). A landlord's late fee or administrative charge under a lease does not transform a residential tenancy into the "business of lending money." Nor do allegations about late fees under leases plausibly establish that the Defendants are in the business of making usurious loans. At most, the FAC alleges a dispute over lease charges. That is not enough to plead "collection of unlawful debt" under RICO. *See Home Orthopedics*, 781 F.3d at 528 n.8; *Conti v. Robidoux*, 741 F. Supp. 1019, 1021–22 (D.R.I. 1990).

The FAC's unlawful-debt theory also remains deficient. RICO's "unlawful debt" provision is aimed at illegal gambling debts and usurious loans made in the business of lending money or a thing of value. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 n.8 (1st Cir. 2015); 18 U.S.C. § 1961(6). A landlord's late fee or administrative charge under a lease does not transform a residential tenancy into the "business of lending money." Nor do allegations about late fees under leases plausibly establish that the Defendants are in the business of making usurious loans. At most, the FAC alleges a dispute over lease charges. That is not enough to plead "collection of unlawful debt" under RICO. *See Home Orthopedics*, 781 F.3d at 528 n.8; *Conti v. Robidoux*, 741 F. Supp. 1019, 1021–22 (D.R.I. 1990).

> "[U]nlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to

52

principal or interest because of the laws relating to usury, **and** (B) **which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law**, where the usurious rate is at least twice the enforceable rate;

18 U.S.C. § 1962(a)–(c); 18 U.S.C. § 1961(1) (emphasis added).

The First Circuit has discarded such far-fetched allegations of "unlawful debts" through footnotes. *Home Orthopedics Corp.*, 781 F.3d at 528 n.8 ("Home Orthopedics suggests in its opening brief that Linares and Pino's **attempts to collect the consulting fees constituted** "**collection of an unlawful debt**," making no pattern of racketeering activity necessary to satisfy the third RICO element. **This suggestion is without merit, however, because RICO limits "unlawful debt" to illegal gambling debt and "usurious" loans**, see 18 U.S.C. § 1961(6), and **no such debts are alleged here**.") (emphasis added). Put bluntly, fees are not loans. *Id.*

Assessing late fees under leases does not transform the Plaintiffs' leases into "usurious" loans, or otherwise into "unlawful debts" under RICO. *See also Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, R.I.C.O. Bus. Disp. Guide (CCH) P 10286 (5th Cir. 2002) (cable service provider did not collect "unlawful debts" by collecting late fees from cable subscribers). The Defendants did not "loan" any money to the Plaintiffs.

Such an expansion of RICO is far attenuated from cases involving "loan sharking," which is what Congress intended to combat through this RICO provision. *U.S. v. Oreto*, 37 F.3d 739, 743 (1st Cir. 1994) (applying RICO to "loansharking enterprise" where "[a]t least two witnesses testified that they were physically assaulted by Oreto, Sr.'s collectors, and many more borrowers testified that they believed that harm would come to them if they failed to make their payments"). None of this "mafia-like" collection activity of allegedly unlawful late fees is mentioned in the First Amended Complaint.

Further dispositive is the fact that the Plaintiffs do not allege that the Defendants are in the "business of lending money or a thing of value at a rate usurious under State or Federal law," as is required for a claim based upon a "collection of an unlawful debt" under the RICO Act. 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(a)–(c). To the opposite effect, their First Amended Complaint leans on allegations that the Defendants borrowed money from banks and mortgaged their properties, not "loaned" any money (other than Olson's implausible "boat-jacking" allegations that he attempts to tie into a "fake, personal loan" allegedly given while Olson worked for the Defendants and had rent deducted from his paycheck, which sounds like a dispute over the terms of his employment, not a RICO claim). *Grassick*, 2012 WL 106691, at \*5 (dismissing RICO claim sounding in employment dispute).

A decision from the District of Rhode Island, rendered by the late Judge Lagueux, is instructive on the meaning of "business of lending money." In *Conti v. Robidoux*, 741 F. Supp. 1019 (D.R.I. 1990), the District of Rhode Island explained what "business" means under 18 U.S.C. §§ 1961(6) and 18 U.S.C. § 1962(a)–(c). "**Business signifies a profession or on-going activity for profit or livelihood**." *Conti*, 741 F. Supp. at 1021 (emphasis added). *Conti* noted the Second Circuit's view "that the 'business of lending money' requirement as **designed to target loan sharks**." *Id.* at 1022 (citing *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2nd Cir. 1985)).

Ultimately, the Court agreed with the Second and Ninth Circuit's interpretation that "**the civil RICO action is not simply an action to recover excessive interest or to enforce a penalty for the overcharge**. **RICO is concerned with evils far more significant than the simple practice of usury**." *Id.* (citing *Durante Bros.*, 755 F.2d at 250 and *Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 666 (9th Cir. 1988)).

54

Accordingly, the District of Rhode Island held in *Conti* that an owner of automobile dealership who made two usurious loans was not "in the business of loaning money" and could not be held liable under the RICO Act. *Id.*

First, making this case even more distanced from RICO than *Conti*, it is not even plausibly alleged that the Defendants made any "usurious" loans; it is alleged that the Defendants collected excessive late fees (*i.e.*, $75 for late rent). Second, as was true in *Conti*, the Complaint plausibly alleges that the Defendants are in the "business" of owning and leasing real estate, not the "business of loaning money." 18 U.S.C. § 1961(6); 18 U.S.C. § 1962(a)–(c). If the car dealership in *Conti* was not subject to RICO's "unlawful debt" provisions, then neither are the Defendants. The Plaintiffs have failed to plead predicate acts under RICO under all of their theories.

2. **The Plaintiffs have also failed to plausibly allege an "injury" to their "business or property by reason of" a RICO violation against any of the Defendants.**

Even if the Court were to assume, *arguendo*, that the FAC adequately alleged a pattern of racketeering activity—and it does not—the Plaintiffs still fail to plausibly allege an injury to business or property "by reason of" a RICO violation. 18 U.S.C. § 1964(c). The Supreme Court has made clear that the key word in this analysis is "direct." *Horn*, 145 S. Ct. at 944–46; *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Anza*, 547 U.S. at 457; *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–12 (2010) (explaining the strict "**direct-relationship requirement**"). Time and again," the Supreme Court has "reiterated that § 1964(c)'s 'by reason of language demands '**some direct relation between the injury asserted and the injurious conduct alleged**." *Horn*, 604 U.S. at 612 (quoting *Holmes*, 503 U.S. at 268) (emphasis added).

Here, the FAC again pleads injuries that are "entirely distinct from the alleged RICO violation." *Anza*, 547 U.S. at 457. At most, the Plaintiffs allege downstream consequences of

55

alleged landlord-tenant disputes, maintenance disputes, or eviction proceedings—not direct injuries caused by a RICO predicate act. *Id.*

As to what exactly constitutes an "injury" to "business or property" for purposes of RICO, the United States Supreme Court recently opined that "the reach of § 1964(c) turns on more than the meaning of 'injured.'" *Medical Marijuana, Inc. v. Horn*, 145 S.Ct. 931, 945-46 (2025). In *Horn*, the Supreme Court left play in the joints for the district courts, suggesting that "'business' may not encompass every aspect of employment, and 'property' may not include every penny in the plaintiff's pocketbook." *Id.* at 946. However, the *Horn* court then placed guardrails on its holding by concluding that "**not every monetary harm—be it lost wages, medical expenses, or otherwise—necessarily implicates RICO**." *Id.* (emphasis added).

To the extent an injury to "property" is alleged, the Plaintiffs do not own their units—they are tenants—so any "injury" is not to **their** "property" for purposes of RICO. *Oscar v. University Students Co-op Ass'n*, 965 F.2d 783, 786–87 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (evaluating "injury" in RICO case brought by tenant against landlord for allegedly allowing drug dealing to occur on premises) ("[Oscar] does not own the property on which she lives; her property interest in the land is a leasehold interest. Although one might measure an owner's loss by the diminution in fair market value, the same cannot be said for a renter. If the resale value of the property goes down, Oscar has lost nothing. Indeed, if the value of the property drops far enough, Oscar's rent should go down. She would incur a financial gain, not a loss."). Thus, under *Horn* and *Oscar*, the Plaintiffs have not "lost" any "property" they owned for purposes of RICO, and any alleged failure to maintain the Plaintiffs' units is not an "injury" to their "property." 18 U.S.C. § 1964(c).

While the Plaintiffs also attempt to allege a variety of remote "monetary harms" such as rent and utility increases, forfeited security deposits, moving and storage costs, lost wages, and costs stemming from eviction proceedings, none of these alleged harms are direct and proximate "monetary harms" caused by the Defendants' alleged violation of RICO. *See, e.g.*, ECF No. 26 (First Amended Complaint) ¶ 354 ("Often, unexpected costs, bills, and delays in income come from the Defendants' own actions and omissions, such as when tenants have hospital bills or miss work due to bad conditions such as lack of heat or to attend retaliatory sham "inspections"). *Compare with Hemi Group*, 559 U.S. at 18 (reversing denial of motion to dismiss because the "City's injuries here were not caused **directly** by the alleged fraud, and thus were not caused "by reason of" it[,]" and "therefore," the City, "ha[d] no RICO claim").

In other words, even assuming there is an "injury" under RICO, if these alleged injuries were suffered by the Plaintiffs, they were not injuries directly resulting from "racketeering activity" under RICO and a violation thereof. *Roe v. Healy*, 78 F.4th 11, 27 (1st Cir. 2023) (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9–11 (2010) ("Indirect or downstream harm does not establish statutory standing to pursue a RICO claim."); *see also Sasmor v. Meisels*, 708 Fed. Appx. 728, 731 (2nd Cir. 2017) (Unpublished) ("Nor has Sasmor presented evidence sufficient to establish that the very act of pursuing the eviction proceedings amounted to extortion[,]" and "Sasmor did not incur these litigation expenses as a result of a RICO violation and in this respect, too, Sasmor has not shown that he suffered a RICO injury.").

This defect is especially clear with the FAC's new mortgage and HAP theories. To the extent the FAC alleges that lenders or public housing authorities were misled by mortgage covenants, HAP contracts, or assumption agreements, any direct injury from those representations would belong—if at all—to the third-party recipients of those representations, not to the tenants.

ECF No. 26 (First Amended Complaint) ¶¶ 54–59, 132, 175–179, 203–205, 227–230, 403–435. The tenant-Plaintiffs do not plausibly allege that their claimed harms—moving costs, lost wages, food spoilage, hotel expenses, emotional distress, loss of employment opportunities, or reputational harm from eviction records—flowed directly from those third-party representations. *Holmes*, 503 U.S. at 268; *Anza*, 547 U.S. at 457. *Cf. Vitone v. Metropolitan Life Insurance Co.*, 954 F. Supp. 37, 38–39 (D.R.I. 1997) (Lagueux, J.) ("Any employment-related harm suffered by plaintiff was a remote and incidental by-product of the racketeering activities directed at the policyholders.").

Thus, even if the FAC plausibly alleged that a lender had been defrauded—which it does not—the tenant-Plaintiffs still do not plausibly allege that they were injured directly and by reason of those representations to the lenders. *See Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., L.P.*, 25 F. Supp. 2d 116, 120–24 (E.D.N.Y. 1998), *aff'd*, 201 F.3d 430 (2d Cir. 1999) (rejecting tenants' RICO standing where alleged misrepresentations were directed to HUD rather than tenants); *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994) (citing *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden*, 795 F.2d 1111, 1117 (1st Cir. 1986)) ("Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories, *see, e.g., Arlington Trust Co. v. Estate of Wood*, 123 N.H. 765, 465 A.2d 917, 918 (1993), a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him.").

The Plaintiffs' expected reliance on an "overpayment" theory also does not save the FAC. The problem is not merely whether money changed hands for allegedly substandard units; it is that the FAC does not plausibly allege that any overpayment was caused directly by a RICO predicate act, as opposed to alleged breaches of warranty, habitability disputes, or later maintenance failures.

58

Whatever overpayment theory Plaintiffs may pursue under state law, the FAC still does not bridge the gap between those alleged losses and a properly pleaded federal scheme to defraud under RICO. *Hemi Group, LLC*, 559 U.S. at 9 (quoting *Holmes*, 503 U.S. at 268) (holding RICO plaintiffs are "required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'"); *see also, e.g.*, *Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de P.R.*, 621 F.3d 10, 15 (1st Cir. 2010) ("Even if the banks were implicitly misrepresenting their motive for not dealing with Méndez, it is not the falsity of their excuse that causes him damage but their refusal to provide him with accounts.").

The same is true of the FAC's renewed effort to premise standing on organizational injuries to Reclaim RI. Reclaim RI still alleges only that the Defendants frustrated its organizing campaign, increased its costs, and impeded potential membership or revenue. ECF No. 26 (First Amended Complaint) ¶¶ 367–376, 483. Whatever that may mean for other purposes, it does not plausibly establish a direct injury to "business or property" by reason of a RICO predicate act. *See Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y. LLC*, 575 F. Supp. 2d 499, 507 (S.D.N.Y. 2008) (citing *Libertad v. Welch*, 53 F.3d 428, 437 (1st Cir. 1995)). Reclaim RI's allegations remain too remote and too generalized to satisfy § 1964(c).

> The only injury, however, that BRUSH alleges is that defendants' scheme has frustrated BRUSH'S efforts to advocate for and organize tenants who occupy rent-regulated apartments in West Harlem and Northern Manhattan communities. This may give BRUSH constitutional standing; however, RICO poses a much higher standing requirement. RICO injury requires injury to "business or property," and does not encompass activity that merely "conflicts with the group's mission and renders their objectives more difficult to achieve." *Libertad v. Welch*, 53 F.3d 428, 437 (1st Cir. 1995)).

*Buyers and Renters United to Save Harlem*, 575 F. Supp. 2d at 507.

Therefore, despite its allegations, Reclaim RI lacks standing based on its organizational injuries and vague references to "member-tenants." *See* ECF No. 26 (First Amended Complaint) ¶¶ 370–376, 483 ("Defendants frustrated the organizing drive through unlawful threats of retaliation and actual retaliation, including retaliatory eviction of leading member-tenants."). If the unidentified "member-tenants" possess direct RICO injuries caused by any Defendant, they must be alleged in their individual capacity, not organizationally through Reclaim RI. *Buyers and Renters United to Save Harlem*, 575 F. Supp. 2d at 507. The only allegations in the FAC that could plausibly be tied to Reclaim RI are those relating to the Riveras, who are not even a party. ECF No. 26 (First Amended Complaint) ¶¶ 360, 363–65.

If anything, and if at all true, the Plaintiffs' alleged injuries could be said to have been caused by contractual breaches—not because of RICO violations—and the RICO Act does not avail the Plaintiffs of a remedy for these remote injuries. *Mendez Internet Mgmt. Servs., Inc.*, 621 F.3d at 15 (rejecting the plaintiff's RICO claims based upon mail and wire fraud because "[e]ven if the [defendants] were implicitly misrepresenting their motive . . . , it is not the falsity of their excuse that causes [the plaintiff] damage"); *see also Embassy Suites*, 223 F.3d at 17 (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999)) (holding that "plaintiffs must show that the defendants' misstatements were 'the reason the transaction[s] turned out to be . . . losing one[s]'").

Putting it all together, the Plaintiffs have come nowhere close to "plausibly" alleging "racketeering activity" on the part of any of the Defendants that "directly" resulted in "injury" to their "business" or "property." *Iqbal*, 556 U.S. at 678. Lacking any merit whatsoever, Counts I, II, and III brought under RICO must be dismissed.

**B. Doe, Pine, and Olson have failed to allege plausible claims under the Fair Housing Act.**

**1. Doe's FHA Claim**

Doe claims "sexual harassment" in violation of 42 U.S.C. § 3604 by all Defendants. ECF No. 26 (First Amended Complaint) ¶¶ 98–129, 497–503.

Section 3604 of the FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The statute also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by § 3604. 42 U.S.C. § 3617.

Critically, Doe faced a 2-year statute of limitations on an action brought under the FHA. 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action in an appropriate United States district court or State court **not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice**, . . . whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice[.]") (emphasis added).

Also, important under the present circumstances, the plaintiff alleging sexual harassment under the FHA "must plead plausibly, *inter alia*, that the alleged harassment '**materially change[d] the conditions' or privileges of h[is] tenancy**." *Paulsen v. Great Bridge Attleboro Limited Partnership*, 552 F. Supp. 3d 160, 165 (D. Mass 2021) (quoting *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 95 (1st Cir. 2006)) (emphasis added).[6]

---

[6] The District of Massachusetts also notes in *Paulsen* that the First Circuit has not addressed the question of "whether sexual harassment qualifies as sex discrimination under the FHA." *Paulsen*, 552 F. Supp. 3d at 164. Albeit, looking to Title VII cases from the First Circuit, the *Paulsen* court ultimately concluded that "sexual harassment, at least in certain circumstances, may constitute sex-

**Doe's claim under the FHA is time-barred**. 42 U.S.C. § 3613(a)(1)(A). Doe alleges that he "moved out at the end of June 2023." ECF No. 26 (First Amended Complaint) ¶ 122. The instant action was commenced on July 9, 2025—which is more than two (2) years after Doe's tenancy allegedly ended.

While Doe also alleges that "the Defendants sued Mr. Doe to evict him after he had already left," *Id.* ¶¶ 124–25, and that he received an email from Elmwood Realty on August 23, 2023, allegedly threatening to "share a video from a walkthrough inspection of [Doe's] apartment after giving [him] proper notice," *Id.* ¶ 123, these allegations take place **after** Doe moved out. *Id.* ¶ 122.

Therefore, even if these allegations could plausibly form the basis for a "sexual harassment" claim covered by the FHA (which is dubious), Doe's claim is time-barred under § 3613(a)(1)(A).

In other words, this alleged discrimination could not possibly have "materially change[d] the conditions' or privileges of [Doe's] **tenancy**." *Paulsen*, 552 F. Supp. 3d at 165 (citing *Valentin-Almeyda*, 447 F.3d at 95). Doe's "tenancy" was over by the time these allegations are said to have occurred. ECF No. 26 (First Amended Complaint) ¶¶ 122–123. *See also Edwards v. Alexander County Housing Authority*, Case No. 19-CV-00879-JPG, 2021 WL 101340, at *4–5 (S.D. Ill. Jan. 12, 2021) (holding claim under FHA time-barred when brought more than two (2) years after the plaintiff moved out, because, "according to Sueing's complaint, however, she moved out of the Elmwood development in 2015[,]" so "[h]er claims, therefore, began accruing then—the day she last suffered an injury"); *Lawrence v. Center Properties, LLC*, Case No. 20-247, 2020 WL 4784985, at *3 (E.D. La. Aug. 17, 2020) ("She was evicted from the apartment on May 20, 2015.

---

based discrimination under the FHA," this shaky ground for the applicability of the FHA to Doe's claims in the first instance should cause the Court to scrutinize Doe's claims with heightened suspicion. *Id.* at 165 (citing *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 17 (1st Cir. 2013)).

62

Thus, the statute of limitations for Lawrence's claims began to run—at the latest—on May 20, 2015[,]" and FHA claim became time-barred on May 20, 2017.").

Because Doe's claim is clearly time-barred on the face of the Complaint, the Court must dismiss Doe's claim under the FHA that is set forth in Count IV. *Garcia-Gesualdo v. Honeywell Aerospace of Puerto Rico, Inc.*, 135 F.4th 10, 16 (1st Cir. 2025) (quoting *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019)) (holding that "affirmative defenses—such as untimeliness—"may be raised in a motion to dismiss, provided that the facts establishing the defense are clear on the face of the plaintiff's pleadings").

### 2.  Pine's FHA Claim

Pine alleges that Butler and Elmwood Realty (and only Butler and Elmwood Realty), violated 42 U.S.C. § 3604(f) of the FHA based upon disability discrimination. ECF No. 26 (First Amended Complaint) ¶¶ 224–243, 504–513.

Pine alleges she "suffers from physical and mental impairments, including mobility limitations and post-traumatic stress disorder (PTSD), which substantially limit one or more major life activities, including walking, climbing stairs, and maintaining emotional stability," 42 U.S.C. § 3602(h), and that she "suffered harm" when the Defendants allegedly failed to make "reasonable accommodations" for her upon notification and allegedly retaliated against her for her requests. 42 U.S.C. § 3604(f)(2) and (f)(3)(B). *Id.* ¶¶ 504–13.

The First Circuit has set forth the test for alleging a theory of liability based upon a failure to make reasonable accommodations in *Astralis Condominium Ass'n v. Secretary, U.S. Dept. of Housing and Urban Development*, 620 F.3d 62 (1st Cir. 2010). There, the *Astralis* court held that for an FHA claimant "[t]o establish a prima facie case of failure to accommodate under the FHAA," she must allege the following:

1. "[A] claimant must show that [s]he is handicapped within the purview of 42 U.S.C. § 3602(h) and that the party charged knew or should reasonably have known of h[er] handicap. . . .

2. Next the claimant must show that [s]he requested a particular accommodation that is both reasonable and necessary to allow him an equal opportunity to use and enjoy the housing in question. . . .

3. Finally, the claimant must show that the party charged refused to make the requested accommodation. 42 U.S.C. § 3604(f)(3)(B)."

*Id.* at 67.

On the first element, assuming for purposes of this Motion that Pine has adequately alleged she is "disabled" for purposes of the FHA, she has not set forth any "plausible" facts supporting a "reasonable inference" that "the party charged knew or should reasonably have known of h[er] handicap." *Id.*; *see also Iqbal*, 556 U.S. at 678 (holding "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Of note, Pine states that "[s]he moved into her unit in 2001 when it was owned by a different landlord[,]" and that "Elmwood Realty became her landlord on or about November 2023." ECF No. 26 (First Amended Complaint) ¶¶ 224–243. However, despite her alleged "mobility limitations and post-traumatic stress disorder (PTSD)," as well as her "chronic pain caused by her disability," Pine does not plausibly allege she made a request for reasonable accommodation, or that she communicated anything to Butler about her having a disability, at any time between when Elmwood Realty acquired the property in November of 2023 until August of 2024. *Id.* ¶¶ 224–243, 504–513. "Ms. Pine [only generally alleges that she] wrote an email to an

64

Elmwood Realty employee named Amanda stating that she was "legally disabled" and has a disability parking tag." *Id.* ¶ 232. According to Pine, "[t]he email also noted that Ms. Pine's disabilities meant that she needed a parking spot close to the building entrance, is mostly homebound, has severe insomnia, is unable to clear snow, and has stress, anxiety, Post-Traumatic Stress Disorder and loneliness requiring an emotional support animal (as recommended by her medical team)." *Id.* Pine does not allege the email mentioned anything about hot water or a specific disability related to such. *Id.*

After 10 months, in August of 2024, Pine alleges she "signed a new lease with Elmwood Realty as the listed landlord in August of 2024." *Id.* ¶ 234. She does not allege that Butler, Elmwood Realty, or any of the Defendants countersigned the new lease that she allegedly signed in August of 2024. *Id.* Then, Pine vaguely states, "[a]s part of this process, Ms. Pine wrote to Elmwood Realty to ask for certain reasonable accommodations." *Id*. The alleged "reasonable accommodations" Pine states she notified the Defendants do not mention hot water for a specific disability. Pine does not state who she wrote to at Elmwood Realty or whether there was a response. *Id.* No writing is attached to the Complaint, and there are no allegations that Pine ever communicated any of this to Butler. *Id.*

Pine's allegations are wholly insufficient under *Twombly-Iqbal* to allege that the Defendants—never mind Butler, who is not mentioned here—"knew or should reasonably have known of h[er] handicap" up through this point—over 10 months into her tenancy at somewhere she has lived for 23 years. *Astralis*, 620 F.3d at 67; *Twombly*, 550 U.S. at 570 (holding that the complaint must plead "enough facts to state a claim to relief that is plausible on its face").

The only allegation made by Pine that is somewhat more specific and which implicates Butler is in Paragraph 236 when she states, "[o]n August 31, 2024 Ms. Pine wrote **the landlord**

65

on the tenant maintenance portal **asking for the shower to be remediated and alerting the landlord that a functioning shower was especially important to her because of her disability**.” *Id.* ¶ 236.

Reading this allegation, the Court should be mindful that Pine has not plausibly alleged the Defendants knew anything about “specific disability,” for which she required hot water or a functioning shower as a “reasonable accommodation,” until she says she “ask[ed] for the shower to be remediated and alerting the landlord that a functioning shower was especially important to her because of her disability,” on August 31, 2024. *Id.* This vague message begs the question— what was her alleged disability, and how did she link it to a “reasonable accommodation” for a functioning shower or hot water?

Pine claims “within twenty minutes,” she “received the following message from Mr. Butler (Figure 6)[.]” *Id.* ¶ 237. Pine does not allege how she knows this message was sent to her by Butler, and the screenshot of the alleged message from TenantCloud does not mention Butler. *Id. See also Humana Inc.*, 126 F.4th at 103 (holding that the Court only “focus[es] on the complaint’s non-conclusory, **non-speculative factual allegations** and ask whether they plausibly narrate a claim for relief” when evaluating a Rule 12(b)(6) motion) (emphasis added).

Also, of note, the screenshot displayed in Figure 6 at Paragraph 237 mentions nothing about a disability, and merely states the subject of the message is regarding Pine’s “Plumbing / Shower / Tub / Other Maintenance Request.” ECF No. 26 (First Amended Complaint) ¶ 237. The message merely shows “Elmwood Realty” thanked her for her “very detailed message with a lot of information [the sender] do[es] not need,” noted she seems unhappy and she has “refused to sign [her lease],” and suggested Pine “start[s] looking for a new place as [the sender] will be terminating

[her tenancy]." *Id.* No notice of a "disability" on the part of the Defendants can be reasonably inferred here.

In sum, none of Pine's allegations satisfy the first element of a prima facie reasonable accommodation claim under the FHA and *Twombly-Iqbal*, and there are no non-speculative or non-conclusory facts alleged by Pine rendering it "plausible" that any of the Defendants (particularly Butler who she brings this claim against along with Elmwood Realty) ever knew that she had a disability. *Id.* ¶¶ 169–79.

Turning to the second element of Pine's claim, Pine fails to plausibly allege that she ever "requested a particular accommodation that is both reasonable and necessary to allow [her] an equal opportunity to use and enjoy the housing in question." *Astralis*, 620 F.3d at 67.

A "reasonable accommodation" under the FHA is an accommodation "in rules, policies, practices, or services, when such accommodations may be necessary to afford such person [with a qualified 'handicap'] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(2)–(3). A "reasonable accommodation" must be "triggered by a request" from the tenant. *Astralis*, 620 F.3d at 67 (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001)).

Moreover, a plaintiff has the burden "to demonstrate that his requested accommodation 'seem[ed] reasonable on its face.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012). "**The request 'must explain how the accommodation requested is linked to some disability**.'" *Reed*, 244 F.3d at 261 (emphasis added). "'**A routine or "mundane' request**," *Id.* at 260, "such as a request to transfer to a different apartment, does not rise to the level of a request for a reasonable accommodation **unless the plaintiff specifically explains** 'how the accommodation requested is linked to some disability.'" *Colon-Jimenez v. GR Management Corp.*, 218 Fed. Appx. 2, 3 (1st Cir. 2007) (Unpublished) (quoting *id.* at 260). "**It is [the plaintiff's]**

**responsibility to put [the defendants] 'on notice by making 'a sufficiently direct and specific request for special accommodations**.'" *Id.* (emphasis added).

Pine's allegations in Paragraphs 224 through 243 of the First Amended Complaint do not come close to satisfying this standard established by the First Circuit, and she has not plausibly alleged that she made a "request for a reasonable accommodation" to Butler or Elmwood Realty under the FHA. ECF No. 26 (First Amended Complaint) ¶¶ 224–243.

To the contrary, Pine's allegations are vague, speculative, and conclusory and should not be credited by the Court as showing she placed the Defendants on notice that she was requesting a "reasonable accommodation," or that she otherwise "specifically explain[ed]" to Butler or Elmwood Realty how her requested "accommodation" was linked to her "disability," which she has not even plausibly alleged the Defendants were aware of. *Colon-Jimenez*, 218 Fed. Appx. at 3.

Essentially, Pine's only somewhat specific allegation of a "request" for an "accommodation" was through a "routine" or "mundane" maintenance request titled "Plumbing / Shower / Tub / Other Maintenance Request" on August 31, 2024—10 months into her tenancy with Elmwood Realty—which is exactly the type of request that the First Circuit rejected as a "request for reasonable accommodation" in *Colon-Jimenez*. *Id.* If the *Colon-Jimenez* plaintiff's request to "transfer to a different apartment, does not rise to the level of a request for a reasonable accommodation," then Pine's maintenance request for hot water in the shower sent to an unknown person behind a portal, certainly does not suffice to render it plausible that Butler and Elmwood Realty appreciated that Pine was making a "request for a reasonable accommodation" under the FHA. *Id.*

Once again, what was the nature of the alleged "disability" and its connection to a maintenance request for hot water? How could Butler or Elmwood Realty "accommodate" a tenant

without knowing what the nature of the "request" was? How did Pine "trigger" any responsibility to "accommodate" under the FHA? These questions are left unanswered by Pine, and thus, she has not alleged her prima facie case.

Additionally, the remainder of Pine's alleged requests such as "an emotional support animal, advance notice of non-emergency maintenance, a parking space near her entranceway, and advance notice of any decision not to renew the lease," during the "process" of Pine allegedly signing a new lease in August of 2024—that she does not claim Butler was aware of—do not purport to place "Elmwood Realty" on notice of "'a sufficiently direct and specific request for special accommodations." *Id.* ¶ 234; *Colon-Jimenez*, 218 Fed. Appx. at 3.

Pine merely states, "[t]he Defendants sent her this notice because she asked for reasonable accommodations during the lease renewal process and because she included 'information [Mr. Butler] d[id] not need' (about her disability)." ECF No. 26 (First Amended Complaint) ¶ 239. Pine alleges no facts to support this bare allegation. *Twombly*, 550 U.S. at 570 (holding that the complaint must plead "enough facts to state a claim to relief that is plausible on its face").

### 3. Olson's FHA Claim

The First Amended Complaint also adds a new FHA claim by John Olson. ECF No. 26 (First Amended Complaint) ¶¶ 514–520. Olson alleges that he suffers from substance use disorder, that he temporarily left his apartment to attend inpatient treatment, and that while he was away Butler allegedly treated the unit as abandoned, turned off utilities, placed abandoned-property signs on the door, and retained Olson's boats. *Id. See also id.* ¶¶ 313–34.

Even assuming, *arguendo*, alcoholism can qualify as a handicap in the circumstances alleged under the FHA, the FAC still does not plausibly connect the complained-of conduct to

69

discrimination "because of" Olson's handicap rather than to an ordinary dispute over possession of the premises, employment, or alleged rent and personal-property issues.

Section 3604 reaches discrimination in the terms, conditions, or privileges of rental "**because of**" handicap. 42 U.S.C. § 3604(f) (emphasis added). But Olson's own allegations frame the dispute as arising from the terms of his rental payments, his contractual relationship with Butler as an employee-tenant, and his allegation that after Butler "heard a rumor that Mr. Olson was not planning on coming back to work Butler's," he demanded rental payments. ECF No. 26 (First Amended Complaint) ¶¶ 324–333. The FAC does not plausibly allege that Olson was discriminated against "because of" his alcoholism. 42 U.S.C. § 3604(f).

At most, Olson alleges a state-law dispute concerning possession of personal property, leasehold status, or alleged self-help conduct. Those allegations do not plausibly state a disability-discrimination claim under the FHA. Accordingly, Count VI of the First Amended Complaint should also be dismissed.

### C. Many of the claims in this Complaint are barred by claim or issue preclusion.

With all of their federal claims disposed of, the Plaintiffs are left with nothing but their State law claims. ECF No. 26 (First Amended Complaint), Counts VII–XVI. As explained *supra*, Section II, many of these claims have already been litigated, dismissed, and/or decided in the Rhode Island District Court. *See* **Ex. A** (dismissal of Potter's claims after bench trial on May 14, 2024); **Ex. E** (voluntary dismissal **with prejudice** by Towns); **Ex. F** (dismissal of Wood's claims after bench trial on October 8, 2025); **Ex. H** (dismissal of Silva's claims after bench trial on May 14, 2024).

Given the prior and pending Rhode Island District Court proceedings involving several Plaintiffs, the Court should, at a minimum, take notice of those proceedings in evaluating the

70

fundamentally state-law nature of these disputes and any obvious preclusion issues presented by particular claims. The Defendants preserve their preclusion arguments as to Potter, Towns, and Silva to the extent the Court finds it necessary to reach them. But even apart from preclusion, the federal claims in the First Amended Complaint fail on their own terms and warrant dismissal.

### D. The Court should decline to exercise supplemental jurisdiction over any remaining State law claims.

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995).

The First Circuit has not hesitated to apply this principle to deny supplemental jurisdiction in cases where RICO claims were dismissed and only state law claims remained. *Lares Group II v. Tobin*, 221 F.3d 41, 45 (1st Cir. 2000) (determining that "because appellants' federal RICO claim constituted the sole basis for subject matter jurisdiction in this case, the district court acted well within its broad discretion in dismissing without prejudice appellants' supplemental state law claims") (citation omitted); *Camelio v. American Foundation*, 137 F.3d 666, 672 (1st Cir. 1998) (noting "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation . . . , and perhaps most importantly in this case, the claims that the court dismissed raise substantial questions of state law that are best resolved in state court.").[7] By the same token, the Court should not hesitate here to decline supplemental jurisdiction. 28 U.S.C. §

---

[7] Courts will also "decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c).

1367. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Vega Kodak Caribbean, Ltd.*, 3 F.3d 476, 478 n.2 (1st Cir. 1993)

## V.        Conclusion

Notwithstanding the volume of allegations in the First Amended Complaint, the Plaintiffs still have not plausibly alleged a federal RICO or FHA claim. At bottom, the FAC remains a collection of landlord-tenant grievances dressed in federal garb. Whatever viable claims the Plaintiffs believe they possess under Rhode Island law may be pursued in the appropriate forum, but this Court is not the proper vehicle for converting those disputes into civil racketeering or federal housing-discrimination claims.

Therefore, for the foregoing reasons, the Defendants respectfully request that the Court **GRANT** the Defendants' Motion to Dismiss, and: (i) **DISMISS** Counts I, II, III, IV, V, and VI of the First Amended Complaint, with prejudice; (ii) **DISMISS** all Counts brought by Potter, Towns, and Silva, with prejudice to the extent barred by applicable preclusion doctrines; (iii) **DECLINE** to exercise supplemental jurisdiction over the remaining Counts in the First Amended Complaint; and (iv) **ORDER** any other appropriate relief to the Defendants that this Court deems equitable and just.

### LR Cv 7(c) REQUEST FOR HEARING

The Defendants hereby request a one (1) and a half (1/2) hour hearing for oral argument on the Motion to Dismiss pursuant to Local Rule Cv 7(c).

*Respectfully submitted,*

**JEFFREY BUTLER, CARISSA MARIE ZINGONI a/k/a CARISSA BUTLER, SPRING STREET REALTY, LLC, ELMWOOD REALTY NORTH, LLC, and ELMWOOD REALTY, LLC a/k/a ELMWOOD PROPERTY MANAGEMENT,**

*By and through their attorney,*

*/s/ Michael A. Kelly*
Michael A. Kelly, Esq. (#2116)
Gregory S. Estabrooks, Esq. (#10713)
**KSPR Law, P.C.**
128 Dorrance St Ste. 300
Providence, RI 02903
Tel.: (401) 490-7334
Fax: (401) 490-7874
mkelly@ksprlaw.com
gestabrooks@ksprlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on June 1, 2026, a copy of the foregoing *Motion to Dismiss Plaintiffs' First Amended Complaint* was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. The document is available for viewing and downloading from the ECF system.

*/s/ Michael A. Kelly*
Michael A. Kelly, Esq. (#10713)
**KSPR LAW, PC**

73